## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CHERRYL HALL,**
**Individually and on behalf of all others**
**Similarly situated,**

   **Plaintiff,**

**v.**              **Case No. _____**

**BANK OF AMERICA, N.A., individually and**
**as successor by merger to BAC HOME**
**LOANS SERVICING, LP;**
**BALBOA INSURANCE COMPANY;**
**and QBE INSURANCE GROUP, individually**
**and as successor in interest to BALBOA**
**INSURANCE COMPANY,**

   **Defendants.**
_____/

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

  Plaintiff, Cherryl Hall, individually and on behalf of all others similarly situated, for her

Class Action Complaint and demand for jury trial, states and alleges as follows:

**I.**  **INTRODUCTION**

  1.  Plaintiff brings this action against BAC Home Loans Servicing Company, Bank

of America, N.A., as successor in interest by merger to BAC Home Loans Servicing, Inc., Bank

of America, N.A., individually, Balboa Insurance Company ("Balboa"), and QBE Insurance

Group ("QBE"), individually and as successor in interest to Balboa[1] for injuries arising out of

Defendants' force-placed insurance practices.

---

[1] Defendants Bank of America and BAC Home Loans are referred to collectively as "BAC" or "Bank of America."
Defendants Balboa and QBE are referred to collectively as "Balboa." All Defendants are collectively referred to as
"Defendants."

1

2.      Bank of America and BAC Home Loans are among the nation's largest residential mortgage lenders and loan servicers. They use their control over Plaintiff's and Class Members' mortgage accounts to reap substantial undisclosed and unearned profits from force-placed insurance.

3.      The mortgages that Bank of America and BAC Home Loans own and service require that borrowers maintain various forms of homeowners' insurance, including flood insurance. When a borrower does not purchase or maintain the specific amount of insurance that Bank of America requires, Bank of America purchases such insurance for the borrower. This practice is called "force-placement" and is standard and appropriate under Plaintiff's and Class Members' mortgages, if done properly.

4.      What is not standard and appropriate is Bank of America's manipulation of the force-placed insurance market, whereby Bank of America engages in exploitative and self-dealing practices for its own benefit, to the detriment of its borrowers.

5.      Bank of America and its subsidiary Balboa entered into a non-competitive and exclusive relationship whereby all force-placed insurance for Bank of America borrowers was purchased from Balboa. In return, Balboa paid a kickback equal to a percentage of each force-placed insurance policy to Bank of America.

6.      This relationship benefited both Bank of America and Balboa substantially at the expense of Bank of America consumers. Balboa's force-placed insurance policies cost substantially more than comparable policies that could be purchased on the open market. The excessive mark-up in price included not only the actual cost of providing insurance, but also the fees and so-called commissions that Balboa returned to Bank of America.

7.      Plaintiff and Class Members are mortgage borrowers whose residential mortgage loans are owned or serviced by BAC or Bank of America during the applicable statute of limitations and whom BAC or Bank of America required to pay for force-placed flood insurance policies.

8.      Federal law requires that properties located in Special Flood Hazard Areas ("SFHA's") must maintain flood insurance. However, the amount of flood insurance coverage required by federal law is limited to the borrower's outstanding loan balance.

9.      Defendants' practices, as alleged in this Complaint, constitute a violation of the Truth in Lending Act, violation of the anti-tying provisions of the Bank Holding Company Act, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and unconscionability. Plaintiff and Class Members have been injured by Defendants' practices and are therefore entitled to damages, injunctive and declaratory relief, and all other relief that this Court determines is appropriate.

## II.    PARTIES

### A.    *Plaintiff Cherryl Hall*

**10**.      Plaintiff, Cherryl Hall, is a resident of Garland County, Arkansas. She owns a condominium in Hot Springs, Arkansas. Bank of America or BAC Home Loans service her mortgage. Bank of America, after determining that Plaintiff's property was located in a flood zone, force-placed excessive flood insurance on Ms. Hall's property and received a kickback from Balboa.

11.      Cherryl Hall purchased her home on January 23, 2007 for $107,000 with a mortgage through Countrywide Home Loans, Inc. ("Countrywide") Ms. Hall's mortgage is written on a Fannie Mae/Freddie Mac Uniform Instrument. Countrywide was purchased by Bank

of America in 2009. Upon information and belief, Ms. Hall's mortgage was serviced by Countrywide until Bank of America bought Countrywide. Since 2009, BAC Home Loans and/or Bank of America serviced Ms. Hall's mortgage. A copy of Cherryl Hall's mortgage is attached hereto as **Exhibit 1**.

12.      Beginning in 2010, Bank of America began requiring that Ms. Hall carry additional insurance on top of her condominium/association policy. On November 23, 2010 Bank of America sent Ms. Hall a notice indicating that she did not maintain sufficient flood insurance coverage on her property. This notice stated that federal law and Ms. Hall's mortgage required "flood insurance coverage in an amount at least equal to the lesser of: (1) the maximum insurance available under the NFIP for participating communities, which is currently $250,000; or (2) the replacement value of the improvements to your property (typically based on the amount of hazard insurance we understand you have purchased for the Property)." The November 23, 2010 letter stated that Bank of America may force-place a flood insurance policy for $139.03 and that such policy would provide $26,735.00 in coverage. The November 23, 2010 letter is attached as **Exhibit 2**.

13.      Bank of America's November 23, 2010 letter is a misrepresentation of federal law. Bank of America's notice is misleading in that it indicates that Ms. Hall had only two options regarding flood insurance coverage. To the contrary, the National Flood Insurance Act requires flood insurance in amount equal to the lesser of: (1) the maximum insurance available under the NFIP, or $250,000; (2) the replacement cost value of the property; or (3) the borrower's outstanding loan balance. Bank of America wholly fails to notify borrowers that coverage equal to outstanding loan balance is sufficient for purposes of borrowers' mortgages or federal law and that this amount adequately protects Bank of America's interest in the property.

4

14.     Sometime after November 23, 2010 and before April 18, 2011 Bank of America force-placed a flood insurance policy on Plaintiff's property. Upon information and belief, this policy covered October 29, 2010 through October 29, 2011. By letter dated April 18, 2011 Bank of America notified Ms. Hall that it had cancelled this policy, stating that it had received information sufficient to meet Bank of America's requirements. A copy of this cancellation letter is attached hereto as **Exhibit 3.**

15.     Despite Bank of America's April 18, 2011 letter stating that Ms. Hall did in fact have adequate flood insurance coverage, on April 21, 2011 Bank of America sent Ms. Hall a "Notice of Placement" letter. This letter stated that Bank of America had "purchased additional flood insurance to protect its interest in the property." The cost of this policy was $73.20 and provided $14,076.00 in coverage. The coverage period for this policy was Oct. 29, 2010 through Oct. 29, 2011; thus, this policy covered almost six months which had already passed and during which Bank of America had no risk. On information and belief, Bank of America or its affiliate received a portion of the $73.20 premium for this policy. The April 21, 2011 letter is attached as **Exhibit 4**.

