# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 1:12-cv-22700-FAM

CHERYL HALL, MARLA LUGO,
DONALD NOVELL, JOAN NOVELL,
JOSEPH GALLAGHER, JOHN VIDRINE,
CATHERINE SOILEAU, JOHN TOTURA,
and JACQUELYN TOTURA, on behalf of
themselves and all others similarly situated,

               Plaintiffs,

                                                 **CLASS ACTION**

v.                                                 **JURY DEMAND**

BANK OF AMERICA, N.A, individually and
as successor by merger to BAC HOME LOANS
SERVICING, LP; BANC OF AMERICA
INSURANCE SERVICES, INC.; BALBOA
INSURANCE COMPANY; QBE INSURANCE
CORP., individually and as successor-in-interest
to BALBOA INSURANCE COMPANY; and
QBE FIRST INSURANCE AGENCY.

               Defendants.

_____/

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs CHERYL HALL, MARLA LUGO, DONALD NOVELL, JOAN NOVELL,

JOSEPH GALLAGHER, JOHN VIDRINE, CATHERINE SOILEAU, JOHN TOTURA, and

JACQUELYN TOTURA file this class action complaint on behalf of themselves and all others

similarly situated against BANK OF AMERICA, N.A., ("Bank of America"); BAC HOME

LOANS SERVICING, LP ("BAC Home Loans" or "BAC"); BANK OF AMERICA, N.A., as

successor in interest to BAC HOME LOANS SERVICING, LP ("BofA/BAC")[1]; BANC OF

_____

[1] Bank of America, BAC, and BofA/BAC will together be referenced as the "BOA Defendants."
Similarly, QBE Insurance Corp., individually and as successor-in interest to Balboa, Balboa, and
QBE First will collectively be references as the "QBE Defendants."

AMERICA INSURANCE SERVICES, INC. ("BAISI"); BALBOA INSURANCE COMPANY ("Balboa"); QBE INSURANCE CORP., individually and as successor-in-interest to BALBOA INSURANCE COMPANY ("QBE"), and QBE FIRST INSURANCE AGENCY ("QBE First").[2]

## INTRODUCTION

1.      On November 10, 2010, *American Banker* published an article describing major mortgage lenders' and servicers' questionable and often illegal practices related to force-placed insurance. The article revealed for the first time the exceptionally profitable exclusive relationships, collusive activities, and circular arrangements among the mortgage lenders and servicers, their affiliates, and their cooperating insurers, including the defendants here.

2.      Lenders and servicers force place insurance when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on property that secures a loan. Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" a new policy on the property and then charge the premiums to the borrower.  Plaintiffs do not challenge the practice of force-placing insurance, but rather the manner in which Defendants exercise their power to force place insurance under borrowers' mortgages and the law.

3.      The arrangements revealed by *American Banker* comprise an extremely lucrative profit-making scheme that yields the major mortgage lenders and servicers and their selected insurers hundreds of millions of dollars annually.  Just two insurance companies control the entire market for forced-placed policies in the country—Assurant and QBE.  These companies and their affiliates enter into exclusive relationships with the major mortgage lenders and servicers to provide the policies. To maintain their exclusive relationships with these lenders, the

---

[2] QBE purchased Balboa from Bank of America in or around June 2011.

insurers pay unearned "kickbacks" of a percentage of the force-placed premiums ultimately charged to the borrower, offer them subsidized administrative services, and/or enter into lucrative captive reinsurance deals with them.   The BOA Defendants work exclusively with QBE/Balboa.

4.      The money to finance the forced-place insurance schemes comes from unsuspecting borrowers who are charged inflated force-placed insurance premiums by lenders. In many instances borrowers are required to pay for backdated insurance coverage to cover periods during which no claims were made, coverage that exceeds the legal requirements, or they are charged additional improper fees.

5.      Defendants' force-placed insurance scheme takes advantage of the broad discretion afforded the lenders and/or servicers in standard form mortgage agreements.  These agreements require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils.  Some mortgage agreements also require borrowers to maintain flood insurance on their properties sufficient to cover the lender's risk from flood damage.  If a homeowner's hazard or flood policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

6.      Although force-placed insurance is designed to protect the lender's interest in the property that secures the loan and thus should not exceed that interest, lenders often purchase coverage from their exclusive insurers in excess of that required to cover their own risk.  And, as a matter of practice, the major lenders and servicers collude with the two major force-placed insurers to manipulate the force-placed insurance market and artificially inflate the premiums charged to consumers, resulting in premiums up to ***ten times*** greater than those available to the consumer in the open market. *American Banker* reported that "[t]hough part of the extra expense

can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry— even after accounting for the generous commissions and other payments that servicers demand." *See* J. Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, AM. BANKER (Nov. 10, 2010), *available at* http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html. Lenders, servicers, and force-placed insurers reap these unconscionable profits entirely at the expense of the unsuspecting borrower.

7.     At a recent hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that these force-placed schemes have reaped in recent years:[3]

## LPI Premiums Have Quadrupled Since 2004

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004–2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                              13                                    August 9, 2012

8.     As illustrated below, QBE, a named defendant in this action, held 41.1% of the

---

[3] The following graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012. The presentation is available at: http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf.

4

nationwide market share for force-placed insurance in 2011. Together, QBE/Balboa and

Assurant controlled 99.7% of the market from 2008 to 2010, and held no less than 96.1%

between 2004 and 2011.[4]

### Assurant and QBE Are the Market for LPI:
### Countrywide Market Share

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|-----------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                    18                    August 9, 2012

9.      It is no surprise that these practices have come under increased scrutiny in recent

years by the government and regulators.[5] For example:

- On March 21, 2013, the New York Department of Financial Services'
  ("NYDFS"), investigation into force-placed insurance practices "produced a

---

[4] This graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012. The presentation is available at: http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance _presentation_birnbaum.pdf

[5] These practices have also come under increased scrutiny by the courts. This Court has already certified a Florida class against Wells Fargo Bank and Wells Fargo Insurance Inc. (as well as their exclusive FPI carrier QBE)—based on the same practices described here. *See Williams v. Wells Fargo Bank, N.A.*, Case No. 11-cv-21233 (S.D. Fla.) [D.E. 211].

major settlement with the country's largest 'force-placed' insurer, Assurant, Inc. . . . [The settlement] includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower rates."[6]  Further, under the Consent Order entered, Assurant and its subsidiaries (including ASIC), are prohibited from paying commissions to any servicers or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer.  *See* Assurant & NYDFS Consent Order, Mar. 21, 2013, at 9.

- The NYDFS held hearings on May 17, 2012 related to the force-placed insurance market.  In his opening statement, the Superintendent of Financial Services Benjamin Lawsky stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included; 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers.  He went on to state:

  > "In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions…"

- After the August 2012 NAIC hearings, the state regulator from Louisiana, James Donelon, referred to the force-placed insurance market as a "monopoly" and stated that stricter regulations may be needed.[7]

10.    Further underscoring the wrongful nature of these force-placed insurance kickback schemes, Fannie Mae recently clarified its existing policies regarding force-placed insurance in a Servicing Guide Announcement, stating that:

[L]ender-placed insurance premiums must exclude:

---

[6] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of Dollars*, Dep't of Fin. Servs., Mar. 21, 2013, *available at,* http://www.dfs.ny.gov/about/press2013/pr1303211.htm.

[7] *See* Zachary Tracer and David Beasley, *U.S. Regulators to Examine Force-Placed Insurance*. BLOOMBERG BUSINESSWEEK, Aug. 10, 2012 *available at*: http://www.businessweek.com/news/2012-08-10/u-dot-s-dot-regulators-to-examine-forced-place-insurance.

- any lender-placed insurance commission earned on that policy by the servicer or any related entity,

- costs associated with insurance tracking or administration, or

- any other costs beyond the actual cost of the lender-placed insurance policy premium.[8]

11.     Florida has now become the epicenter for these force-placed insurance schemes.

In his presentation to the NAIC, Mr. Birnbaum illustrated the astounding rise in force-placed insurance policies in Florida:[9]

### LPI Premium by State:  Florida Has Become Ground Zero

|     | 2004  | 2005  | 2006  | 2007  | 2008  | 2009  | 2010  | 2011  |
|-----|-------|-------|-------|-------|-------|-------|-------|-------|
| FL  | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA  | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX  | 10.6% | 10.7% | 8.8%  | 8.7%  | 7.0%  | 5.6%  | 5.6%  | 6.1%  |
| NY  | 3.6%  | 3.6%  | 4.5%  | 4.4%  | 4.3%  | 4.7%  | 5.4%  | 5.6%  |
| IL  | 3.0%  | 3.3%  | 3.9%  | 3.7%  | 3.9%  | 4.4%  | 4.1%  | 4.6%  |
| NJ  | 2.9%  | 2.7%  | 2.9%  | 2.7%  | 2.7%  | 2.9%  | 3.4%  | 4.0%  |
| MI  | 4.2%  | 4.4%  | 4.4%  | 5.8%  | 3.6%  | 2.7%  | 2.2%  | 2.0%  |
| OH  | 3.6%  | 3.8%  | 3.5%  | 2.7%  | 2.4%  | 2.2%  | 2.3%  | 2.9%  |
| GA  | 3.4%  | 3.2%  | 3.2%  | 2.4%  | 2.3%  | 2.3%  | 2.3%  | 2.3%  |
| PA  | 2.6%  | 2.6%  | 2.7%  | 1.8%  | 1.8%  | 1.8%  | 1.7%  | 1.8%  |

CEJ LPI Presentation to NAIC                    15                              August 9, 2012

12.     Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the putative class and subclasses they seek to represent.  This class action seeks to redress that harm on behalf of these classes of consumers

---

[8] Fannie Mae Servicing Guide Announcement SVC-2012-04, March 14, 2012, available at: https://www.fanniemae.com/content/announcement/svc1204.pdf.

[9] This graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation                      is                     available                      at: http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance _presentation_birnbaum.pdf

and to recover all improper costs they have incurred related to the forced placement of hazard and flood insurance by the lenders and mortgage servicers, their affiliates, and their cooperating insurers.

**PARTIES**

**Plaintiffs**

13.     Plaintiff CHERYL HALL is a citizen of the State of Arkansas.  She is a natural person over the age of 21 and otherwise *sui juris*.

14.     Plaintiff MARLA LUGO is a citizen of the State of New York.  She is a natural person over the age of 21 and otherwise *sui juris*.

15.     Plaintiff DONALD NOVELL is a citizen of the State of Florida.  He is a natural person over the age of 21 and otherwise *sui juris*.

16.     Plaintiff JOAN NOVELL is a citizen of the State of Florida.  She is a natural person over the age of 21 and otherwise *sui juris*.

17.     Plaintiff JOSEPH GALLAGHER is a citizen of the State of Florida.  He is a natural person over the age of 21 and otherwise *sui juris*.

18. Plaintiff JOHN VIDRINE is a citizen of the State of Louisiana.  He is a natural person over the age of 21 and otherwise *sui juris*

19.     Plaintiff CATHERINE SOILEAU is a citizen of the State of Louisiana.  She is a natural person over the age of 21 and otherwise *sui juris*

20.     Plaintiff JACQUELYN TOTURA is a citizen of the State of Florida.  She is a natural person over the age of 21 and otherwise *sui juris*.