16.     Bank of America force-placed a second flood insurance policy on Plaintiff's property and sent Ms. Hall another letter entitled "Notice of Placement" on November 2, 2011. This letter is identical in all material aspects to the April 21, 2011 letter. The November 2, 2011 policy cost another $73.20 and provided the same $14,076.00 in coverage. This policy was effective October 29, 2011 through October 29, 2012. On information and belief, Bank of America or its affiliate received a portion of the $73.20 premium for this policy. A copy of the November 2, 2011 letter is attached as **Exhibit 5**.

17.     On January 5, 2012, Bank of America force-placed another flood insurance policy on Plaintiff's property and sent her another "Notice of Placement" letter. This policy covered the same time periods as the previous policy—October 29, 2011 through October 29, 2012—and provided an additional $3,355.00 in coverage at a cost of $17.68. On information and belief, Bank of America or its affiliate received a portion of the $17.68 premium for this policy. The January 5, 2012 letter is identical in all material respects to the first two force-placement letters.

18.     Each letter that Defendants sent to Plaintiff, Cherryl Hall contained a material misrepresentation of Plaintiff's flood insurance requirements under federal law and her mortgage. Specifically, Ms. Hall's mortgage and federal law require that she carry flood insurance coverage sufficient to "cover" Bank of America's interest in the property, but then Bank of America, in its flood insurance notices, states that Ms. Hall must carry higher amounts of flood insurance, either $250,000 in coverage or coverage equal to the replacement cost of her home.

19.     Plaintiff, Cherryl Hall's condominium is covered by a Condominium/Association insurance policy through State Farm. According to the Condominium Rider attached to Ms. Hall's mortgage, a condominium policy is sufficient to meet the requirements under federal law and Ms. Hall's mortgage. A copy of the Condominium Rider is attached as **Exhibit 6**. Ms. Hall's condominium association maintains flood insurance coverage equal to the full replacement cost value of the condominium complex through State Farm. A form entitled "Evidence of Insurance" sent to Defendants on December 12, 2011 and showing the coverage limits for the condominium/association policy and the replacement cost value of the condominium complex is attached as **Exhibit 7**. Ms. Hall's flood insurance coverage through her condominium association sufficiently meets her mortgage requirements.

6

**B.**     *Defendants*

20.     Defendant, Bank of America, N.A., is a Delaware corporation and national banking association insured by the Federal Deposit Insurance Corporation. Bank of America has its principal place of business in Charlotte, North Carolina. All causes of action alleged herein are brought against Bank America, except Count VI, the cause of action for tortious interference with a business relationship, which is brought against Defendant Balboa only.

21.     Defendant, BAC Home Loans Servicing, LP, (formerly known as Countrywide Home Loans Servicing, LP) was a Texas limited partnership and subsidiary of Bank of America Corporation that serviced mortgage loans originated or owned by Bank of America, including residential mortgage loans. On or about July 1, 2011 BAC Home Loans merged into Bank of America, N.A. BAC Home Loans Servicing, LP was registered to do business in Florida and North Carolina. Although BAC Home Loans has merged with Defendant Bank of America, suit is brought directly against BAC and against Bank of America as successor by merger for wrongs alleged prior to the merger.

22.     Defendant, Bank of America, is liable for the conduct of BAC Home Loans Servicing alleged herein as a result of the merger. As such, all claims alleged herein are brought against BAC and Bank of America as successor by merger to BAC, as well as Bank of America in its individual capacity.

23.     Defendant, Balboa Insurance Company, is a California corporation. Prior to June 2011, Defendant Balboa was a subsidiary of Defendant Bank of America. In June 2011, Balboa was sold to QBE Insurance Group, a publicly traded Australian corporation. According to the terms of this sale, QBE has since maintained long-term distribution agreements with Defendant Bank of America for force-placed insurance. Balboa provided both insurance tracking services

7

and force-placed insurance policies for Bank of America mortgages prior to June 2011; now QBE performs these functions. Count VI of this Complaint, tortious interference with business relations, is brought against Defendants, Balboa and QBE only.

24.     Defendant, QBE, is an Australian corporation. QBE Americas, Inc., QBE's American subsidiary, is a Delaware corporation with its principal place of business in New York. QBE Americas, Inc. is authorized to conduct business in the State of Florida. Upon information and belief, QBE maintains the prearranged force-placed insurance relationship with Bank of America that once belonged to Balboa.

## III.    JURISDICTION AND VENUE

25.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d)(2)("CAFA"). Plaintiff is a citizen of the State of Arkansas. Defendants are citizens of states other than Arkansas and conduct business in Florida. The amount in controversy exceeds $5,000,000 and there are at least 100 class members.

26.     This Court has subject matter jurisdiction over Plaintiff's claims arising under the Bank Holding Company Act, 12 U.S.C. §1972, according to the statute's jurisdictional statement in 12 U.S.C. §1975. All other claims arose out of the same transaction or occurrence so as to make them part of the same constitutional case. Therefore, this Court has subject matter jurisdiction over all of Plaintiff's claims.

27.     This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367 because all state law claims arise out of the same common nucleus of operative facts as Plaintiff's asserted federal claims.

28.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendants transact business and may be found in this District.

8

IV.     **FACTUAL ALLEGATIONS**

A.      ***The Force-Placed Insurance Industry***

29.     Bank of America is one of many large mortgage owners and servicers in the country that has reaped an improper and substantial financial benefit from the force-placement of insurance on borrowers' property through the manipulation of the force-placed insurance market. Although the typical form mortgage, such as Plaintiff's mortgage here, allows a lender to force-place insurance when a borrower fails to maintain adequate coverage, Defendants' manipulation of this practice has caused substantial harm to Plaintiff and Class Members as a result of self-dealing and profiteering.

30.     Borrowers do not choose the company that services their mortgage and borrowers have no power to dictate the actions of the loan servicer. As a result, unequal bargaining power defines the relationship between the borrower and loan servicer. As a result, the loan servicing industry has developed business strategies designed to create as much additional revenue as possible from unsuspecting and helpless borrowers. Force-placed insurance is an area where such self-dealing and profiteering is readily apparent.

31.     Pursuant to standard mortgage contracts, if a servicer determines that a borrower's property is "under-insured" for any reason, the servicer may purchase insurance necessary to meet its insurance requirements, *i.e.*, it may force-place insurance on the property at the borrower's expense.

32.     Force-placed insurance is substantially more expensive than standard insurance coverage and may cost as much as ten to twenty times the rate of comparable policies that may be purchased on the open market. *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker (Nov. 10, 2010), available at

http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html. (hereinafter "Ties to Insurers"). This American Banker article went on to note that "[t]hough part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand."