21.     Plaintiff JOHN TOTURA is a citizen of the State of Florida.  He is a natural person over the age of 21 and otherwise *sui juris*.

**Defendants**

22.     Defendant BANK OF AMERICA, N.A. is a Delaware corporation and national banking association insured by the Federal Deposit Insurance Corporation. Bank of America has its principal place of business in Charlotte, North Carolina. Bank of America provides services including but not limited to banking, insurance, investments, property mortgages, and consumer and commercial finance in Florida and across North America.

23.     Defendant BAC HOME LOANS SERVICING, LP (formerly known as Countrywide Home Loans Servicing, LP), a subsidiary of Bank of America Corporation, was a Texas limited partnership that serviced mortgage loans originated or owned by Bank of America, N.A., including residential mortgage loans. BAC Home Loans was registered to do business in Florida and North Carolina. On July 7, 2011, it filed a Notice of Cancellation that stated it was no longer transacting business in the state of Florida. By doing so, it authorized the Florida Department of State as its agent to accept service with respect to any cause of action arising during the time it was authorized to operate in Florida. BAC Home Loans acted as the mortgage servicer for the real property mortgages provided by Bank of America.

24.     BAC Home Loans committed violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and the common law of Florida and is named as a Defendant because the claims arose prior to its merger with Bank of America, as alleged below.

25.     As a result of the merger, pursuant to section 607.1106(1), Florida Statutes, Bank of America is liable for the conduct of BAC Home Loans Servicing, LP at issue in this Complaint. Bank of America is named in its capacity as a "successor in interest" to BAC Home Loans Servicing, LP. The claims made against Bank of America as successor in interest are not claims made against Bank of America individually.

26.     On or about July 1, 2011, BAC merged into Bank of America.  Notwithstanding this merger, this suit is brought directly against BAC (through its successor-in-interest, Bank of America) pursuant to subsections 607.1106(1)(c) and (d), Florida Statutes.[10]  Bank of America is liable for the conduct of BAC Home Loans Servicing alleged herein as a result of the merger. As such, most of the claims alleged herein are brought against both BAC and Bank of America as successor by merger to BAC, as well as against Bank of America in its individual capacity. The cause of action for a violation of FDUTPA contained herein is not alleged against Bank of America individually.

27.     BANC OF AMERICA INSURANCE SERVICES, INC. is a non-bank subsidiary of Bank of America, N.A. Upon information and belief, Banc of American Insurance Services, Inc. is the Bank of America entity through which force-placed insurance policies and commissions are funneled.

28.     Defendant BALBOA INSURANCE COMPANY is a California corporation with its headquarters in Irvine, California. Balboa was a subsidiary of Defendant Bank of America. In June 2011, QBE Insurance Corporation purchased Balboa's assets and liabilities from Bank of America. The terms of the sale included an agreement that QBE would maintain long-term distribution agreements with Bank of America for force-placed insurance. Balboa provided both insurance tracking services and force-placed insurance policies to lenders, including Bank of America, nationwide; QBE now performs these functions.

---

[10] Section 607.1106(1) provides, inter alia, that: "When a merger becomes effective:
(c)    The surviving corporation shall thenceforth be responsible and liable for all the liabilities and obligations of each corporation party to the merger;
(d)    Any claim existing or action or proceeding pending by or against any corporation party to the merger may be continued as if the merger did not occur or the surviving corporation may be substituted in the proceeding for the corporation which ceased existence . . . ." § 607.1106(1), Fla. Stats.

29.     QBE INSURANCE CORPORATION is a Pennsylvania corporation and is licensed in all fifty states and the District of Columbia.  QBE Insurance Corporation is a wholly-owned subsidiary of QBE Reinsurance Corporation, a Delaware corporation.  QBE Insurance Corporation writes force-placed insurance policies through numerous sub-agencies, including QBE First Insurance Agency and QBE Specialty Insurance Company.

30.     QBE FIRST INSURANCE AGENCY is a wholly owned subsidiary of QBE Financial Institution Risk Services, Inc., which is a wholly owned subsidiary of QBE Holdings, Inc.  QBE First assumed servicing and administrative functions in connection with force-placed insurance from Balboa after QBE Insurance Corporation purchased Balboa's force-placed business in or around June 2011.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

32.     Plaintiffs are citizens of the states of Arkansas, Florida, New York, and Louisiana.  Defendants are citizens of various other states but are registered to do business in the aforementioned states.  The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

33.     This Court has subject-matter jurisdiction over Plaintiffs' claims arising under the Bank Holding Company Act, 12 U.S.C. § 1972, *et seq.*, according to the statute's jurisdictional statement, 12 U.S.C. § 1975.

34.     This Court further has subject-matter jurisdiction over those of Plaintiffs' claims that arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d)

according to the statute's jurisdictional statement, 18 U.S.C. § 1964.

35.     This Court has jurisdiction over Defendants because they are foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

36.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between the Plaintiffs and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

37.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District.  Venue is also proper here because at all times relevant hereto, most Plaintiffs resided in the Southern District of Florida and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

38.     All conditions precedent to this action have occurred, been performed, or have been waived.

## **FACTUAL ALLEGATIONS**

39.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower the full cost of the premium is neither a new concept nor a term undisclosed

to borrowers in mortgage agreements. The standard form mortgage agreements used by most major lenders include a provision requiring the borrower to maintain hazard insurance coverage—and flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency—on the property securing the loan, and in the event the insurance lapses, permit the lender to obtain force-placed coverage and charge the premiums to the borrower rather than declare the borrow in default.

40. Plaintiffs Hall, Gallagher, Vidrine, Soileau, and the Novells entered into mortgage agreements that include the following provision:

> **5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. . . .
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

41. Plaintiffs Lugo and the Toturas entered into mortgage agreements including substantially the same language.  Copies of all Plaintiffs' mortgage agreements are attached as exhibits to the BOA Defendants motion to dismiss the First Amended Complaint in this action. (D.E. 115-2.)

42. Plaintiffs' mortgages also state that "Lender may do and pay for whatever is

*reasonable or appropriate* to protect Lender's interest in the Property. *See* Plaintiffs' mortgages ¶ 9.[11]

43.     All Class Members' mortgages contain the same or nearly identical language as Plaintiffs' mortgages.

44.     What is unknown to borrowers and not disclosed in the mortgage agreements is that lenders and loan servicers have exclusive arrangements with certain insurers pursuant to which the lenders, servicers, and insurers manipulate the force-placed insurance market and artificially inflate premiums. The premiums are inflated to provide lenders and servicers with kickbacks disguised as "commissions" (usually paid to an affiliate), or provide the lender or servicer (through an affiliate) with lucrative reinsurance arrangements as well as to include unmerited charges. The borrower is then forced to pay the inflated premiums.

**The Force-Placed Insurance Scheme**

45.     The scheme works as follows. Lenders and mortgage servicers (here, Bank of America and BAC), purchase master or "umbrella" insurance policies that cover the entire portfolio of mortgage loans. In exchange, Balboa/QBE obtains the exclusive right to force-place insurance on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate. The insurer monitors the lender's loan portfolio for lapses in borrowers' insurance coverage. Once a lapse is identified, Balboa/QBE sends notice to the borrower that insurance will be "purchased" and force-placed if the voluntary coverage is not continued. If a lapse continues, the insurer notifies the borrower that insurance is being force-placed at his or her expense.

46.     No individualized underwriting ever takes place for the force-placed coverage.

---

[11] This provision is located in Paragraph 7 of the Toturas' mortgage.

Rather, the BOA Defendants require, or at least permit, the insurer to automatically place this coverage when a borrower's policy lapses. In many instances, the insurance lapse is not discovered for months or even years after the fact.  Despite the absence of any claim or damage to the property during the period of lapse, retroactive coverage is placed on the property and the past premiums charged to the borrower.

47.    Once coverage is forced on the property, the lender or servicer charges the borrower for the insurance premiums and, through Balboa/QBE, automatically deducts the amount from the borrower's mortgage escrow account, or adds it to the balance of the borrower's loan.[12]

48.     The lender or servicer then pays the premium to the insurer who then kicks back a set percentage of the premium to the mortgage lender's or servicer's affiliate (here BAISI) as a "commission."  The affiliate then shares a percentage of that payment with the lender or servicer, sometimes in the form of "soft dollar" credits.

49.    The money paid back to the lender or servicer's affiliate is not given in exchange for any services provided by the affiliate; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickback as legitimate, the insurer sends a disclosure to the borrower that the affiliate may receive a "commission" or "compensation" for helping the lender to procure a force-placed policy.  In reality, however, no work is ever done by the affiliate to procure insurance for that particular borrower because the coverage comes through the master or umbrella policy already in place.

50.    Under this highly profitable force-placed insurance scheme, Bank of America and BAC are incentivized to purchase and force-place insurance policies with inflated premiums on

---

[12] On some occasions when a borrower does not have an escrow account, the lender creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

borrowers' properties because the higher the cost of the insurance policy, the higher the kickback.

51.     QBE/Balboa also enters into agreements with the BOA Defendants whereby the insurer provides servicing activities on the entire loan portfolio at below cost. The servicing costs are added into the force-placed premiums which are then passed on to the borrower. QBE/Balboa is able to provide these services below cost because of the enormous profits they make from the hyper-inflated premiums charged for force-placed insurance. However, because insurance-lapsed mortgaged property comprises only 1–2% of the lenders' total mortgage portfolio, the borrowers who pay these premiums unfairly bear the entire cost to service the entire loan portfolio.

52.     In addition, force-placed insurance providers enter into essentially riskless "captive reinsurance arrangements" with lenders and their affiliates to "reinsure" the property insurance force-placed on borrower. A recent *American Banker* article detailed this reinsurance problem with respect to JP Morgan Chase Bank:

> JPMorgan and other mortgage servicers' reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements. Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS.
>
> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns. The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market. Further limiting competition are the companies' tendency to file identical

rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, (May 18, 2012), available at http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

53.     The BOA Defendants may also overcharge borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard form mortgage agreement.  Either of these clauses typically protects the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy.  Force-placed policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause.  This means the borrower is charged for coverage for which the lender or servicer has no exposure.

54.     Ultimately it is the unsuspecting borrower who suffers the consequences of these unconscionable practices.[13]

55.     Prior to June 2011, Balboa provided the BOA Defendants with subsidized mortgage portfolio monitoring and forced-placed insurance. When QBE purchased Balboa, it agreed to continue to provide Bank of America with these services with the assistance of its affiliate QBE First.  QBE is now the exclusive force-placed insurer for Bank of America.

56.     Upon information and belief, prior to the sale, Balboa passed a portion of its force-placed profits up to Bank of America. QBE changed that arrangement when it acquired Balboa and now provides Bank of America with low-cost administrative mortgage services through QBE First in return for the exclusive right to force-place insurance.  A commission or

---

[13] Furthermore, when the cost of the high-priced premium is added by the Defendants to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

other compensation is then kicked back to Bank of America or its affiliate, BAISI, based upon a set percentage of the insurance premium.

## The Plaintiffs

57.     The actions and practices described above are unconscionable and done in bad faith with the sole objective to maximize profits. Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged hyper-inflated and illegitimate non-competitive "premiums" for force-placed insurance that include undisclosed kickbacks to the Defendants or their affiliates (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of captive reinsurance arrangements and administrative services.