33.     Although force-placed insurance is intended to protect the lender's interest in the property, lenders often purchase force-placed insurance in excess of their own risk. All costs are passed on to the borrower.

34.     In addition to the high cost of force-placed insurance policies, such policies typically provide less coverage than a standard homeowner' insurance policy that a borrower could otherwise obtain on the open market.

35.     Borrowers have no opportunity to shop for the best rates for force-placed insurance. Both the terms and conditions of the policy and the cost of the policy are determined by the servicer and insurance provider. Thus, servicers have no incentive to seek or provide the most competitively priced product; rather, the servicer's incentive is to find the policy that best serves its own interests, through incentives or other compensation.

36.     Force-placed insurance policies are not written on an individual basis. Instead, the price is determined according to pre-arranged contracts between the insurer and servicer and the force-placed insurance provider automatically issues policies when it determines that a borrower's coverage has lapsed or become insufficient.

37.     The force-placed insurance market is very lucrative for loan servicers because servicers routinely receive commissions and kickbacks from the force-placed insurance provider

for using that company for force-placed insurance. This kickback can be as much as 40% of the total premiums paid by homeowners. This kickback is often predetermined pursuant to a prearranged agreement between the force-placed insurance provider and the loan servicer.

38.     Self-dealing and abuse are highly prevalent in the force-placed insurance industry. The servicer benefits by force-placing the insurance policies with either (1) an affiliate or (2) a third party provider who has already agreed to share the revenue with the servicer through kickbacks ceded to a subsidiary or affiliate of the servicer.

39.     Under the commissions structure, the force-placed insurance provider agrees to pay a kickback, often disguised as a "commission," either directly to the servicer or to a subsidiary acting as an insurance "agent." Through this scheme, the force-placed insurance provider pays so-called commissions to a licensed insurance agency that is actually an affiliate or subsidiary of the servicer and exists solely for the purpose of collecting kickbacks from the force-placed insurance policies.

40.     The kickback arrangements artificially inflate the actual cost of force-placed insurance policies for the borrower. Loan servicers, like Defendants, force borrowers to pay for both the actual cost of the force-placed insurance policy and the cost of the kickbacks returned to the servicer as "commissions." Industry analysts have concluded that referral fees, commissions, and other payments to banks in connection with force-placed insurance explain why the cost paid by the borrower is much higher. *See Ties to Insurers*, *supra*. In fact, this practice leads to paydays amounting to hundreds of millions of dollars per year for banks like Bank of America. *Id*.

41.     The kickback arrangements between force-placed insurance providers and loan servicers keep force-placed insurance premiums artificially inflated because a substantial

11

percentage of the borrowers' premiums are actually used to fund the illegal kickback scheme rather to cover the actual risk.

42.     Motivated by the financial incentives created by force-placed insurance kickback arrangements, servicers often require that borrowers pay for unnecessary insurance coverage by (1) requiring coverage that is duplicative of existing coverage and/or provides greater coverage than the amounts required by the borrower's mortgage or applicable law; and/or (2) backdating force-placed insurance policies, thus requiring that borrowers pay for retroactive coverage for a time period during which there is no risk of loss.

43.     Insurance is "prospective in nature." *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in Trouble*, American Banker (Nov. 10, 2010), available at: http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html. Requiring that borrowers pay for backdated insurance coverage to cover periods during which there is no loss is improper and egregious.

**B.     *Defendants' Operations***

44.     Bank of America, BAC Home Loans, and Balboa were engaged in a scheme designed to unfairly and deceptively reap excessive and unconscionable fees from borrowers in connection with force-placed flood insurance.

45.     Defendants Bank of America and BAC Home Loans originate mortgage loans, acquire mortgage loans, and service mortgage loans on behalf of others. Each loan is secured by a deed of trust on the underlying property. Prior to its merger with Bank of America, BAC Home Loans acted as servicer for all of these loans.

46.     Until at least June 2011, Bank of America owned its own force-placed insurance company, Balboa Insurance Company. BAC purchased all force-placed insurance from Balboa

pursuant to an exclusive relationship whereby all force-placed insurance for BAC mortgages was purchased from Balboa. Until June 2011, Balboa was a subsidiary of Bank of America. Upon information and belief, this exclusive relationship has continued with Defendant QBE since it acquired Balboa in June 2011.

47.     Upon information and belief, in exchange for BAC agreeing to purchase all force-placed insurance policies from Balboa, Balboa pays a "commission" of a set percentage of the premium for each force-placed insurance policy to another Bank of America subsidiary, Banc of America Insurance Services, Inc. ("BAISI").

48.     BAISI does nothing to earn these so-called "commissions." It does not seek competitively priced flood insurance policies or perform any other acts to "earn" a commission. Rather, in exchange for Bank of America agreeing to refer all of its force-placed insurance business to Balboa, BAISI receives an automatic "commission" of a portion of every force-placed flood insurance premium. This is really a kickback. *See* Black's Law Dictionary (9th ed. 2009)(defining "kickback" as the "return of a portion of a monetary sum received, esp. as a result of coercion or a secret agreement.") BAISI is set up merely as a conduit to receive this kickback.

49.     This arrangement is such that a competitively-priced insurance policy is not actually found for any given property. Instead, Bank of America, through its prearranged agreement with Balboa, binds itself to purchase all force-placed flood insurance from Balboa. The cost of insurance bears no relation to the homeowner's home; rather, the cost is predetermined according to Bank of America's entire loan portfolio.

50.     As a result of these arrangements with Bank of America subsidiaries, Defendants easily manipulated the force-placed insurance market for their own financial gain and charged

Plaintiff and Class Members substantially higher rates than average and required coverage that far exceeded the amounts necessary to fully insure the property.

51.     These practices have recently come under fire by all fifty State Attorneys General as part of a nationwide investigation. As the State Attorneys General have recognized, this practice has greatly contributed to the foreclosure crisis.

52.     Borrowers, like Plaintiff, are required to establish an escrow account to pay the premiums on force-placed insurance.

53.     A fiduciary relationship exists between Bank of America and Plaintiff because Bank of America received a greater economic benefit than from a typical escrow transaction. *See Capital Bank v. MVB, Inc*., 644 So. 515, 519 (Fla. 3d DCA 1994). Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when Bank of America took it upon itself to manage borrowers' escrow accounts and withdraw money from borrowers' escrow accounts to pay force-placed flood insurance premiums. Bank of America violated its fiduciary duty when it began receiving unlawful kickbacks or fees under the kickback scheme, which is clearly a greater economic benefit than what was contemplated under the mortgage.

54.     To further increase profits, Defendants also required that Plaintiff and many Class Members pay for unnecessarily backdated force-placed insurance.