58.     Plaintiffs here do not challenge the BOA Defendants' right to force place insurance in the first instance.  They challenge Defendants' manipulation of the force-placed insurance market with an eye toward artificially inflating premiums and placing unnecessary coverage, which the BOA Defendants purchase from their selected insurer and then choose to pass on to the borrower.  This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, and to recover for Plaintiffs the excess amounts charged to them beyond the true cost of insurance coverage.

### A.     Plaintiff Cheryl Hall

59.     Plaintiff Cheryl Hall is a resident of Garland County, Arkansas and owns a condominium in Hot Springs, Arkansas.  Ms. Hall purchased her condominium on January 23, 2007 for $107,000 with a mortgaged loan through Countrywide Home Loans, Inc. ("Countrywide").  Ms. Hall's mortgage is written on a Fannie Mae/Freddie Mac Uniform Instrument.  Upon information and belief, after Bank of America acquired Countrywide in 2009.

BAC Home Loans and/or Bank of America has serviced Ms. Hall's mortgage.

60.     Beginning in 2010, Ms. Hall obtained flood insurance in addition to her condominium/association policy. The BOA Defendants sent Ms. Hall a notice on November 23, 2010 that the flood insurance obtained was insufficient to cover her property. This notice stated that both federal law and the terms of Ms. Hall's mortgage required "flood insurance coverage in an amount at least equal to the lesser of: (1) the maximum insurance available under the NFIP for participating communities, which is currently $250,000; or (2) the replacement value of the improvements to your property (typically based on the amount of hazard insurance we understand you have purchased for the Property)." The November 23, 2010 letter further stated that a flood insurance policy carrying a $139.03 premium and providing $26,735.00 in coverage would be placed if additional voluntary coverage was not obtained.

61.     The notice misrepresented federal law and was misleading because it represented that Ms. Hall had only two options regarding the amount of flood insurance coverage she needed to acquire when in fact the National Flood Insurance Act provides a third option which is coverage equal to the borrower's outstanding loan balance. The third option makes sense because a lender's financial interest in the property is equal to the outstanding loan balance.

62.     Sometime between November 23, 2010 and April 18, 2011, the BOA Defendants and Balboa force-placed excess flood insurance on Ms. Hall's property for the period October 29, 2010 through October 29, 2011. A percentage of the insurance premium charged to Ms. Hall was then kicked back to the BOA Defendants from Balboa.

63.     On April 18, 2011, Ms. Hall was notified that this policy had been cancelled, and that BAC had received information that her coverage was sufficient to meet applicable requirements.

19

64.    Despite the representation made to Ms. Hall about adequate insurance coverage in its April 18, 2011 letter, the BOA Defendants then sent Ms. Hall a "Notice of Placement" letter, which advised her that BAC had "purchased additional flood insurance to protect its interest in the property" from October 29, 2010 through October 29, 2011.  The coverage period covered a preceding six-month period during which Ms. Hall made no claims on her property.  Although the BOA Defendants had no risk during this period, it force-place $14,076.00 in coverage and charged Ms. Hall a monthly premium of $73.20.

65.    Ms. Hall received a second "Notice of Placement" on November 2, 2011—practically identical to the April 21, 2011 letter—notifying her that the BOA Defendants were force-placing a second flood policy for the same coverage amount and monthly premium but effective October 29, 2011 through October 29, 2012.

66.    The BOA Defendants sent Ms. Hall a third "Notice of Placement" on January 5, 2012 for the same coverage period of October 29, 2011 through October 29, 2012 but increasing the insurance coverage an additional $3,355.00 and raising the monthly premium by $17.68.

67.    Each letter sent to Ms. Hall included the same material misrepresentation regarding the flood insurance required by federal law and her mortgage.

68.    The insurance force-placed by the BOA Defendants and Balboa was excessive and unnecessary because Ms. Hall's condominium was covered by a State Farm condominium/association insurance policy. According to the Condominium Rider attached to Ms. Hall's mortgage, a condominium policy is sufficient to meet the flood insurance requirements of federal law and Ms. Hall's mortgage.  Moreover, Ms. Hall's condominium association maintains flood insurance coverage equal to the full replacement value of the condominium complex through State Farm.  Thus, at the time the BOA Defendants force-placed

flood coverage on Ms. Hall's condominium, the voluntary coverage she had in place exceeded the requirements of both her mortgage and federal law.

69.     There is no material difference between these Defendants' actions and practices directed to Ms. Hall and their actions and practices directed to the Class.

**B.     Plaintiff Marla Lugo**

70.     Plaintiff Marla Lugo resides in Mount Vernon, New York.   Until 2008, the mortgage on Ms. Lugo's primary residence was serviced by Countrywide. Following Bank of America's acquisition of Countrywide in July 2009, BAC Home Loans replaced Countrywide as Ms. Lugo's mortgage servicer.

71.     Ms. Lugo maintained homeowners' insurance on her property through Travelers until the policy lapsed in 2008.  Ms. Lugo paid an annual premium of approximately $1,200 for the coverage. When the insurance policy with Travelers lapsed, BAC Home Loans force-placed a hazard policy on her property through Balboa.

72.     The BOA Defendants charged Ms. Lugo an annual premium of $3,239 in May 2009, May 2010, September 2010, and May 2011 for the force-placed coverage. The insurance premiums were added to the balance of Ms. Lugo's loan balance, and the insurance premiums were paid first, before any payment was applied to the principal or interest owed on the underlying mortgage loan.   A percentage of the premium was kicked back to the BOA Defendants or a Bank of America affiliate (believed to be BAISI).

73.      There is no material difference between Defendants' actions and practices directed to Ms. Lugo and their actions and practices directed to the Class.

C.     **Plaintiffs Donald and Joan Novell**

74.     Plaintiffs Donald and Joan Novell obtained a loan from Amnet Mortgage Inc.,
d/b/a American Mortgage Network of Florida which was secured by a mortgage on real
property located in West Palm Beach, Florida.  The mortgage loan was serviced by BAC Home
Loans.[14]

75.     In October 2009, the Novells' voluntary insurance policy with Citizens Property
Insurance Corporation ("Citizens") lapsed.

76.     In July 2010, the Novells received a notice from that the BOA Defendants
(through Balboa) had force-placed insurance on the mortgaged property effective May 15, 2010
to May 15, 2011.  The Novells were charged an annual premium of approximately $12,931
which was added to balance of the Novells' mortgage loan.

77.     In May 2011, the Novells received a notice that the force-placed insurance on
their property would be renewed for the period May 15, 2011 to May 15, 2012.  The Novells
were charged an annual premium of approximately $18,310 which was added to the balance of
the Novells' mortgage loan.

78.     During the time the Novells were charged these premiums, Citizens quoted the
Novells an annual premium of $4,015 (approximately 4½ times less than the force-placed
insurance premium) to cover the same property.

79.     The premiums charged to the Novells included undisclosed amounts kicked back
to the BOA Defendants and their affiliates and other illegitimate costs.

---

[14].   U.S. Bank National Association, as Trustee for SARM 05-19XS, has filed a foreclosure
lawsuit in the 15th Circuit Court in and for Palm Beach County, claiming an interest in the
Novells' mortgage loan.  Thus, it appears that the Novells' mortgage debt has been securitized,
and that BAC Home Loans, LP manages that loan pursuant to an agreement with the
securitization trustee.

80.     There is no material difference between these Defendants' actions and practices directed to the Novells and their actions and practices directed to the Class.

**D**.     **Plaintiff Joseph Gallagher**

81.     In April 2006, Plaintiff Joseph Gallagher obtained a loan from Amnet Mortgage Inc. d/b/a American Mortgage Network of Florida secured by a mortgage on real property located in Florida. The mortgage loan was transferred first to Countrywide Home Loans (Defendant BAC Home Loans, LP's predecessor in interest), and ultimately to the Federal National Mortgage Association (a/k/a "Fannie Mae"), and has been serviced by BAC Home Loans or its predecessor Countrywide Home Loans since shortly after it was originated.

82.     Mr. Gallagher obtained insurance on the property through Citizens.

83.     On October 1, 2009, Mr. Gallagher received a Notice stating that the BOA Defendants (through Balboa) were force-placing windstorm and hail insurance on the property through a surplus-line insurance provider, Lexington Insurance.  The annual premium for the force-placed policy totaled approximately $4,491.   That amount was deducted from Mr. Gallagher's escrow account on September 29, 2009.

84.     Upon information and belief, Mr. Gallagher's Citizens insurance policy was in effect at the time of the force-placement and contained provisions for wind and hailstorm insurance.

85.     The annual cost of Mr. Gallagher's Citizens insurance policy, which included all hazard (not just windstorm and hail) and covered his personal property and liability, totaled approximately $2,000—less than half the cost of the force-placed wind policy that covered only the dwelling.

86.     The October 1, 2009 Notice informed Mr. Gallagher that his monthly mortgage

payment would be adjusted to collect the force-place insurance premium balance.

87.     Between that date and February 22, 2013, hazard insurance premiums were deducted from Mr. Gallagher's escrow account at least five times in varying amounts, ranging from $669.09 to $2,044.00.

88.     Shortly thereafter, Mr. Gallagher's mortgage payment increased to the extent that he could no longer pay the full monthly amount. Upon information and belief, Mr. Gallagher initially paid at least a portion of the force-placed insurance premiums through his monthly mortgage payment.

89.     The increase in Mr. Gallagher's mortgage payment due to the force-placed insurance premium has led, at least in part, to his home going into foreclosure. Mr. Gallagher is currently a defendant in a contested foreclosure proceeding.

90.     The correspondence to Mr. Gallagher never disclosed that the premium included costs for the kickbacks and unearned commissions, the offset of administrative costs performed by the vendor, or a captive reinsurance arrangement.

91.     There is no material difference between these Defendants' actions and practices directed to Mr. Gallagher and their actions and practices directed to the Class.

       **E.     Plaintiff John Vidrine**

92.     John Vidrine purchased his home in Ville Platte, Louisiana on June 2, 2007, with a mortgage from Countrywide Home Loans, Inc. Countrywide Home Loans is now Bank of America. Thus, Bank of America now owns and/or services Mr. Vidrine's mortgage.

93.     Mr. Vidrine's home is located in a Special Flood Hazard Area ("SFHA") and he must maintain flood insurance on his property. According to his mortgage, he must carry flood insurance "in the amount that Lender requires." His mortgage further states that "if Borrower

fails to maintain any of the coverages "that Lender requires," that "Lender may obtain insurance coverage, at Lender's option and Borrower's expense."

94.    Mr. Vidrine maintained over $80,000 in flood insurance coverage through his private insurer until at least 2011.  However, the BOA Defendants determined that Mr. Vidrine did not have adequate flood insurance coverage and force-placed flood insurance on his property through QBE/Balboa.

95.    On September 25, 2011, the BOA Defendants force-placed flood insurance on Mr. Vidrine's property. The force-placed insurance policy was effective from August 5, 2011 through August 5, 2012.  The premium was $831.08.

96.    The BOA Defendants threatened to force-place additional flood insurance on Mr. Vidrine's property in 2012. On June 21, 2012, Mr. Vidrine was sent a letter notifying him that his force-placed flood insurance policy would expire on August 5, 2012, but would automatically renew for another year. This letter stated further that Mr. Vidrine was required to maintain flood insurance equal to the lesser of: (1) the replacement cost value of his property; or (2) the maximum flood insurance allowed under the NFIP, which is $250,000. The notice states that coverage equal to unpaid loan balance is only an available option for flood insurance if replacement cost coverage is not available. This is a misstatement of federal law and Mr. Vidrine's mortgage.