55.     Bank of America's force-placed insurance scheme provides an incentive to purchase the highest priced force-placed insurance policy. The higher the cost of the policy, the greater the kickback to Bank of America.

56.     Upon information and belief, Balboa monitors all Bank of America mortgage accounts, borrowers' flood insurance status, and lapses in coverage. Balboa sends letters to Bank of America borrowers, on Bank of America letterhead, notifying the borrower of Bank of

America's insurance coverage demands. Through the payment of the kickbacks hidden in the flood insurance premiums, borrowers pay the cost of these outsourced services that Bank of America is not permitted to charge to the borrower.

57.     The "premiums" for insurance that are charged to the Plaintiff are illegal because they include not only the excessive cost of insurance but also include illegal kickbacks and the cost of the bundle of administrative services that Balboa provides to Bank of America.

58.     Plaintiff and Class Members have no way of refusing Bank of America's demands for excess insurance. Unless the borrower purchases additional unnecessary insurance, she cannot avoid the excessive charges for force-placed insurance.

59.     The charges for force-placed insurance are not determined on a competitive basis and are well in excess of rates available in the open market to Bank of America, Plaintiff, or Class Members. Bank of America undertakes no good faith, arms-length transactions in the purchase of forced-placed insurance.

60.     The actions and practices of Defendants described herein are in bad faith and are unconscionable. Even if the terms of the mortgage could be construed to allow this conduct, such actions and practices are an abusive and unlawful use of Defendants' contractual authority. Such conduct violates both State and Federal law.

61.     Defendants' manipulation of force-placed insurance purchases has maximized the profits to themselves and their related companies to the great detriment of Plaintiff and Class Members.

62.     Defendants are not authorized by any law, contract, or agreement to manipulate their force-placed insurance purchases in bad faith as alleged above.

**V.     CLASS ALLEGATIONS**

15

63.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of a class of persons who were charged for force-placed insurance in connection with their residential mortgage by Defendants.

64.     Plaintiff's proposed class is defined as follows:

All United States residents with mortgages owned or serviced by Bank of America, N.A. and/or BAC Home Loans Servicing, LP, who, during the applicable statute of limitations, were charged for a force-placed flood insurance policy, and who, at any time paid, or who still owe, premiums for such force-placed policies.

65.     Excluded from the Class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and employees, and Plaintiff's counsel.

66.     Defendants subjected Plaintiff and Class Members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner. The conduct described above is the Defendants' standard and undisputed business practice.

**A.      *Numerosity***

67.     The individual class members are so numerous that joinder of all members is impracticable. Defendants sell and service millions of mortgage loans and insurance policies nationwide. The individual class members are ascertainable as the names and addresses of all class members can be identified in the business records maintained by the Defendants. The exact number of Class Members cannot be ascertained without discovery, but the number is certainly in the thousands if not millions. When BAC merged into Bank of America, it serviced approximately 14 million mortgages in the United States—this is twenty percent of all home mortgages in the country. Approximately 5.5 million properties in the United States are located in SFHA's and therefore must carry flood insurance under the National Flood Insurance Act.

**B.      *Commonality***

16

68.     This action presents numerous common questions of law and fact, including:

a.      Whether Defendants have charged borrowers for unnecessary insurance coverage, including, but not limited to insurance coverage that that exceeds the amount required by law or the borrowers' mortgages; and/or backdated insurance that covers time periods for which Defendants have no risk of loss;

b.      Whether Defendants manipulated force-placed insurance purchases to maximize its own profits to the detriment of Plaintiff and Class Members;

c.      Whether Defendants received commissions from force-placed insurance providers;

d.      Whether Defendants received payments from force-placed insurance providers that exceeded to value of any services actually performed;

e.      Whether force-placed insurance premiums that Defendants charged to Plaintiff and Class Members are illegal because they include unearned kickbacks;

f.      Whether Bank of America violated TILA by conditioning its extension of credit on the borrowers purchasing flood insurance through its affiliate, in direct contravention of the anti-coercion disclosures included with borrowers' mortgages, including Plaintiff's mortgages;

g.      Whether Bank of America violated TILA by failing to disclose kickbacks charged to Class Members in its mortgages;

h.      Whether Bank of America violated TILA when it changed the terms of Plaintiff's mortgage to allow previously unauthorized kickbacks and insurance coverage in excess of the amount authorized by the mortgage, which is Bank of America's interest in the property;

i.      Whether Bank of America violated the anti-tying provisions of the Bank Holding Company Act by tying its agreement to purchase flood insurance on behalf of Class Members and its continuing extension of credit, on Class Members agreeing that it will purchase insurance by or through its affiliate; and

j.      Whether Bank of America's tying practices had an anti-competitive effect on the interstate flood insurance market in violation of the Bank Holding Company Act.

k.      Whether Defendants breached the terms of Class Members' form mortgage contracts, the implied covenant of good faith and fair dealing and/or Defendants' fiduciary duty to Class Members by failing to seek competitive bids

17

on the open market, and instead purchased high-cost insurance from an affiliate for self-dealing purposes;

l.      Whether Bank of America's force-placed insurance business practices are unconscionable; specifically whether the mortgage provisions relating to force-placed insurance are procedurally and substantively unconscionable to the extent that Bank of America claims that they authorize it to derive hidden financial benefits by force-placing high-cost flood insurance policies when a portion of the "cost" is actually returned to Bank of America or its affiliate, BAISI;

m.      Whether Bank of America Defendants have been unjustly enriched through their manipulation of the force-placed flood insurance market;

n.      Whether Balboa and/or QBE have been unjustly enriched through the prearranged dealings with Bank of America;

o.      Whether Defendants Balboa and/or QBE unlawfully interfered with Class Members' relationships with BAC; and

p.      Whether Plaintiff and Class Members are entitled to damages, restitution, declaratory relief and/or injunctive relief as a result of Defendants' conduct.

### C.      *Typicality*

69.      Plaintiff is a member of the Class. Her claims are typical of the claims of the Class because of the similarity, uniformity, and common purpose of the unlawful conduct of Defendants. Each Class Member has sustained and will continue to sustain damages in the same manner as Plaintiff as a result of Defendants' wrongful conduct.

### D.      *Adequacy of Representation*

70.      Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiff and the unnamed Class Members. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

71.     The law firms representing Plaintiff are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

E.      *Requirements of Fed. R. Civ. P. 23(b)(3)*

72.     The questions of law or fact common to Plaintiff's and Class Members' claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiff and the unnamed Class Members are based on the force-placed insurance policies that Defendants unlawfully secured from the same company under the same common scheme, and their deceptive and egregious actions involved in securing the force-placed policy.

73.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations. Thus, when determining whether common questions predominate, courts focus on the liability issue, and, if the liability issue is common to the class as is the case here, common questions will be held to predominate over individual questions.