97.    The BOA Defendants charged $831.08 to Mr. Vidrine's mortgage escrow account in September 2012.  The BOA Defendants, Balboa, BAISI, or another Bank of America affiliate retained a portion of this premium as a "commission." The rest was paid to QBE.

98.    There is no material difference between these Defendants' actions and practices directed to Mr. Vidrine and their actions and practices directed to the Class.

F.      **Plaintiff Catherine Soileau**

99.     Catherine Soileau purchased her home in Rayne, Louisiana on February 28, 2005. She financed her purchase with a $66,800 first mortgage from Net Bank. Ms. Soileau took out a second mortgage with Net Bank for $16,700. Bank of America currently owns and/or services both of Ms. Soileau's mortgages.

100.    Because Ms. Soileau's home is located in an SFHA, her mortgage and federal law require that she must maintain flood insurance.

101.    Ms. Soileau's first mortgage is a Louisiana Fannie Mae/Freddie Mac uniform mortgage. It provides that she must carry flood insurance "in the amount that Lender requires." The mortgage further states that "if Borrower fails to maintain any of the coverages . . . that Lender requires," that "Lender may obtain insurance coverage, at Lender's option and Borrower's expense." Her second mortgage contains nearly identical language.

102.    Throughout 2011 and 2012, Ms. Soileau voluntarily maintained approximately $117,000 in flood insurance through Louisiana Farm Bureau. Despite this coverage, the BOA Defendants twice force-placed additional flood insurance on Ms. Soileau's property through Balboa and/or QBE.

103.    On April 14, 2011, the BOA Defendants sent Ms. Soileau a Notice of Placement of Lender-Placed Flood Insurance. The policy provided $7,000 in flood insurance coverage and Bank of America charged $36.75 to Ms. Soileau's mortgage escrow account. The policy, though purchased on April 14, 2011, was effective from February 23, 2011 through February 23, 2012.

104.    On February 29, 2012, the BOA Defendants sent Ms. Soileau another notice that it had force-placed flood insurance on her property, renewing and slightly augmenting the prior year's force-placed insurance policy. This new policy provided $8,000 in flood insurance

coverage and Bank of America charged $42.00 to Ms. Soileau's escrow account.

105.    Each time the BOA Defendants charged Ms. Soileau's escrow account, they or one of their affiliates received a percentage of the charge as a kickback. The rest was retained by the force-placed insurance provider.

106.    The force-placed flood insurance premiums that the BOA Defendants charged to Ms. Soileau's escrow account were unnecessary and excessive. As of April 14, 2011, Ms. Soileau's total mortgage balance was $76,630. The BOA Defendants force-placed $7,000 in flood insurance coverage in addition to her voluntary coverage of $117,000, resulting in a total requirement of $124,000. As of February 29, 2012, Ms. Soileau's total mortgage balance was $59,786. The BOA Defendants force-placed $8,000 in flood insurance coverage in addition to her voluntary coverage of $117,000, resulting in a total requirement of $125,000.

107.    Ms. Soileau mailed notice of her objections to the BOA Defendants' practices and her intent to file suit against them prior to joining this lawsuit.

108.    There is no material difference between these Defendants' actions and practices directed to Ms. Soileau and their actions and practices directed to the Class.

### G.    Plaintiffs John and Jacquelyn Totura

109.    Plaintiffs John and Jacquelyn Totura ("the Toturas"), husband and wife, are residents of Bradford County, Florida. The Toturas own their home in Starke, Florida. The Toturas purchased their home on August 10, 1998 with a mortgage through America's Wholesale Lender, a fictitious name for Countrywide Home Loans, Inc., which was purchased by Bank of America in 2009. Plaintiffs' mortgage has always been serviced by BAC Home Loans and Bank of America.

110.    The Toturas' mortgage is a Florida Fannie Mae/Freddie Mac Uniform Instrument.

Paragraph 5 of the Toturas' mortgage requires that they maintain hazard insurance "in the amounts and for the periods that Lender requires" and states that "[i]f Borrower fails to maintain coverage . . . Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property."

111.   Prior to Bank of America's purchase of Countrywide, the Toturas and Countrywide had an agreement that the Toturas would self-insure their property.

112.   When Bank of America purchased Countrywide and became the servicer of the Toturas' mortgage, BAC Home Loans began force-placing hazard insurance on the property. The Toturas were notified via letter dated August 12, 2009 that BAC Home Loans would force-place hazard insurance on the property if they did not obtain the coverage that BAC Home Loans required.  BAC Home Loans sent a second notice on August 27, 2009. On October 4, 2009, BAC Home Loans sent a final letter, stating that it had, in fact, force-placed a hazard insurance policy on their property. The cost of this policy was $715.73, and BAC Home Loans created an escrow account for payment of this premium.  Although the Toturas' outstanding loan balance was only $59,511.00 at the time, Defendants force-placed an $83,000.00 insurance policy.  This force-placed policy was through Defendant Balboa.

113.   The insurance policy that BAC Home Loans forced in October 2009 covered a time period spanning from July 2009 to July 2010.  Thus, the 2009 force-placed policy covered at least three months which had already passed.  The Toturas' property suffered no losses during this time.

114.   Beginning in October 2009, BAC Home Loans increased the Toturas' monthly mortgage payments to include payments on the newly created escrow account.  When the Toturas continued paying their regular monthly payments, BAC Home Loans stopped crediting

their mortgage account with the payment amounts, instead placing the Toturas' monthly mortgage payments in a non-interest-bearing suspense account. BAC Home Loans then considered the Toturas' mortgage account past due and sent them a letter titled "Notice of Intent to Accelerate."

115.    BAC Home Loans forced two more insurance policies on the Toturas' property, in October 2010 and October 2011. These policies also covered the annual period from July to July, and were thus backdated by at least three months each time. The cost of the 2010 and 2011 force-placed policies were $503.76 and $716.02 respectively.

116.    Plaintiffs contacted Bank of America in writing several times in attempts to obtain documents and other information related to their mortgage account, including letters dated March 25, 2010, August 15, 2011, and September 9, 2011.

117.    Because of their troubles with BAC Home Loans, the Toturas retained an attorney who sent a Qualified Written Request on March 25, 2010, requesting certain information pursuant to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e). Among other things, the Toturas' March 25, 2010 letter expressed concern about BAC Home Loans' application of their mortgage payments and BAC Home Loans' force placement of hazard insurance. The March 25, 2010 letter requested, among other things, copies of the Toturas' Note and Mortgage and any letters, statements or documents sent to them by BAC Home Loans.

118.    BAC Home Loans responded to the Toturas' March 25, 2010 letter on April 30, 2010. BAC Home Loans declined to provide much of the information that the Toturas had requested, including copies of their mortgage and note. BAC Home Loans' stated reason was that "Countrywide/Bank of America did not originate the subject loan" and thus "Countrywide/Bank of America is not responsible" for any communications that occurred at

origination of the loan.  BAC claimed that "the owner of this loan is U.S. Bank" and that "Bank of America services the loan on behalf of the owner."  This statement turned out to be incorrect.

119.    The Toturas contacted U.S. Bank concerning their mortgage loan.  On July 23, 2010, U.S. Bank responded that "[w]e have no records or loan number ending 9793, nor do we have a record of the property address you provided.  Based on this information it does not appear US Bank is a legal owner."

120.    On February 23, 2012, the Toturas received another letter in response to requests about their mortgage account.  This letter was in response to the Toturas' letters dated August 15, 2011 and September 9, 2011.  According to this letter, the Toturas had expressed several additional concerns, including, but not limited to:

    a.   The BOA Defendants had provided the Toturas an incorrect customer service number; they therefore had difficulty contacting the BOA Defendants concerning their loan;

    b.   The copy of the recorded mortgage that the Toturas received from differed from the mortgage on record.  Therefore the Toturas requested copies of the original documents from the BOA Defendants;

    c.   The Toturas did not receive accurate year-end mortgage statements or escrow analyses;

    d.   The Toturas' cashier's checks, which were addressed to America's Wholesale Lender, the name of the lender on their mortgage, were altered by BAC Home Loans;

    e.   The Toturas' concern that BAC Home Loans was sending past-due notices when their account was not past due; and

    f.   The Toturas' concern that Plaintiff Jacquelyn Totura's name had been forged on the mortgage documents.

121.    BAC Home Loans' 2012 letter confirms that BAC Home Loans forced hazard insurance on the Toturas' property and that this coverage was backdated. This letter also confirms that BAC Home Loans did not apply the Toturas' mortgage payments to the mortgage

account, but rather held their payments in a non-interest-bearing account and considered their account past due. Additionally, this letter confirms that BAC Home Loans provided the Toturas with an incorrect customer service number and incorrectly told them that US Bank owned their mortgage.

122.    According to BAC Home Loans' 2012 letter, Bank of America had always owned and/or serviced the Toturas' mortgage. Based on BAC Home Loans' own admission, "America's Wholesale Lender and Bank of America are one in the same." Bank of America never fully responded to the Toturas' request for their mortgage documents, stating that "[w]e are unable to send you the original Mortgage and Note, as these are not available for forwarding." BAC Home Loans did, however, provide them with the correct customer service phone number several months after the Toturas had closed their mortgage account.

123.    To get free from BAC Home Loans and their practices, the Toturas paid off their mortgage and a "Satisfaction of Mortgage" was filed in the county recorder's office on October 4, 2011.

124.    Upon information and belief, Bank of America or its affiliates received kickbacks as a result of the force-placed insurance policy imposed on the Toturas.

125.    There is no material difference between these Defendants' actions and practices directed to the Toturas and their actions and practices directed to the Class.