74.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> a.      Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the United States;
>
> b.      Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake. As a result, individual class members have no interest in prosecuting and controlling separate actions, yet if the action is not prosecuted, Defendants will continue their wrongful actions;
>
> c.      There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

      d.     The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

      e.     Individual suits would not be cost effective or economically maintainable as individual actions; and

      f.     The action is manageable as a class action.

**F.**    ***Requirements of Fed. R. Civ. P. 23(b)(1) & (2)***

75.    Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

76.    Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## VI.    CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

**77**.    Plaintiff restates and realleges the preceding paragraphs of this Complaint as though fully set forth herein word for word.

78.    Plaintiff and Class Members have mortgages that are owned and/or serviced by Bank of America.

79.    Plaintiff's and Class Members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding flood insurance requirements and force-placement by Bank of America.

**80**.    Plaintiff's mortgage requires that she maintain flood insurance "in the amounts . . . and for the periods that Lender requires." *See* Mortgage § 5. Plaintiff's mortgage then states

that if she fails to maintain insurance coverage in the "amounts . . . that Lender requires" that "Lender may obtain insurance coverage, at Lender's option and Borrower's expense" and that the "cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained." *Id.*

81.     Kickbacks are not "costs." Bank of America breached the mortgage contract by charging Plaintiff for the "cost" of force-placed flood insurance when a portion of this "cost" was returned to Bank of America or its affiliate pursuant to secret agreements among Bank of America and its affiliates, including Balboa, its force-placed insurance provider.

82.     Bank of America further breached the mortgage agreement by paying its affiliate a "commission" when its affiliate provided no services to Plaintiff and had no role in the purchase of force-placed insurance for Plaintiff.

83.     Bank of America breached the terms of the mortgage contract by using Plaintiff's escrow funds for payment of an unearned "commission" to its affiliate, BAISI, when BAISI performed no agent services in exchange for the payment. Although the flood insurance notices indicate that "BAISI is an affiliate of Bank of America, N.A. and may receive a commission or other compensation in connection with obtaining your insurance," this is not what actually happened. Consideration requires a *quid pro quo*. That is, the affiliate must actually *do* something to earn the commission. Bank of America cannot simply give borrowers' money away to its affiliates.

84.     Section 3 of Plaintiff's mortgage governs how a mortgage lender or servicer should apply funds for items paid out of escrow, such as flood insurance premiums. Paragraph 3 states that the "Lender shall not charge Borrower for holding and applying Funds" to escrowed items. Bank of America's kickback scheme violates this provision by charging borrowers a fee,

which it calls a "commission," for doing nothing more than paying BAISI force-placed insurance premiums.

85.    Section 5 of the mortgage states that any force-placed insurance "shall cover Lender . . . against any risk, hazard or liability . . . ." The third paragraph in Section five of the mortgage contract also states that "[a]ll insurance policies required by Lender and renewals of such policies shall . . . include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance." *See* **Exhibit 1**, Mortgage § 5. A reasonable construction of these provisions is that Bank of America may insist that borrowers maintain insurance coverage in the amount necessary to "cover" Bank of America's interests, but not more. The amount necessary to "cover" the Lender's interests is coverage equal to the "outstanding loan balance." Bank of America breached Class Members' contracts by requiring coverage exceeding the outstanding loan balance.

86.    Plaintiff and Class Members have been damaged by Defendants' breach of their mortgage contracts. They are entitled to compensation equal to the amount of their damages, as well as an injunction prohibiting Defendants from further violations of the express terms of their mortgages.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

86.    Plaintiff restates and realleges the preceding paragraphs of this Complaint as though fully set forth herein word for word.

87.    The implied covenant of good faith and fair dealing is a part of every contract.

While the implied covenant cannot override an express contractual term, it attaches to the performance of specific contractual provisions. The duty to act in good faith limits one party's ability to act in a manner that contravenes the reasonable expectations of the other party.

88.     Good faith and fair dealing, in connection with the discharge of performance and other duties according to contractual terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

89.     Section 5 of Plaintiff's mortgage warns that the "cost" of force-placed insurance may significantly exceed the cost of insurance the borrower could obtain. A reasonable borrower would understand that coverage force-placed on a borrower might be more expensive due to the higher risks associated with insuring the homes of delinquent borrowers. A reasonable borrower would not, however, expect that the "cost" would be two to twenty times more expensive due to self-dealing and profiteering engaged in through contractual arrangements between the lender, its affiliates, and the company providing the policy, here another affiliate of Bank of America. "Costs" should also be construed to include kickbacks to the lender and its affiliates.

90.     Although Section 5 of the standardized residential mortgage authorizes Bank of America to charge Plaintiff for force-placed flood insurance, this provision is not a license to steal. It is not a license for Bank of America to pay itself a kickback under the guise of a "commission" (in an amount or percentage that is never disclosed to the borrower) when the "agent" receiving this so-called "commission" does nothing to earn it. Here, BAISI does not perform any duties one would normally expect of an insurance agent. It is merely a conduit for a setup deal. Bank of America buys all force-placed insurance from Balboa at inflated rates. Balboa then kicks back a percentage of the "cost" of this insurance to BAISI. BAISI exists for no

purpose other than to be the vessel into which these kickbacks are poured, on a monthly basis, pursuant to secret agreements among Defendants. No reasonable consumer would expect that this is how a lender would go about obtaining insurance to "cover" its interests (as the mortgage states). Bank of America is doing much more than "covering" its interests; it is engaging in a massive rip-off of consumers.

91.     Section 5 of the mortgages states that force-placed insurance will "cover" the lender. A reasonable borrower would not interpret this to mean that Bank of America would force-place insurance coverage in amounts far in excess of that necessary to "cover" its interests—the balance owed on the loan. Force-placing insurance in excess of the loan balance is an express breach of this term of the mortgage contract. Bank of America's purpose behind such a requirement is in bad faith, and therefore Bank of America's actions also constitute a breach of the implied covenant of good faith and fair dealing.

92.     Plaintiff and Class Members have suffered and continue to suffer damages as a result of Defendants' breach of the contract and its implied covenant of good faith and fair dealing. They are entitled to compensation equal to their damages and an injunction prohibiting further acts of bad faith.

## COUNT III
## BREACH OF FIDUCIARY DUTY

93.     Plaintiff restates and realleges the preceding paragraphs of this Complaint as though fully set forth herein word for word.

94.     Bank of America holds funds in escrow on behalf of borrowers whose mortgages it services. These funds are to be used for the purpose of paying insurance premiums when due,

and any excess funds are to be returned to Plaintiff and members of the Class under the terms of the mortgage agreements.