## CLASS ALLEGATIONS

### A.    Class Definitions

126.    Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. Plaintiffs seek to represent the following classes:

Nationwide Class

Plaintiffs Cherryl Hall, Marla Lugo, Donald and Joan Novell, Joseph Gallagher, John Vidrine, Catherine Soileau, and John and Jacquelyn Totura represent:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard and/or flood insurance policy placed on property through Bank of America and/or BAC Home Loans and/or these companies' affiliates, entities, or subsidiaries.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

Florida Subclass as to Count XI – Florida Deceptive and Unfair Trade Practices Act:

Plaintiffs Donald and Joan Novell, Joseph Gallagher, John Totura, and Jacquelyn Totura represent:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard and/or flood insurance policy placed on property located within the State of Florida, through Bank of America and/or BAC Home Loans and/or these companies' affiliates, entities, or subsidiaries.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

New York Subclass as to Count XII – New York General Business Law § 349:

Plaintiff Marla Lugo represents:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard and/or flood insurance policy placed on property located within the State of New York, through Bank of America and/or BAC Home Loans and/or these companies' affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

Arkansas Subclass as to Count XIII – Arkansas Deceptive Trade Practices Act:

Plaintiff Cherryl Hall represents:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard and/or flood insurance policy placed on property located within the State of Arkansas,

through Bank of America and/or BAC Home Loans and/or these companies' affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

127.     Plaintiffs reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

128.     Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

### B.     Numerosity

129.     The proposed classes are so numerous that joinder of all members would be impracticable.  Defendants sell and service millions of mortgage loans and insurance policies in the states of Florida, Louisiana, New York, and Arkansas, as well as nationwide.  The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.  Each class numbers at least in the thousands.  Although the precise number of members for each class can only be obtained through discovery, the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

### C.     Commonality

130.     There are questions of law and fact that are common to all Plaintiffs' and class members' claims.  These common questions predominate over any questions that go particularly to any individual class member.   Among such common questions of law and fact are the following:

a.  Whether Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages and/or backdated coverage that

33

covered periods of time for which the BOA Defendants had no risk of loss;

b.  Whether the BOA Defendants breached the mortgage contracts with Plaintiffs and the nationwide class by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions and reinsurance payments) and by charging Plaintiffs and the class for servicing their loans;

c.  Whether Defendants have been unjustly enriched at the expense of the Plaintiffs and the nationwide class;

d.  Whether the BOA Defendants breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with selected insurers and/or their affiliates, which resulted in inflated insurance premiums being charged to Plaintiffs and the nationwide class;

e.  Whether Defendants manipulated forced-placed insurance purchases to maximize their profits to the detriment of Plaintiffs and the classes;

f.  Whether Bank of America affiliates (e.g., BAISI) perform any work or services in exchange for the "commissions" or other "compensation" they collect;

g.  Whether the premiums charged are inflated to include kickbacks and unwarranted "commissions;"

h.  Whether the premiums charged are inflated to include charges for bundled administrative services that the vendors provide to the lenders or mortgage servicers, and which are not chargeable to Plaintiffs and the classes under the terms of their mortgages;

i.  Whether the premiums charged are inflated to include the cost of a captive reinsurance arrangement;

j.  Whether the force-placed insurers intentionally and unjustifiably interfered with the Plaintiffs' and the nationwide class's rights under the mortgage contracts by paying kickbacks to the lenders/mortgage servicers or their affiliates and by charging for administering the loan portfolio;

k.  Whether the BOA Defendants violated TILA by conditioning their extensions of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers' mortgages;

l.  Whether the BOA Defendants violated TILA by failing to disclose kickbacks charged to class members in their mortgages;

m. Whether Bank of America violated the anti-tying provisions of the federal Bank Company Holding Act by tying their agreement to purchase insurance on behalf of class members, and their continuing extensions of credit, on class members agreeing that they could purchase insurance through their affiliate;

n. Whether an objective consumer would be deceived by BAC Home Loans' arrangement, which incentivizes Defendants to charge excessive fees for force-placed insurance, and therefore violates Florida's Deceptive and Unfair Trade practices law;

o. Whether Defendants' failure to inform Plaintiff Lugo and members of the New York Subclass that force-placed insurance premiums include costs of kickbacks, administrative costs performed by insurance vendors, and/or captive reinsurance premiums is deceptive and unfair in violation of the New York GBL § 349;

p. Whether Defendants' failure to inform Plaintiff Cherryl Hall and members of the Arkansas subclass that force-placed insurance premiums include the costs of kickbacks, administrative services performed by insurance vendors, and/or captive reinsurance premiums is deceptive and unfair in violation of the Arkansas Deceptive Trade Practices Act;

q. Whether Defendants violated the federal RICO statute by including material misrepresentations in notices and other documents mailed to borrowers; and

r. Whether Plaintiffs and the Classes are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.     Typicality**

131.    Each Plaintiff is a member the Class he or she seeks to represent.  Plaintiffs' claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**E.     Adequacy of Representation**

132.    Each Plaintiff is an adequate representative of the class he or she seeks to represent and will fairly and adequately protect the interests of that class.  Plaintiffs are

35

committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiffs and the unnamed class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

133.    To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F.      Requirements of Fed. R. Civ. P. 23(b)(3)**

134.    The questions of law or fact common to Plaintiffs' and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiffs and the unnamed class members are based on the force-placed insurance policies that Defendants unlawfully secured and their deceptive and egregious actions involved in securing the force-placed policy.

135.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

136.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.      Superiority**

137.    A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> 1.      Joinder of all class members would create extreme hardship and inconvenience for the affected class members as they reside all across the United States;

2.    Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;

3.    There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

4.    The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

5.    Individual suits would not be cost effective or economically maintainable as individual actions; and

6.    The action is manageable as a class action.

**H.    Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

138.    Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

139.    Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**COUNT I**

**BREACH OF CONTRACT**
**(All Plaintiffs against the BOA Defendants)**

140.    Plaintiffs re-allege and incorporate paragraphs 1-139 of this complaint as if fully set forth herein.  Plaintiffs further allege as follows.

141.    Plaintiffs and all similarly situated class members have mortgages that are owned and/or serviced by the BOA Defendants.

142.    Plaintiffs and these class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements

and its placement by the BOA Defendants.   The force-placed provisions from Plaintiffs' mortgages are described above in paragraphs 40, 41, and 42.

143.    Plaintiffs' mortgages require that they maintain insurance on their properties and provide that if they fail to do so, then the lender may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the cost.

144.    The BOA Defendants charge borrowers premiums that include unearned "commissions" or kickbacks, reinsurance premiums, as well as bundled administrative and other impermissible costs.   These costs are not costs of coverage, and are not applied to protecting the BOA Defendants' rights or risk in the collateral for borrowers' mortgage loans.   The BOA Defendants breached the mortgage agreements by, among other things, charging Plaintiffs and class members amounts beyond the actual cost of coverage.

145.    The BOA Defendants also breached Plaintiffs' and the class members' mortgage agreements by charging Plaintiffs and class members for excess and unnecessary force-placed insurance coverage, including retroactive coverage, as such coverage does not protect the BOA Defendants' rights in their collateral or cover their risk.

146.    Plaintiffs and the Class members have suffered damages as a result of the BOA Defendants' breaches of contract.

**WHEREFORE**, Plaintiffs Hall, Vidrine, Soileau, Gallagher, Lugo, the Novells, and the Toturas, on behalf of themselves and all similarly situated Class members, seek compensatory damages resulting from the Bank of America Defendants' breaches of contract, as well as injunctive relief preventing it from further violating the terms of the mortgages.   Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (All Plaintiffs against the BOA Defendants)

147.    Plaintiffs re-allege and incorporate paragraphs 1-139 of this complaint as if fully set forth herein.  Plaintiffs further allege as follows.

148.    A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

149.    Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

150.    Plaintiffs' and class members' mortgage contracts allow the BOA Defendants to force-place an insurance policy on the borrower's property in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

151.    The mortgage contracts afford the BOA Defendants substantial discretion in force placing insurance coverage.  They are permitted to unilaterally choose the company from which they purchase insurance and negotiate a price for the coverage they procure.  The servicers have an obligation to exercise the discretion afforded them in good faith, and not capriciously or in bad faith.

152.    Plaintiffs do not seek to vary the express terms of the mortgage contract, but only to insure that the BOA Defendants exercise their discretion in good faith.

153.    The BOA Defendants breached the implied covenant of good faith and fair dealing by, among other things:

    a.    Manipulating the force-placed insurance market by selecting insurers (here, QBE/Balboa and their affiliates) that will artificially inflate premiums to

include kickbacks to Bank of America affiliates (e.g., BAISI) and issue excess insurance coverage not necessary to cover the BOA Defendants' risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased from QBE/Balboa and their affiliates without seeking a competitive price;

b.   Exercising their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies with artificially inflated premiums to maximize their own profits;

c.   Assessing inflated and unnecessary insurance policy premiums against Plaintiffs and class members and misrepresenting the reason for the cost of the policies;

d.   Collecting a percentage or allowing its affiliates to collect a percentage of whatever premiums are charged to Plaintiffs and the Class and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

e.   Charging Plaintiffs and the Class for commissions when the insurance is prearranged and no commission is due;

f.   Charging Plaintiffs and the Class inflated premiums due to the captive reinsurance arrangement;

g.   Charging Plaintiffs and the Class for having the vendor perform their obligation of administering its mortgage portfolio which is not chargeable to Plaintiffs or the Class;

h.   Force placing insurance coverage in excess of what is required by law or borrowers' mortgage agreements; and

i.   Force placing insurance coverage in excess of that required to cover the lender's interest in the property, or the balance owed on the loan.

154.   As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

**WHEREFORE**, Plaintiffs Hall, Gallagher, Vidrine, Soileau, Lugo, the Novells, and the Toturas, on behalf of themselves and similarly situated Class members, seek a judicial declaration determining that the premiums charged and the terms of the force-placed insurance

policies violate the duties of good faith and fair dealing. Plaintiffs also seek compensatory damages resulting from the Bank of America Defendants' breaches of their duties. Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

### UNJUST ENRICHMENT
### (All Plaintiffs against the BOA Defendants and BAISI)[15]

155.   Plaintiffs re-allege and incorporate paragraphs 1-139 above as if fully set forth herein and further allege as follows.

156.   The BOA Defendants and BAISI received from Plaintiffs and the Class benefits in the form of inflated insurance premiums related to force-placed insurance policies, unwarranted kickbacks and commissions, captive reinsurance arrangements, and subsidized loan servicing costs.

157.   These Defendants entered into an agreement whereby QBE (and before QBE, Balboa)—would provide force-placed insurance policies to the BOA Defendants for the portfolio of loans monitored on behalf of the BOA Defendants. The BOA Defendants would then charge Plaintiffs and the Class premiums that had been artificially inflated to include costs not properly chargeable to the borrower. The force-placed policies imposed on borrowers were therefore far more expensive than those available to borrowers in the open market that provide even more coverage.

158.   These Defendants also collected premiums on force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

159.   QBE and Balboa paid and collected significant monies in premiums, kickbacks,

---

[15] Plaintiffs plead their unjust enrichment claim against Bank of America in the alternative to their contractual claims against it.

commissions, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage). Commissions or kickbacks were paid directly to the BAISI and/or the BOA Defendants in order to be able to exclusively provide force-placed insurance policies. QBE and Balboa were mere conduits for the delivery of the kickbacks, "commissions," and other charges to the BOA Defendants and BAISI.

160. These payments directly benefitted the BOA Defendants and BAISI and were taken to the detriment of the borrower. The kickbacks and commissions, reinsurance arrangements, and subsidized costs were subsumed into the price of the insurance premium and ultimately paid by the borrower. Therefore, these Defendants had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

161. Further, the BOA Defendants received financial benefits in the form of increased interest income, duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause, and/or "soft-dollar" credits.

162. As a result, Plaintiffs and the Class have conferred a direct benefit on the BOA Defendants and BAISI.

163. The BOA Defendants and BAISI had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

164. These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class Members, demand an award against the BOA Defendants and BAISI in the amounts by which these Defendants have been unjustly enriched at Plaintiffs' and the Class members' expense, and

such other relief as this Court deems just and proper.

## COUNT IV

### UNJUST ENRICHMENT
### (Plaintiffs against QBE, individually and as successor-in-interest to Balboa and QBE First)

165.    Plaintiffs re-allege and incorporate paragraphs 1-139 above as if fully set forth herein and further allege as follows.

166.    QBE received from Plaintiffs and Class members benefits in the form of insurance premiums related to force-placed insurance policies.

167.    QBE paid significant monies to the BOA Defendants and BAISI in kickbacks, commissions, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage).  Commissions or kickbacks were paid directly to the BOA Defendants and BAISI in order to be able to exclusively provide force-placed insurance policies and receive the corresponding insurance premiums.