95.     A fiduciary relationship exists between Plaintiff and Bank of America because Bank of America has received a greater economic benefit than from a typical escrow transaction. *See Capital Bank v. MVB, Inc*., 644 So. 515, 519 (Fla. 3d DCA 1994). Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when Bank of America took it upon itself to manage borrowers' escrow accounts and withdraw money from borrowers' escrow accounts to pay force-placed flood insurance premiums. Bank of America violated its fiduciary duty when it began receiving unlawful kickbacks or fees under the kickback scheme, which is clearly a greater economic benefit than what was contemplated under the mortgage.

96.     Bank of America breached its fiduciary duty to Plaintiff and other members of the Proposed Class by (1) not acting in their best interest when it profited from force-placed flood insurance policies that were purchased using escrow funds it held for the benefit of Plaintiff and Class members at the expense of Plaintiff and Class members, and (2) not disclosing the kickback scheme to Plaintiff and Class Members.

97.     These actions were undertaken by Bank of America in bad faith for its own benefit and were not intended to benefit Plaintiff or other Proposed Class members.

98.     As a direct result of Bank of America's actions and subversion of Plaintiff's interest to its own interests in reaping extravagant and outrageous fees, Plaintiff and the Proposed Class have suffered injury in the form of unnecessary and excessive escrow charges and a loss of funds from their escrow accounts.

99.     Plaintiff and the Proposed Class are entitled to damages for Defendant's breach of its fiduciary obligations and misappropriation of escrow funds. In addition, Plaintiff and the

25

Class are entitled to punitive damages because Bank of America acted in bad faith in deliberate or reckless disregard of their rights and its obligation to hold their escrow funds in trust.

**COUNT IV**
**UNCONSCIONABILITY**

100.     Plaintiff restates and realleges all preceding paragraphs of this Complaint as though fully set forth herein word for word.

101.     Bank of America's actions are unconscionable.

102.     Cherryl Hall's mortgage contains provisions concerning force-placed insurance and authorizes the lender to obtain insurance if the borrower fails to maintain adequate insurance. However, with respect to the amount of insurance, Plaintiff's mortgage is largely silent. What it says about the amount of insurance is limited to giving the lender discretion to set the amount and it goes on to state that such insurance "shall cover Lender."

103.     On information and belief, Cherryl Hall's mortgage is identical in all respects material to this case to all other first mortgages that Bank of America services.

104.     Any reasonable interpretation of these provisions leads to the conclusion that any force-placed flood insurance policy will "cover" the lender, i.e. it will protect the lender's interest in the property against loss by floods.

105.     Bank of America construes this language as allowing it to require any amount of flood insurance, and it exercises this discretion to force-place insurance far in excess of the its interest in the property, which is the outstanding balance of the loan.

106.     Bank of America's application of this mortgage language is an unconscionable surprise to borrowers.

107.    Bank of America's affiliates or partners charged premiums many times more costly and substantially more limited than flood insurance a homeowner could purchase from an independent insurance company.

108.    Bank of America withdrew Balboa's premiums and its affiliate's commissions directly from borrowers' escrow accounts. In doing so, the premiums and other fees became a part of customers' loan obligations. Failure to pay these premiums and commissions would result in negative credit reporting in the event of delinquency, and foreclosure in the event of default on paying such premiums and commissions.

109.    Bank of America's actions, as described in this Complaint, are substantively unconscionable because Class Members are required to obtain far more insurance than federal law requires. Bank of America's practices are so abusive and unfair as to shock the conscience.

110.    Bank of America's actions are procedurally unconscionable because they give the borrower no opportunity to prove that existing coverage is sufficient to cover Bank of America's interests in their property. Instead, borrowers must prove that they have whatever amount of insurance Bank of America demands or face force-placement in a policy that charges more than twice the market rate. In fact, the notices that Bank of America sends to borrowers indicating the borrower's current coverage is insufficient do not even tell the borrower that coverage equal to the outstanding loan balance is sufficient.

111.    Further, the disparity in means and bargaining power leaves Class Members no real option regarding the language of the loan or Bank of America's purchases or policies during the life of the loan.

112.    The imposition of additional unnecessary flood insurance when customers already have flood insurance exceeding either the outstanding balance on their loan or the replacement

27

cost of their home is itself unconscionable and has caused Plaintiff and Class Members to suffer damages.

113.    Plaintiff seeks for the Court to remedy Bank of America's wrong by limiting the application of the unconscionable mortgage provisions by restricting Bank of America to require only an amount of insurance coverage that is required by law, and nothing more.

**COUNT V**
**VIOLATIONS OF THE TRUTH IN LENDING ACT (15 U.S.C. § 1601 *et seq.*)**

**114**.    Plaintiff restates and realleges all preceding paragraphs of this Complaint as though fully set forth herein word for word.

115.    Plaintiff's and Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act, 15 U.S.C. §1601, *et seq.*, ("TILA") and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

116.    Bank of America is a "creditor" as defined by TILA because it owned Plaintiff's mortgage and changed the terms of that mortgage so as to create a new mortgage obligation, of which Bank of America was the creditor. Specifically, Plaintiff's mortgage originated with Countrywide Home Loans, Inc., which merged with BAC Home Loan Servicing, which has since been merged into Defendant Bank of America, N.A. Alternatively, Bank of America is liable as an assignee pursuant to 15 U.S.C. §1641.

117.    Pursuant to TILA, Bank of America was required to accurately and fully disclose the terms of the legal obligations between the parties. 12 C.F.R. §226.17(c).

118.    Bank of America violated TILA, specifically 12 C.F.R. §226.17(c), by (i) failing to clearly, fully, and accurately disclose its flood insurance requirements in its mortgages; (ii)

28

misrepresenting in its flood insurance notices that Plaintiff was obligated by federal law to maintain flood insurance in amounts greater than required by federal law, and greater than necessary to protect its interest in the property securing the mortgages; and (iii) failing at all times to disclose the amount and nature of the "commission" Bank of America and/or its affiliates would receive for the purchase of flood insurance.

119.    When Bank of America changed the terms of Plaintiff's mortgage to allow previously unauthorized kickbacks and insurance amounts in excess of Bank of America's interests in the property, it created a new debt obligation, requiring a new set of disclosures showing the amount of the flood insurance premiums (i.e. finance charges) and all components thereof. On information and belief, Bank of America increased the principal amount under Plaintiff's mortgage when it force-placed the insurance, which is a new debt obligation for which new disclosures are required.

120.    Bank of America has never disclosed to its borrowers the amount of the "commissions" paid to BAISI.

121.    Bank of America violated TILA by adversely changing the terms of Plaintiff's loans after origination in order to allow a Bank of America affiliate—BAISI—to receive a kickback on force-placed flood insurance premiums. These kickbacks are not authorized in the mortgage in any clear and unambiguous way.

122.    Bank of America also violated the TILA by adversely changing the terms of Plaintiff's loans after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgages.