168.    QBE also collected premiums on force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

169.    On information and belief, QBE deducted the excess premiums directly from borrowers' escrow accounts.  In the alternative, the BOA Defendants were mere conduits for the delivery of insurance premiums to QBE.

170.    As a result, Plaintiffs and the Class have conferred a direct benefit on QBE.

171.    QBE had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

172.    Upon information and belief, subsequent to the sale of Balboa's force-placed insurance business to QBE in June 2011, QBE First assumed the duties of monitoring Bank of

America's loan portfolio.

173. In exchange for providing Bank of America's with this low-cost loan servicing, QBE First received a commission from each homeowner's force-placed insurance policy premium. The loan monitoring is the responsibility of the mortgage servicer and payments for it are not properly chargeable to the borrowers.

174. Upon information and belief this "commission" was deducted directly from borrowers' escrow accounts. In the alternative, the BOA Defendants were mere conduits for the delivery of the commission to QBE First.

175. QBE First had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

176. QBE and QBE First will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which the QBE Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demands an award against QBE in the amounts by which it has been unjustly enriched at Plaintiff's and the Class members' expense, and such other relief as this Court deems just and proper.

### COUNT V

### BREACH OF FIDUCIARY DUTY
### (Plaintiffs Cheryl Hall, Joseph Gallagher, Donald and Joan Novell, John and Jacquelyn Totura, and Marla Lugo against the BOA Defendants)

177. Plaintiffs Hall, Gallagher, Lugo, the Novells, and the Toturas re-allege and incorporate paragraphs 1-139 of this complaint as if fully set forth herein, and further allege as follows.

178.    The BOA Defendants hold funds in escrow on behalf of borrowers whose mortgages they service.   These funds are designated for the purpose of paying insurance premiums when due.   Any excess funds are to be returned to the above-named Plaintiffs and members of the Class under the terms of the mortgage agreements.

179.    Fiduciary relationships exist between the above-named Plaintiffs and the BOA Defendants because the BOA Defendants have received a greater economic benefit than that taken from a typical escrow transaction.   Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when the BOA Defendants took it upon themselves to manage borrowers' escrow accounts and withdrew money from such escrow accounts to pay force-placed insurance premiums.   The BOA Defendants violated their fiduciary duties to Plaintiffs and class members when they intentionally withdrew amounts beyond the cost of insurance—amounts that would cover unlawful kickbacks or other compensation under the force-placed insurance scheme described above.   The kickbacks or other compensation provide the BOA Defendants and their affiliate, BAISI, a greater economic benefit than what was contemplated under the mortgage.

180.    The BOA Defendants breached their fiduciary duties to Plaintiffs and other members of the proposed class by (1) not acting in the borrowers' best interest by profiting from force-placed insurance policies that were purchased using escrow funds held for the benefit of Plaintiffs and Class members at the expense of Plaintiffs and Class members, and (2) not disclosing the kickback scheme to Plaintiffs and Class Members.

181.    These actions were undertaken by the BOA Defendants in bad faith, were solely for their benefit, and were not intended to benefit the above-named Plaintiffs or other proposed class members.

182.    As a direct result of the BOA Defendants' actions and subversion of these Plaintiffs' interest to their own in reaping extravagant and outrageous fees, Plaintiffs and all others similarly situated have suffered injury in the form of unnecessary and excessive escrow charges and a loss of funds from their escrow accounts.

**WHEREFORE**, the above-named Plaintiffs and the proposed class are entitled to damages for the BOA Defendants' breach of their fiduciary obligations and misappropriation of escrow funds.  In addition, these Plaintiffs and the Class are entitled to punitive damages because the BOA Defendants acted in bad faith in deliberate or reckless disregard of their rights and of the BOA Defendants' obligation to hold their escrow funds in trust.

## COUNT VI

## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (All Plaintiffs against the QBE Defendants)

183.    Plaintiffs re-allege and incorporate paragraphs 1-139 of this complaint as if fully set forth herein.  Plaintiffs further allege as follows.

184.    Plaintiffs and the Class Members have an advantageous business and contractual relationship with the BOA Defendants pursuant to their mortgage contracts.  Plaintiffs and the Class have legal rights under these mortgage contracts.  For example, Plaintiffs and the Class have a right not to be charged exorbitant premiums in bad faith for forced-place insurance.

185.    The QBE Defendants have (and Balboa had) knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiffs and the Class members and the BOA Defendants.  The insurers are not party to the mortgage contracts and are not a third-party beneficiaries of the mortgage contracts. Further, neither the QBE Defendants nor Balboa has/had any beneficial or economic interest in the mortgage contracts.

186.    The QBE Defendants and Balboa intentionally and unjustifiably interfered with

Plaintiffs' and the Class's rights under their mortgage contracts, as described above by, *inter alia*, entering into or continuing an exclusive relationship with the BOA Defendants and their affiliate by which they provide compensation (kickbacks, reinsurance, and low-cost services) to the BOA Defendants and BAISI in exchange for the exclusive right to force place inflated and unnecessary premiums, which they purposefully and knowingly charge to Plaintiffs and the Class.

187.   Plaintiffs and the Class have been damaged as a result of the QBE Defendant's and Balboa's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges for force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE,** Plaintiffs and all Class members similarly situated seek a judgment against the QBE Defendants and Balboa for the actual damages suffered as a result of their tortious interference.  Plaintiffs also seek all costs of litigating this action including attorney's fees.

## COUNT VII

### VIOLATIONS OF THE TRUTH IN LENDING ACT 15 U.S.C. § 1601 *et seq.*
### (All Plaintiffs against the BOA Defendants)

188.   Plaintiffs re-allege and incorporate paragraphs 1-139 of this complaint as if fully set forth herein.  Plaintiffs further allege as follows.

189.   The above-named Plaintiffs' and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, ("TILA") and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

190.   The BOA Defendants are "creditors" as defined by TILA because they owned

Plaintiffs' mortgages and changed the terms of the mortgages so as to create a new mortgage obligation, of which the BOA Defendants were the creditors.

191.    Pursuant to TILA, the BOA Defendants were required to accurately and fully disclose the terms of the legal obligations between the parties. 12 C.F.R. § 226.17(c).

192.    The BOA Defendants violated TILA, specifically 12 C.F.R. § 226.17(c), when they (i) added force-placed insurance to Plaintiffs' mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan monitoring, and/or other profiteering involving the BOA Defendants and/or their affiliates as a result of the purchase of force-placed insurance.

193.    The BOA Defendants changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance premiums, and thus created a new debt obligation when they changed the terms of Plaintiffs' mortgages to allow previously unauthorized kickbacks and insurance amounts in excess of the BOA Defendants' interests in the property.  Under TILA, the BOA Defendants were then required to provide a new set of disclosures showing the amount of the insurance premiums (i.e. finance charges) and all components thereof.  The BOA Defendants increased the principal amount due under Plaintiffs' mortgages when they force-placed insurance.  This created a new debt obligation for which new disclosures were required.

194.    The BOA Defendants adversely changed the terms of Plaintiffs' loans after origination in order to allow a Bank of America affiliate to receive a kickback on force-placed insurance premiums.  These kickbacks are not authorized in the mortgage in any clear and unambiguous way. The BOA Defendants never disclosed to borrowers the amount of the "commissions" or other unearned profits paid to their affiliate.

195.     The BOA Defendants also violated TILA by adversely changing the terms of Plaintiffs' loans after origination by requiring and threatening to force-place more insurance than necessary to protect their interest in the property securing the mortgages.

196.     With respect to Plaintiffs Hall and Vidrine and force-placed flood insurance Class members, the BOA Defendants also violated TILA when they (i) misrepresented in insurance notices that Plaintiffs were obligated by federal law to maintain flood insurance in amounts greater than required by federal law and/or greater than necessary to protect their interest in the property securing the mortgages; and (ii) failed to correct the original disclosures when the prior disclosures clearly differ from the BOA Defendants' current insurance requirements.

197.     Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because the BOA Defendants' kickback, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among the Bank of America Defendants and their affiliates and was concealed from borrowers.

198.     Plaintiffs and Class Members have been injured and have suffered a monetary loss arising the BOA Defendants' violations of TILA.

199.     As a result of the BOA Defendants' TILA violations, Plaintiffs and Class Members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)–(2).

200.     Plaintiffs and Class Members are also entitled to recovery of attorneys' fees and costs to be paid by the BOA Defendants, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT VIII

### VIOLATION OF THE ANTI-TYING PROVISIONS OF THE
### BANK HOLDING COMPANY ACT, 12 U.S.C. §1972 *et seq.*
### (All Plaintiffs against Bank of America)

201.    Plaintiffs re-allege and incorporate paragraphs 1-139 of this complaint as if fully set forth herein.  Plaintiffs further allege as follows.

202.    Bank of America's kickback scheme violates the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. § 1972, *et seq.* (the "BHCA").

203.    The BHCA, 12 U.S.C. § 1972(b), states that "a bank shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement . . . (B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company."

204.    BAISI is subsidiary of Defendant Bank of America or its holding company.

205.    Bank of America's purchase of insurance on borrowers' behalf is a service that Bank of America offers to its borrowers. To accept this service, borrowers must agree to pay commissions to Bank of America or its subsidiary BAISI for unidentified services.

206.    Upon information and belief, the BOA Defendants, BAISI, and Balboa (now QBE) entered into contractual arrangements under which BAISI would act as the "broker" or "agent" for 100% of force-placed insurance policies purchased on behalf of Bank of America's borrowers. Under these agreements, BAISI received a guaranteed commission for every force-placed insurance policy procured on behalf of Bank of America's borrowers equal to a set percentage of the premium for each policy.

207.    BAISI does not engage in any insurance broker or agent services.  For example, BAISI does not seek out competitive insurance policies from different insurance providers, but refers all force-placed insurance business to Balboa (now QBE).

208.    This is an unusual banking practice.  Bank of America's exclusive agreement with Balboa/QBE obviates any opportunity for BAISI to earn a commission.

209.    The following practices are anti-competitive:

   a.  Bank of America and BAC refer all force-placed insurance business to BAISI and guarantee BAISI's commissions. The commissions paid are based on contracts between Bank of America and Balboa/QBE, not on any services actually provided to Plaintiffs by BAISI. BAISI has no competitive incentive to provide any services for borrowers;

   b.  Bank of America sets the commission amount that BAISI will receive. The substantial revenue that Balboa, which was once also a subsidiary of Bank of America, receives in premiums from Bank of America borrowers gives it an incentive to agree to any commission rate that Bank of America demands. QBE now receives these premiums and pays the commissions;

   c.  Bank of America's tying arrangement results in unreasonably high commissions. The commissions are a percentage of Balboa or QBE's premiums. Balboa and QBE provide more limited insurance policies than borrowers can obtain on the market but cost significantly more than other policies the borrowers would obtain on the open market. Bank of America's agreements allow BAISI to receive more than twice the commission any other insurance agent could receive for procuring more limited insurance than any other insurance agent would procure;

   d.  Unlike regular insurance agency arrangements, Bank of America utilizes its power as borrowers' mortgage lender and/or servicer to guarantee payment of commissions. Bank of America withdraws insurance premiums and commissions directly from borrowers' escrow accounts to pay commissions to its subsidiary, BAISI. If borrowers refuse to make increased payments to their escrow account, Bank of America coerces them into doing so with negative credit reporting and, potentially, foreclosing on their homes. Thus, Bank of America uses its power as borrowers' bank to steer commissions to itself through BAISI;

   e.  Bank of America's force-placed insurance arrangement usurps market share from other insurance agencies in favor of its own subsidiary BAISI. Force-placed insurance may be a more costly option than purchasing insurance on the open market, but it is a significantly easier and less demanding option. Hundreds of thousands of homeowners in the United States have allowed Bank of America to

purchase force-placed flood insurance on their property since 2008 alone, resulting in tens of millions of dollars in commissions being paid to BAISI; and

f.   Bank of America's exclusive purchase arrangement and kickback scheme artificially inflates the price of force-placed insurance and artificially increases commissions paid to Bank of America's captive insurance agent. The artificially inflated price of force-placed insurance is only possible because Bank of America refers 100% of its force-placed insurance business to Balboa/QBE. As one of the nation's largest mortgagees and mortgage servicers, Bank of America's exclusive force-placed insurance referrals can and do substantially affect competitive incentives to reduce prices. This guarantees distorted commissions to BAISI, whose commissions are a percentage of Balboa's or QBE's inflated premiums.