123.    Plaintiff first received notice from Bank of America indicating that it had changed the terms of her mortgage on November 23, 2010, when Bank of America sent her a letter

inaccurately stating that, according to her mortgage and/or federal law, she must "maintain flood insurance coverage in an amount at least equal to the lesser of: (1) the maximum insurance available under the NFIP . . . , which is currently $250,000; or (2) the replacement value of the improvements to [the] Property (typically based on the amount of hazard insurance . . . purchased for the Property)."

125.    Plaintiff received several more notices entitled "Notice of Placement," wherein Defendants repeated this misrepresentation of federal flood insurance requirements on April 21, 2011, November 2, 2011, and January 5, 2012.

125.    Acts constituting violations of TILA occurred within one year prior to the filing of this Complaint, so this claim is timely.

126.    To the extent any TILA violations are construed to relate back to the time of loan origination, Plaintiff has been unable to discover Bank of America's TILA violations because Bank of America did not previously misrepresent federal flood insurance requirements, never represented that its affiliate would receive unearned kickbacks, and did not previously require more flood insurance than the principal balance of Plaintiff's loan. Plaintiff's claims are subject to equitable tolling.

127.    Plaintiff and Class Members have been injured and have suffered a monetary loss arising from Bank of America's violations of the TILA.

128.    As a result of Bank of America's TILA violations, Plaintiff and Class Members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of Defendants' net worth, as provided by 15 U.S.C. §1640(a)(1)-(2).

129.    Plaintiff and Class Members are also entitled to recovery of attorneys' fees and costs to be paid by Chase, as provided by 15 U.S.C. §1640(a)(3).

**COUNT VI**
**VIOLATION OF THE ANTI-TYING PROVISIONS OF THE BANK HOLDING**
**COMPANY ACT, 12 U.S.C. §1972 *et seq***

130.    Plaintiff restates and realleges all preceding paragraphs of this Complaint as though fully set forth herein word for word.

131.    Bank of America's kickback scheme violates the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. §1972, *et seq.*

132.    The Bank Holding Company Act, 12 U.S.C. §1972(b)("BHCA"), states that "a bank shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement . . . (B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company."

133.    Banc of America Insurance Services is subsidiary of Defendant Bank of America, N.A.

134.    Bank of America's purchase of insurance on borrowers' behalf is a service that Bank of America offers to its borrowers. To accept this service, borrowers must agree to pay commissions to Bank of America or its subsidiary BAISI for unidentified services.

135.    Upon information and belief, Bank of America, BAC Home Loans, BAISI, and Balboa (now QBE) entered into contractual arrangements under which BAISI would act as the "broker" or "agent" for 100% of force-placed insurance policies purchased on behalf of Bank of America's borrowers. Under these agreements BAISI received a guaranteed commission for every force-placed insurance policy procured on behalf of Bank of America's borrowers equal to a set percentage of the premium for each policy.

31

136.    BAISI does not engage in any insurance broker or agent services. For example, it does not seek out competitive insurance policies from different insurance providers, but refers all force-placed insurance business to Balboa.

137.    This is an "unusual" banking practice. Bank of America's exclusive agreement with Balboa obviates any opportunity for BAISI to earn a commission.

138.    Defendants' practices are anti-competitive:

a.      Bank of America and BAC refer all force-placed insurance business to BAISI and guaranty BAISI's commissions. The commissions paid are based on contracts between Bank of America and Balboa, not on any services actually provided by BAISI. BAISI has no competitive incentive to provide any services for borrowers.

b.      Bank of America sets the commission amount that BAISI will receive. The substantial revenue that Balboa, a one-time subsidiary of Bank of America also, receives in premiums from Bank of America borrowers gives it an incentive to agree to any commission rate that Bank of America demands

c.      Bank of America's tying arrangement results in unreasonably high commissions. The commissions are a percentage of Balboa's premiums. Balboa provides more limited insurance policies than borrowers can obtain on the market but cost more than twice as much as other policies the borrowers would obtain on the open market. Bank of America's agreements allow BAISI to receive more than twice the commission any other insurance agent could receive for procuring more limited insurance than any other insurance agent would procure.

d.      Unlike regular insurance agency arrangements, Bank of America utilizes its power as borrowers' mortgage lender and/or servicer to guarantee payment of commissions. Bank of America withdraws insurance premiums and commissions directly from borrowers' escrow accounts to pay commissions to its subsidiary, BAISI. If borrowers refuse to make increased payments to their escrow account, Bank of America coerces them into doing so with negative credit reporting and, potentially, foreclosing on their homes. Thus, Bank of America uses its power as borrowers' bank to steer commissions to itself through BAISI.

e.      Bank of America's force-placed insurance arrangement usurps market share from other insurance agencies in favor of its own subsidiary BAISI.

32

Force-placed insurance may be a more costly option than purchasing insurance on the open market, but it is a significantly easier and less demanding option. Hundreds of thousands of homeowners in the United States have allowed Bank of America to purchase force-placed flood insurance on their property since 2008 alone, resulting in tens of millions of dollars in commissions being paid to BAISI.

f.     Bank of America's exclusive purchase arrangement and kickback scheme artificially inflates the price of force-placed insurance and artificially increases commissions paid to Bank of America's captive insurance agent. The artificially inflated price of Balboa's force-placed insurance is only possible because Bank of America refers 100% of its force-placed insurance business to Balboa. As one of the nation's largest mortgagees and mortgage servicers, Bank of America's exclusive force-placed insurance referrals can and do substantially affect competitive incentives to reduce prices. This guarantees distorted commissions to BAISI, whose commissions are a percentage of Balboa's inflated premiums.

139.    The "tied product" in this arrangement is BAISI's "service" of acting as an insurance agent for force-placed insurance.

140.    The "tying product" is (1) Defendants' service of purchasing insurance on borrowers' behalf; (2) the initial extension of credit; and (3) Bank of America's continuing extension of credit.

141.    Bank of America ties the procurement of insurance on borrowers' behalf to BAISI's "service" as alleged above.

142.    Bank of America benefits directly and indirectly from this tying arrangement. Bank of America's own subsidiary, BAISI, receives commissions on all force-placed insurance.

143.    Plaintiff and Class Members have been damaged by Bank of America's anti-competitive tying arrangement in that they have paid excessive commissions to Bank of America through its subsidiary BAISI.

144.    Plaintiff and Class Members are entitled to three times the amount of damages sustained, and the cost of suit, including a reasonable attorney's fee pursuant to 12 U.S.C. §1975.

Plaintiff and Class Members are further entitled to an injunction barring Bank of America from continuing their unlawful conduct, including their exclusive purchasing arrangement with Balboa and the kickback scheme with Balboa.

**COUNT VII**
**UNJUST ENRICHMENT**
**AGAINST BAC HOME LOANS SERVICING, LP**

145. Plaintiff restates and realleges the preceding paragraphs of this Complaint as though fully set forth herein word for word.