210.   The "tied product" in this arrangement is BAISI's "service" of acting as an insurance agent for force-placed insurance.

211.   The "tying product" is Bank of America's purchase of force-placed insurance for borrowers.  Bank of America also ties its continued extension of credit to Plaintiffs' agreement to pay BAISI's commissions. Bank of America would foreclose on Plaintiffs' homes if they refused to pay BAISI's commissions after Bank of America charged them to Plaintiffs' escrow accounts.

212.   Bank of America ties the procurement of insurance on borrowers' behalf to BAISI's "service" as alleged above.

213.   Bank of America benefits directly and indirectly from this tying arrangement. Bank of America's own subsidiary, BAISI, receives commissions on all force-placed insurance. BAISI remits its profits to Bank of America, whether through direct money transfers, indirect money transfers through Bank of America's holding company, or "soft dollar" transfers.

214.   Plaintiffs and all others similarly situated have been damaged by Bank of America's anti-competitive tying arrangement in that they have paid excessive commissions to Bank of America through its subsidiary BAISI.

**WHEREFORE**, Plaintiffs and the proposed class are entitled to three times the amount of damages sustained, and the cost of suit, including a reasonable attorney's fee pursuant to 12

U.S.C. § 1975.  Plaintiffs and the proposed class are further entitled to an injunction barring Bank of America from continuing their unlawful conduct, including their exclusive purchasing arrangement with Balboa and the kickback scheme with Balboa.

**COUNT IX**

**Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)
(All Plaintiffs against All Defendants)**

215.    Plaintiffs re-allege and incorporate paragraphs 1-139 of this complaint as if fully set forth herein.  Plaintiffs further allege as follows.

216.    At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

217.    The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included the BOA Defendants, BAISI, Balboa, and QBE.

218.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiffs and Class Members to pay unreasonably high premiums for force-placed insurance through a scheme that inflated such premiums to cover kickbacks and expenses associated with monitoring the BOA Defendants' entire loan portfolio. Defendants shared the bounty of their enterprise, i.e., by sharing the premiums generated by the joint scheme.

219.    The RICO enterprise functioned over a period of years as a continuing unit and had a maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

220.    The BOA Defendants, BAISI, Balboa, and QBE conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

221.    The BOA Defendants, BAISI, QBE, and Balboa conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

222.    As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiffs and Class members with the intent to defraud and deceive Plaintiffs and Class members.  For example, Balboa and QBE, with the approval of the BOA Defendants, sent form letters to Plaintiffs on BAC letterhead, stating that BAC would purchase or renew hazard, wind, or flood force-placed insurance if voluntary insurance was not secured by a certain date.  These Defendants represented in the letters that BAC would purchase the required coverage and charge the borrower for the "cost" of the insurance coverage.  The letters also specified an amount for the "cost of Lender Placed Insurance" chargeable to the borrower.  In making these statements, Defendants knowingly and intentionally fostered the mistaken impression that the force-placed insurance premiums that

Plaintiffs were charged represented the "cost" of the policies, when in fact such premiums also included kickbacks returned to the BOA Defendants, BAISI, or another Bank of America affiliate. Defendants had a duty to correct this mistaken impression. The omission was material, as it gave Defendants a colorable reason to charge Plaintiffs unreasonably high premiums and would have influenced Plaintiffs' decisions whether to pay the premiums or contest them.

223.    Joseph Gallagher was sent a letter including these representations on August 10, 2009; the Novells were sent letters including these misrepresentations on May 30, 2010, June 24, 2010, and April 17, 2011; Cherryl Hall was sent letters including these misrepresentations on November 1, 2010 and November 16, 2011; the Toturas were sent letters including these misrepresentations on August 12, 2009, August 26, 2009, June 29, 2010, and June 29, 2011; Marla Lugo was sent letters including these misrepresentations on April 20, 2010 and April 20, 2011; and John Vidrine was sent a letter including these misrepresentations on August 8, 2011.

224.    Balboa and QBE, with the approval of the BOA Defendants and on BAC letterhead also sent Plaintiffs force-placed insurance notices informing them that force-placed insurance had been purchased or renewed at a specified cost. The letters represented that the "cost of this coverage" would be charged to the borrower. Renewal notices also informed the borrower of the "coverage amount" in dollars for the "lender-placed insurance we purchased last year." Letters including these misrepresentations were sent to the Toturas on October 4, 2009, August 3, 2010, September 15, 2010, August 3, 2011; Marla Lugo on May 27, 2009, May 25, 2010, and May 25, 2011; and the Novells on July 30, 2010 and May 24, 2011.

225.    All of the aforementioned letters also warned that if new or additional coverage was purchase or placed, it "may be" obtained with the assistance of agencies that are affiliates of Bank of America (BAISI), which would collect a commission "or other *compensation*" for

55

obtaining the coverage.  This disclosure misleads borrowers in several respects.  First, the notice misrepresents that insurance "*may be obtained*" with the assistance of BAISI.  A master policy was already in place, therefore there was nothing for BAISI to "obtain" moving forward. Second, BAISI would do no work to assist with the procurement of force-placed insurance, nor was this ever Defendants' intention.  Third, the payment made to BAISI in connection with Defendants' force-placed insurance program was not a true "commission" or "compensation" because it was not consideration for any work performed.  The letter, that is, omitted to disclose that the payment was in fact a kickback to BAISI.   Letters including this disclosure was sent to Joseph Gallagher on August 10, 2009,  August 24, 2009, October, 1, 2009;  to the Novells on May 30, 2010, June 24, 2010, July 30, 2010, April 17, 2011, and May 24, 2011; to Cherryl Hall on February 21, 2010, November 1, 2010, November 23, 2010, December 19, 2010, April 21, 2011, November 2, 2011, November 16, 2011, December 8, 2011, and January 5, 2011; to Marla Lugo on May 27, 2009, April 20, 2010, May 25, 2010, April 20, 2011, and May 25, 2011; to the Toturas on August 12, 2009,  August 26, 2009, October 4, 2009, June 29, 2010, August 3, 2010, September 15, 2010, June 29, 2011, and August 3, 2011; to John Vidrine on August 8, 2011 and August 30, 2011; and to Catherine Soileau on January 9, 2012, February 24, 2011, March 20, 2011, April 14, 2011, and February 29, 2012.

226.    For the purpose of executing the scheme to defraud, Defendants sent, mailed and transmitted, or caused to be sent, mailed or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiffs and Class Members that they could charge Plaintiffs and Class Members unreasonably high force-placed insurance premiums. Defendants also transferred sums among

themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud Plaintiffs and Class Members, in violation of the wire fraud statutes.

227.    By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiffs and Class Members in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE**, Plaintiffs and Class Members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT X

## Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) (All Plaintiffs against all Defendants)

228.    Plaintiffs re-allege and incorporate paragraphs 1-139 and 214-225 of this complaint as if fully set forth herein.  Plaintiffs further allege as follows.

229.    At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d).  Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

230.    Defendants agreed to Balboa, Bank of America's subsidiary, would be Bank of America's exclusive force-placed insurance provider and would extract unreasonably high premiums from Bank of America's customers.  Defendants also agreed that Balboa would pay kickbacks to BAISI, another Bank of America affiliate.

231.    After June 2011, Bank of America agreed that QBE or its affiliates would replace Balboa as Bank of America's exclusive force-placed insurance provider and would extract unreasonably high insurance premiums from Bank of America's customers.  Defendants agreed at that time that QBE would pay kickbacks to BAISI.

232.    BAISI passes much of its profits from this scheme to Bank of America.

233.    QBE First and other QBE subsidiaries pass much of their profits from this scheme to QBE Insurance Corp. and other QBE entities.

234.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

235.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs and Class Members suffered damages in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE,** Plaintiffs and Class Members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

### COUNT XI

### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
**(Plaintiffs Gallagher, the Novells, and the Toturas against BAC Home Loans and Bank of America, as successor-in-interest to BAC Home Loans)**

236.    Plaintiffs Gallagher, the Novells, and the Toturas re-allege and incorporate paragraphs 1-139 of this complaint as if fully set forth herein, and further allege as follows.

237.    BAC Home Loans Servicing and BofA/BAC are collectively referred to in this section of the Complaint (Count IV) as BAC Home Loans or BAC.

238.    FDUTPA, Fla. Stat. §§ 501.201, *et seq.* prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id.* at § 501.204.

239.    The above-named Plaintiffs and the Florida Subclass are "consumers" as that term is defined in section 501.203(7) of FDUTPA.

240.    These Defendants have engaged in, and continue to engage in, unconscionable

acts or practices and engaged in unfair or deceptive acts in the conduct of their trade and/or commerce in the State of Florida.

241.    The policies, acts, and practices alleged herein were intended to result and did result in the payment of inflated premiums for force-placed insurance by the Plaintiffs and the Florida Subclass, which in turn were intended to generate unlawful or unfair compensation for BAC Home Loans.

242.    Specifically, these Defendants had an exclusive relationship with their vendor and preferred insurance carrier, Balboa and QBE, whereby BAC would pay unreasonable and inflated premiums for force-placed insurance policies, charge that amount to Plaintiffs and the Florida Subclass, and would then receive compensation through either kickback or captive reinsurance arrangements based on a percentage of the insurance policy's premium.

243.    These Defendants' conduct of charging inflated and excess premiums for force-placed insurance to Plaintiffs and class members violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed within the State of Florida, which has an interest in prohibiting violations of FDUTPA.

244.    These Defendants are not banks or savings and loan associations regulated by the Florida Office of Financial Regulation of the Financial Services Commission.  Further, neither entity is a bank or savings and loan association regulated by federal agencies.

245.    The above-named Plaintiffs and the Florida Subclass sustained damages as a direct and proximate result of BAC Home Loans' unfair and unconscionable practices.  Section 501.211(2), Florida Statutes provides Plaintiffs and the Florida Subclass a private right of action against these Defendants and entitles them to recover their actual damages, plus attorneys' fees and costs.