146. As discussed above, Plaintiff's original contract with Countrywide was subsequently assigned to Bank of America. Plaintiff never borrowed money from BAC Home Loans Servicing, LP, and have no contract with BAC. Hence, Plaintiff's causes of action against BAC must sound in equity and tort. Further, the kickback scheme is not addressed directly or indirectly in Plaintiff's mortgage and, therefore, is not governed by it.

147. Plaintiff's unjust enrichment claims against BAC arise from its illegal practice of earning a hidden profit or other financial benefit by collecting money from residential borrowers for the exorbitant insurance premiums for force-placed flood insurance policies procured through BAISI and its subsidiaries where a portion of the above-market rate premiums were returned to BAC and its affiliates. This secret kickback arrangement between BAC and BAISI monetarily benefited BAC and its affiliates at the direct expense of the Plaintiff.

148. Plaintiff's unjust enrichment claims against BAISI arise from its agreement to induce BAC and Bank of America to place all force-placed flood insurance with BAISI by offering to kick back a portion of each force-placed flood insurance premium to BAC or Bank of America.

149.    BAC or its affiliates enjoyed and accepted monetary or other financial benefits from BAISI by accepting kickbacks paid to BAC or its affiliates out of the exorbitant above-market rates being charged to the Plaintiff under this secret kickback arrangement.

150.    BAISI enjoyed and accepted monetary and financial benefits from Class Members by accepting inflated and anti-competitive insurance premiums for force-placed insurance policies purchased on behalf of Bank of America's borrowers.

151.    BAC and BAISI were unjustly enriched, in an amount to be proven at trial, by receiving from Plaintiff and Class members a benefit in the form of overcharges for force-placed insurance policies that are excessive and unreasonable as a result of BAC and Bank of America's kickback scheme and exclusive arrangement with BAISI. It would be inequitable to allow BAC and Bank of America to retain these benefits at the expense of Plaintiff and the Class.

152.    BAC should compensate Plaintiff and the Class in an amount equal to all payments collected from Plaintiff and the Class that represent the hidden profits or other financial benefits received by BAC or its affiliate. BAISI should compensate the Plaintiff and the Class in an amount equal to all premiums for force-placed flood insurance collected from Plaintiff and the Class resulting from its collusion with BAC or its affiliates.

153.    BAC and BAISI received and are holding funds belonging to Plaintiff and the Class, which in equity and good conscience they should not be permitted to keep.

**COUNT VIII**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**
**(AGAINST BALBOA AND QBE ONLY)**

154.    Plaintiff restates and realleges the preceding paragraphs of this Complaint as though fully set forth herein word for word.

155.    Plaintiff and Class Members have a business relationship with Bank of America pursuant to their mortgage contracts and Plaintiff and Class Members have legal rights under these contracts. For example, Plaintiff and Class Members have a right not to be charged excessive fees for force-placed insurance that are imposed in bad faith and for the benefit of the lender and not the borrowers.

156.    Balboa has knowledge that Plaintiff and Class Members have a relationship with Bank of America pursuant to the mortgage contracts. Balboa is not a party to these mortgage contracts, nor is it a third-party beneficiary of these mortgage contracts. Balboa has no beneficial, economic, or supervisory interest in these mortgage contracts.

157.    Balboa intentionally and unjustifiably interfered with Plaintiff's and Class Members' rights under the mortgage contracts, as alleged above, by, *inter alia*, paying kickbacks to Bank of America and/or its subsidiaries and by charging Plaintiff and Class Members for administering Bank of America's loan portfolio.

158.    Plaintiff and Class Members have suffered damages and injury as a direct and proximate result of Balboa's interference with their mortgage contracts by being charged in bad faith for exorbitant and illegal force-placed insurance charges in contravention of their rights under their mortgages.

## VII.    DAMAGES

159.    Plaintiff and Class Members seek damages in an amount to be determined after trial by jury, but in any event, in excess of five million dollars ($5,000,000).

## VIII.    INJUNCTIVE RELIEF

160.    Plaintiff and Class Members pray that this Court enjoin Defendants from: (1) requiring borrowers to obtain flood insurance in amounts exceeding what is required to protect

the lender's interest in the collateral property and, in any event, any amount in excess of that allowed by federal law; (2) sending notices to borrowers tending to mislead borrowers into believing that flood insurance amounts requested by Bank of America are required by federal law or the mortgages when that is not the case; (3) continuing its exclusive purchasing arrangement with Balboa and/or QBE; (4) enabling kickbacks to Bank of America or its affiliate; and (5) force-placing flood insurance with Bank of America or its subsidiaries, partners, or affiliates.

## IX.     DEMAND FOR JURY TRIAL

161.    Plaintiff, on behalf of herself and all others similarly situated, demands a trial by jury on all issues so triable.

WHEREFORE, Plaintiff prays that this Court certify this case as a class action and allow Plaintiff to pursue the claims and relief described hereinabove on behalf of themselves and all others similarly situated; that the Court certify the two classes identified above; that Plaintiff be awarded the maximum amount of damages allowed by applicable law; pre-judgment interest; for a trial by jury on all issues so triable; for attorneys' fees, costs, and all other appropriate relief. Dated this 24th day of July, 2012.

Respectfully Submitted,

**Attorneys for Plaintiff**

By: /s/ Kevin McLaughlin
Kevin McLaughlin (FL Bar No. 0085928)
Jason Whittemore (FL Bar No. 0037256)
WAGNER, VAUGHAN & McLAUGHLIN, P.A.
601 Bayshore Boulevard, Suite 910
Tampa, FL 33606
Telephone: (813) 225-4000
Facsimile: (813) 225-4010
Kevin@WagnerLaw.com

Jason@WagnerLaw.com

Steven A. Owings (*Pro Hac Anticipated*)
Alexander P. Owings (FL Bar No. 0093797)
OWINGS LAW FIRM
1400 Brookwood Drive
Little Rock, AR 72202
(501) 661-9999
(501) 661-8393 (facsimile)
sowings@owingslawfirm.com
apowings@owingslawfirm.com

Jack Wagoner (*Pro Hac Anticipated*)
WAGONER LAW FIRM, P.A.
1320 Brookwood, Suite E
Little Rock, AR 72202
(501) 663-5225
(501) 660-4030 (facsimile)
Jack@wagonerlawfirm.com

Brent Walker (*Pro Hac Anticipated*)
Russell D. Carter (*Pro Hac Anticipated*)
CARTER WALKER PLLC
2171 West Main, Suite 200
P.O. Box 628
Cabot, AR 72023
(501) 605-1346
(501) 605-1348 (facsimile)
bwalker@carterwalkerlaw.com
dcarter@carterwalkerlaw.com