246.    The above-named Plaintiffs and the Florida Subclass have suffered and will continue to suffer irreparable harm if these Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE,** Plaintiffs Gallagher, the Novells, and the Toturas, on behalf of themselves and the Florida Subclass, demand judgment against BAC Home Loans and/or BofA/BAC for compensatory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT XII

### VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW § 349
### (Plaintiff Marla Lugo against the BOA Defendants)

247.    Plaintiff Marla Lugo re-alleges and incorporates paragraphs 1-139 of this complaint as if fully set forth herein, and further alleges as follows.

248.    Plaintiff Lugo, a New York resident with property in New York, who has been subjected to the BOA Defendants' force-placed insurance scheme, asserts this claim on behalf of a subclass of persons with properties in New York subject to the force-placed insurance practices at issue in this litigation.

249.    The BOA Defendants' acts and practices alleged herein constitute acts, uses, or employment by them and their agents of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in violation of New York General Business Law § 349 ("NY GBL § 349"), making deceptive and unfair acts and practices illegal.

250.    The BOA Defendants engaged in deceptive and unfair practices in violation of

NY GBL § 349 by, among other things, failing to inform Plaintiff and members of the New York Subclass that the premium price for the force-placed insurance included costs for the kickbacks, unearned commissions, the offset of administrative costs performed by vendors or the captive reinsurance arrangement.

251.    The unfair and deceptive trade acts and practices of the BOA Defendants have directly, foreseeably, and proximately caused damages and injury to Plaintiff and the other members of the New York Subclass.

252.    Plaintiff Lugo and the other members of the New York Subclass have no adequate remedy of law.

**WHEREFORE**, Plaintiff Lugo and the New York Subclass are entitled to damages, injunctive relief, declaratory relief, attorneys' fees, and costs as a result of  the BOA Defendants' violations of NY GBL § 349.

## COUNT XIII

### VIOLATION OF ARKANSAS DECEPTIVE TRADE PRACTICES ACT,
### Ark. Code Ann. §§ 4-88-101, *et seq.*
### (Plaintiff Cherryl Hall against All Defendants)

253.    Plaintiff Cherryl Hall re-alleges and incorporates paragraphs 1-139 of this complaint as if fully set forth herein, and further alleges as follows.

254.    Plaintiff Cherryl Hall, an Arkansas resident with property located in Arkansas that has been subjected to the BOA Defendants' force-placed insurance scheme, alleges this claim on behalf of the Arkansas subclass.

255.    Defendants' actions in connection with its force-placed insurance scheme, whereby the BOA Defendants purchase all force-placed insurance from Balboa/QBE and in return Bank of America and/or an affiliate receives a kickback, constitutes unfair and deceptive

acts and practices in or affecting commerce, in violation of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101, *et seq.* ("Ark. DTPA").

256.    The BOA Defendants engaged in deceptive and unfair practices in violation of the Arkansas DTPA by, among other things, failing to inform Plaintiff and Class members that the premium price for the force-placed insurance included costs for the kickbacks, unearned commissions, the offset of administrative costs performed by vendors or the captive reinsurance arrangement.

257.   The BOA Defendants, through Balboa/QBE, sent thousands of notices to Arkansas Sublass members stating that they had the right, under the mortgages, to force-placed flood and/or hazard insurance that was, in actuality, not authorized by mortgages or federal law.

258.   The BOA Defendants, through Balboa/QBE, further misrepresented to Plaintiff and Arkansas Class members that the inflated force-placed insurance premiums represented the "cost" of such insurance, when the BOA Defendants, Balboa, QBE and affiliates all knew that the premium price included costs for kickbacks, unearned commissions, administrative costs, and/or captive reinsurance premiums. This was never disclosed to Plaintiff or the Arkansas Subclass.

259.    Defendants' notices constitute a deceptive practice because they claim a legal right to charge Plaintiff and Class members for "costs" which Defendants cannot legally pass on to the borrower.

260.    Plaintiff and each member of the Arkansas Subclass is an "individual" with standing to bring claims for violation of the Ark. DTPA and Defendants are proper defendants pursuant to Ark. Code Ann. § 4-88-102(4).

261.    Plaintiff and members of the Arkansas Subclass have been injured as a result of Defendants' activities in violation of Ark. DTPA.  Specifically, Plaintiff and members of the Arkansas Subclass were injured when the BOA Defendants added high cost force-placed insurance premiums to their escrow accounts and mortgage balances, thus forcing Plaintiff and Class members to pay the unnecessary charges to all Defendants.

**WHEREFORE**, Plaintiff Cherryl Hall and the Arkansas Subclass are entitled to actual damages and reasonable attorneys' fees under the Ark. DTPA for Defendants' unfair and deceptive trade practices alleged herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs on behalf of themselves and all similarly situated individuals demand judgment against Defendants as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2) or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Class;

(2)    Enjoining Defendants from continuing the acts and practices described above;

(3)    Awarding damages sustained by Plaintiffs and the Class as a result of Defendants' breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)    Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

(5)    Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(6)     Awarding the Florida Plaintiffs and subclass damages, injunctive relief, declaratory relief, attorneys' fees, and costs under FDUTPA;

(7)     Awarding Plaintiff Marla Lugo and the New York Subclass damages, injunctive relief, declaratory relief, attorney's fees, and costs under New York General Business Law § 349.

(8)     Awarding Plaintiff Cherryl Hall and the Arkansas Subclass damages, attorneys' fees and costs under Ark. DTPA;

(9)     Awarding damages sustained by Plaintiffs and the Class as a result of Balboa's and QBE's tortious interference;

(10)     Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute;

(11)     Awarding three times the amount of damages sustained, and the cost of suit, including a reasonable attorney's fee pursuant to the Bank Holding Company Act, 12 U.S.C. § 1975;

(12)     Awarding actual damages and a penalty of $500,000.00 or 1% of Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), and attorneys' fees and costs, as provided by the Truth in Lending Act, 15 U.S.C. § 1640(a)(3); and

(13)     Awarding such other and further relief the Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 28th day of March, 2013.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK, TROPIN, &**<br>**THROCKMORTON P.A.**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiffs* | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>pprieto@podhurst.com<br>Stephen F. Rosenthal<br>srosenthal@podhurst.com<br>John Gravante, III, Esq.<br>jgravante@podhurst.com<br>Matthew Weinshall<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiffs* |
| Lance A. Harke, P.A.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:     (305) 536-8229<br>*Counsel for Plaintiffs* | Jack Wagoner, III, Esq.<br>Angela Mann<br>**WAGONER LAW FIRM, P.A.**<br>1320 Brookwood, Suite E<br>Little Rock, AR 72202<br>Telephone: (501) 663-5225<br>Facsimile: (501) 660-4030<br>jack@wagonerlawfirm.com<br>angela@wagonerlawfirm.com<br>*Counsel for Plaintiffs* |
| Alexander P. Owings, Esq.<br>apowings@owingslawfirm.com<br>Steven A. Owings, Esq.<br>sowings@owingslawfirm.com<br>**OWINGS LAW FIRM**<br>1400 Brookwood Drive<br>Little Rock, AR 72202<br>Telephone: (501) 661-9999<br>Facsímile: (501) 661-8393<br>*Counsel for Plaintiffs* | Brent Walker, Esq.<br>Russell D. Carter, III<br>**CARTER WALKER PLLC**<br>2171 West Main, Suite 200<br>P.O. Box 628<br>Cabot, AR 72023<br>Telephone: (501) 605-1346<br>Facsimile: (501) 605-1348<br>bwalker@carterwalkerlaw.com<br>dcarter@carterwalkerlaw.com<br>*Counsel for Plaintiffs* |
| Chip Merlin, Esq.<br>cmerlin@merlinlawgroup.com | Jeffrey N. Golant, Esq.<br>jgolant@jeffreygolantlaw.com |

| | |
|---|---|
| Mary E. Fortson, Esq.<br>mfortson@merlinlawgroup.com<br>Sean M. Shaw, Esq.<br>sshaw@merlinlawgroup.com<br>**MERLIN LAW GROUP, P.A.**<br>777 S. Harbour Island Blvd., Suite 950<br>Tampa, FL 33602<br>Telephone: 813-229-1000<br>Facsimile: 813-229-3692<br>*Counsel for Plaintiffs* | **LAW OFFICES OF JEFFREY N.<br>GOLANT, P.A.**<br>1000 W. McNab Road, Suite 150<br>Pompano Beach, FL 33069<br>Telephone: 954-942-5270<br>Facsimile: 954-942-5272<br>*Counsel for Plaintiffs* |
| Roy E. Barnes, Esq.<br>John R. Bevis, Esq.<br>bevis@barnesalwgroup.com<br>**BARNES LAW GROUP, LLC**<br>31 Atlanta Street<br>Marietta, GA 30060<br>Telephone: 770-227-6375<br>Facsimile: 770-227-6373<br>*Counsel for Plaintiffs* | Catherine E. Anderson, Esq.<br>Oren Giskan, Esq.<br>**GISKAN SOLOTAROFF ANDERSON<br>& STEWART LLP**<br>11 Broadway Suite 2150<br>New York, New York 10004<br>Telephone: 212-847-8315<br>canderson@gslawny.com |
| Albert L. Frevola, Jr., Esq.<br>afrevola@conradscherer.com<br>Gary B. Englander, Esq.<br>genglander@conradscherer.com<br>Ivan J. Kopas, Esq.<br>ikopas@conradscherer.com<br>Matthew Seth Sarelson, Esq.<br>msarelson@conradscherer.com<br>**CONRAD & SCHERER, LLP**<br>P. O. Box 14723<br>Fort Lauderdale, Florida 33302<br>Telephone:    (954) 462-5500<br>Facsimile:    (954) 463-9244<br>*Counsel for Plaintiffs* | Brian J. Stack, Esq.<br>bstack@stackfernandez.com<br>Sammy Epelbaum, Esq.<br>sepelbaum@stackfernandez.com<br>**STACK FERNANDEZ ANDERSON &<br>HARRIS, P.A.**<br>1200 Brickell Avenue, Suite 950<br>Miami, Florida  33131<br>Tel.  (305) 371-0001<br>Fax:  (305) 371-0002<br>*Counsel for Plaintiffs* |
| Frederick S. Bergen<br>**BERGEN & BERGEN, P.C.**<br>Marist Place, Lafayette Square<br>123 East Charlton Street<br>Savannah, GA 31401-4603<br>Telephone: (912) 233-6600<br>fsbbergenlaws.com<br>*Counsel for Plaintiffs* | Michael L. Addicott, Esq.<br>mlaesq@addicottlaw.com<br>**ADDICOTT & ADDICOTT, P.A.**<br>900 N. Federal Hwy.<br>Ste. 201<br>Hallandale Beach, FL 33009<br>Telephone: 954-454-2605<br>*Counsel for Plaintiffs* |
| Guido Saveri, Esq.  (Cal. Bar No. 22349)<br>guido@saveri.com | |

| | |
|---|---|
| R. Alexander Saveri, Esq.  (Cal. Bar No. 173102)<br>rick@saveri.com<br>Cadio Zirpoli, Esq.  (Cal. Bar No. 179108)<br>cadio@saveri.com<br>**SAVERI & SAVERI, INC.**<br>706 Sansome Street<br>San Francisco, CA  94111<br>Telephone:  (415) 217-6810<br>Facsimile:  (415) 217-6813<br>*Counsel for Plaintiffs* | |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was filed on March 28, 2013 with the Clerk by using the CM/ECF system, which will send notification of such filing to all attorneys of record.

<u>/s/ Adam M. Moskowitz</u>

344583.2