# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 12-cv-22700-FAM

**CHERYL HALL, et.al., on behalf of
Themselves and all others similarly situated,**

      **Plaintiffs,**

**v.**

**BANK OF AMERICA, N.A., individually and
as successor by merger to BAC HOME LOANS
SERVICING , et.al.,**

      **Defendants.**

_____,


## OBJECTION TO CLASS ACTION SETTLEMENT
## OF MICHAEL TRAPASSO AND JILL TRAPASSO
## AND GORDON K. JAMES & ALACIA L. JAMES

Michael and Jill Trapasso's address is 3609 Cottage Club Lane, Naples, Florida and

phone number is (239) 455-7492.   Gordon K. and Alacia L. James' address is 1318 High Ridge

Drive, Duncanville, Texas 75137 and phone number is (972) 780-9054.  These individuals are

settlement class members.  The basis for their objection is set forth below. They intend on

attending the Fairness Hearing through their counsel.

## INTRODUCTION

Where, as here, a class action has been certified specifically for the purpose of settlement,

"the district judge has a heavy duty to ensure that any settlement is 'fair, reasonable, and

adequate' and that the fee awarded plaintiffs' counsel is entirely appropriate." *Piambino v.*

*Bailey*, 757 F.2d 1112, 1138 (11th Cir. 1985).  That scrutiny includes determining what is real

value and what is illusion created to mask [] the relative payment of the class counsel as

compared to the amount of money actually received by the class members. *Feder v. Frank (In re*

*HP Inkjet Printer Litig.)*, 716 F.3d 1173, 1179 (9th Cir. 2013).

## Many Class Members Are Not Eligible To Make Any Recovery Under This Settlement

There is no common fund in this settlement.  The Settling Parties attempt to value the

monetary relief at $228 million as if all 1,069,039 class members will make valid claims. This

number is illusory.  The actual monetary relief will be significantly lower.  One reason is that

many settlement class members are not eligible for any compensation under this settlement.

This case is based on borrowers who were required to have property insurance, failed to

get or keep coverage and the defendants then placed the insurance.  While some borrowers may

have failed to procure or keep this insurance due to sloth or oversight, one of the significant , if

not the most significant  reason why the borrowers did not procure or keep the insurance is that

the borrower was in financial distress and simply could not afford the insurance.  Thus, many of

the class members included in this Settlement were in acute financial distress during some or all of the class period.

Individuals in acute financial distress sometimes file for bankruptcy. From the United States Courts website, the Bankruptcy Statistics section indicates that there were 5,499,567 Chapter 7 filings between January 1, 2008 and December 31, 2013.  It is unknown how many of the 1,069,039 settlement class members filed for Chapter 7.  It could be a significant number. What is known is that a person who is otherwise a class member continues to be a member of the Settlement Class even if they have filed for Chapter 7.  However, to be eligible  for any compensation from this settlement, a claimant "must also affirm that since the issuance of the LPI Policy, Claimant has not filed a Petition under Chapter 7 of the United States Bankruptcy Code, and the Claimant's  indebtedness on the residence secured by their deed of trust or mortgage has not been compromised or discharged in bankruptcy." Settlement Agreement Sec. 6.4.

Thus, a likely substantial (with the precise number being unknown) number of Settlement Class Members are not eligible for compensation under this settlement.  Thus, even if all 1,069,039 settlement class members made claims, $228 million is not the correct valuation of the settlement.  That number is illusory.

## The Claims Process Is Not Fair To The Class

The settling parties have designed a claims-made settlement which requires class members to submit claim forms in order to receive settlement payments.  When the defendant already holds information that would allow at least some claims to be paid automatically, those claims should be paid directly without requiring claim forms.  Federal Judicial Center, *Judges'*

*Class Action Notice and Claims Process Checklist and Plain Language Guide* ("FJC Guide"), at 6 (2010).

The purported $228 million settlement amount in this case is wholly illusory given the strict "claims-made" settlement structure and the absence of any common fund or guaranteed payments to any members of the Settlement Classes.  The Settling Parties attempt to avoid disclosure by scheduling the end of the claims period until well after the fairness hearing.  It is error to approve the settlement without a final accounting of how much the class is actually receiving.  See *In re Baby Prods. Antitrust Litig.*, 728 F.3d 163, 174, 175, 179 (3d Cir. 2013)(reversing for precisely this reason).

The Settlement Agreement expressly provides that Class Members will receive notice of the settlement by first-class mail at their last known mailing address.  Defendants clearly have access to the requisite information to confirm or deny the validity of the information on the Settlement members' claims forms.  Moreover, Bank of America maintains all the information needed to stay in compliance with the Real Estate Settlement Procedures Act. The Settling Parties have the correct information to directly compensate the class.  They just do not want to do so.

The Settling Parties are claiming that it would be unduly burdensome to require Bank of America ("BOA") to manually review 1,069,039 class members' loan files in order to make direct payments.  But if all class members make a claim, that is exactly the effort Defendants would have to make.  The Settling Parties are well aware that only a small fraction of the class will make claims, thus BOA will have to conduct a manual review of only a fraction of claim files in order to determine what class members have valid claims and the correct amount of those claims.

The Settling Parties also contend that a claims-made process is necessary to avoid fraud. Whether that is a legitimate concern or not, the point is that based upon the eligibility requirements and the claims made process, far fewer than 1,069,039 class members will make claims or are eligible to make a valid claim. The 228 million dollar valuation of the monetary relief in this settlement is fiction.

With a claims-made settlement, Defendants know they will never refund even close to the $228 million which the Parties tout as the monetary award the Settlement will provide. Claims rates in claims-made consumer settlements are extremely low. Hypothetical benefits are not actual class benefits, and a settlement should be valued by the amount the class actually receives. See *Baby Products*, 708 F.3d at 174 (district court should consider actual receipts to class to determine settlement fairness); Notes of Advisory Committee on 2003 Amendments to Rule 23 ("it may be appropriate to defer some portion of the fee award until actual payouts to class members are known" (emphasis added)); *Id.* ("fundamental focus is the result actually achieved for class members" (emphasis added); *Id.* (citing 15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class" (emphasis added))). Federal Judicial Center, *Manual for Complex Litigation* (Fourth) § 21.71 (2004) ("In cases involving a claims procedure..., the court should not base the attorney fee award on the amount of money set aside to satisfy potential claims. Rather, the fee awards should be based only on the benefits actually delivered."); cf. *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012) (chronicling problem of "fictitious" fund valuations that "serve only the 'self-interests' of the attorneys and the parties, and not the class."). *Synfuel Techs. Inc. v. DHL Express (USA) Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) (reversing approval where "the court did not attempt to quantify the value of plaintiffs'

case or even the overall value of the settlement offer to class members"). Notably absent from the plaintiffs' filings for settlement approval is any indication of how many claims had been submitted at the time of its filing.

*In re Dry Max Pampers Litigation*, 724 F.3d 713 (6th Cir. 2013) the primary component of the settlement was injunctive relief reinstating a refund program. 724 F.3d at 718-19. As in this case, the objector complained that the injunctive relief was illusory. The Sixth Circuit held that as a matter of law "[t]he burden of proving the fairness of the settlement is on the proponents." Id. at 719 (citing authorities). In failing to provide the available data, the settlement proponents "did not carry [their] burden" and reversed settlement approval because of the misallocation. *Id*.

The Seventh Circuit went even farther in *Eubank v. Pella Corp,* 753 F.3d 718 (7th Cir. 2014). On the basis of an expert report calculating the hypothetical maximum number of claims that could be made, the district court found that the settlement relief was worth $90 million, and concluded that the settlement and its $11 million attorney award was thus fair. *Id*. at 723. But *Eubank* criticized the district court for failing to look at the number of claims that would actually be made and succeed: "without such an estimate no responsible prediction of the value of the settlement to the members of the class could be made." *Id*.

In the Third Circuit's *Baby Products*, the parties created a $35.5 million settlement fund where the attorneys collected $14 million for themselves. 708 F.3d at 169. The Third Circuit reversed: the district court failed to meet its affirmative obligation to consider the class's actual recovery, and the appeals court's own questioning revealed the class received less than $3 million. *Id*. at 170, 174. "[I]f the parties have not on their own initiative supplied the information needed to make the necessary findings, the court should affirmatively seek out such

information." *Id*. at 174. The failure to do so meant that the district court had failed to consider whether class counsel had "adequately prioritize[d] direct recovery," requiring reversal of settlement approval and the accompanying attorney award. *Id*. at 178.

The $228 million dollar settlement value in this case is a mirage.  Based on the low value relief available, the claims rate will likely be well under 1%.  *See Spillman v. RPM Pizza, LLC*., No 10-349-BAJ-SCR, 2013 U.S. Dist. LEXIS 72947. At *8 (M.D. La May 23, 2013) (.27% claims rate for $15 max claim); *Lagarde v. Support.com, Inc*., No. 12-0609 JSC, 2013 U.S. Dist. LEXIS 67875 at *7 (N.D.Cal. May 13, 2013) (claims rate);  *Livingsocial*, 2013 U.S. Dist. LEXIS 40059, at *52 (.25% claims rate); see also *Sullivan v. DB Invs., Inc*. 667 F.3d 273, 329 n.60 (3d Cir. 2011)(en banc)(noting evidence that "consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns.")

This Court, in *Saccaccio*, did not know how many claims would be submitted, but noted "that courts in this district have approved claims-made settlement where the participation rate was very low."  *Saccacio*, 297 F.R.D. at 696, citing *Perez v. Asurion Corp*., 501 F. Supp. 2d at 1377 (1.1% of class members returned claims forms).  This Court never knew the actual claims rate in *Saccaccio*, and it is a fair inference that even a 1.1% claims rate would have received this Court's approval.  Utilizing a 1.1% claims rate, the total class payout in this case would not exceed $2,508,000.  To award $16,000,000 in fees while the class receives $2,508,000 is error.

## The Prospective Relief Provisions of the Settlement Add No Value to the Settlement and Do Not Justify the Requested Fees

A class composed of people who have done business with defendants in the past is not served by prospective injunctive relief that can only benefit those who do business with defendants in the future. See *Felix v. Northstar Location Servs.*, 290 F.R.D. 397, 408 (W.D.N.Y. 2013) (prospective injunctive relief promise of no value to class members who only dealt with

defendant in past transaction).  See *Staton v. Waters Co.*, 327 F.3d 938, 974 (9th Cir. 2003)

(value of injunctive relief is "easily manipulable by overreaching lawyers seeking to increase the

value assigned to a common fund"; forbidding inclusion of nonquantifiable injunctive relief);

The Settlement purports to deliver additional benefits to the Class through injunctive

relief provisions that enjoin and/or mandate specified practices.  The majority of the injunctive

relief terms in the Proposed Settlement have no value to the Class because they merely re-create

pre-existing legal duties.

### Prospective Relief Relating to the Bank of America Defendants

a.  The Bank of America Defendants will not accept hazard LPI commissions to Bank of America-affiliated agents or brokers for 5 years.

b.  The Bank of America Defendants will not enter into hazard LPI quota-share captive reinsurance arrangements on new or renewal hazard LPI Policies for 5 years. (a and b are collective hereinafter referred to as the BOA no –kickback provisions")

c.  The Bank of America Defendants will not place hazard LPI through an LPI insurer affiliated with the Bank of America Defendants for 5 years.

d.  For 5 years, the Bank of America Defendants agree to establish Hazard LPI coverage at the last known coverage amount ("LKCA"), replacement cost value ("RCV"). or the unpaid principal balance ("UPB"), for any coverage for which the Bank of America Defendants attempt to recoup from borrowers any hazard LPI premiums paid by Bank of America to the hazard LPI insurer. ("Coverage Limitation Provision")

e.  For 5 years, the Bank of America Defendants shall advance funds to maintain a borrower's voluntary policy in force, if the voluntary policy otherwise will lapse because the borrower has not paid the premium, provided that (a) the policy is eligible to be renewed by the borrower, (b) the loan is escrowed for insurance with Bank of America, and (c) Bank of America receives notice stating that the voluntary hazard insurance premiums have not been paid and the borrower has not secured voluntary insurance from another carrier. The borrower shall be responsible for all funds advanced pursuant to this paragraph. ("Assumption of Existing Coverage Provision")

f.  For 5 years, the Bank of America Defendants agree to credit a borrower's escrow account with any hazard LPI refund that is due to the borrower within fifteen (15) days of receipt of required evidence of acceptable voluntary insurance coverage for the property that is subject to the hazard LPI Policy. ("Prompt Re-Credit Provision")

g.      The foregoing shall be subject to changes in applicable law or changes in investor requirements that would prevent Defendants from implementing such prospective relief.

**<u>Prospective Relief Relating to the QBE Defendants.</u>**

Subject to Paragraph 4.5 below, and commencing no later than 120 days after the Final Settlement Date, the QBE Defendants shall for a period of 5 years thereafter, not provide any of the following to the Bank of America Defendants or affiliates:

a.      Hazard LPI commissions to the Bank of America Defendants or the Bank of America Defendants-affiliated agents or brokers;

b.      Below-cost or free outsourced services in connection with hazard LPI Policies; provided however, that outsourced services do not include expenses associated with tracking functions that QBE Defendants incur for their own benefit to identify and protect themselves from: (a) exposure to lost premium and losses on properties on which no other insurance coverage is in effect; or (b) administrative costs associated with providing and subsequently canceling hazard LPI Policies on properties on which a hazard LPI Policy is not required. (a and b are collectively referred to as the QBE No-Kickbacks Provisions")

c.      The foregoing shall be subject to changes in applicable law or changes in investor requirements that would prevent Defendants from implementing such prospective relief.

Conflict. Should any provision of Sections 4.2 or 4.3 conflict or be inconsistent with any existing or subsequently adopted state or federal statute, regulation, rule, order, or regulatory directive, or any existing or subsequently adopted agency or investor rule or requirement, such statute, regulation, rule, order, regulatory directive, or requirement shall control.

The No-Kickback provisions, Coverage Limitation Provision, the Assumption of Existing Coverage Provision and the Prompt Re-Credit Provision replicate what is already legally required by Regulation X. 12 CFR, Part 24.

The Prompt Recredit Provision does not replicate a pre-existing legal requirement. Nonetheless, this provision provides only de minimis value for Class members.  The Prompt Recredit Provision places a firm date on the time to recredit. BOA is subject to an implied duty of good faith and fair dealing. As part of good faith and fair dealing, BOA would be obligated to

recredit borrowers with any funds owed them within a reasonable time. To the extent that a

reasonable time for recredit is shorter than 15 days, the Prompt Recredit Provision is of little

value other than avoiding potential litigation about what is a reasonable time for a recredit. To

the extent that a reasonable time for a recredit is longer than 15 days there has been no showing

of a benefit from a faster recredit that would materially benefit any class member.

Accordingly, the Prompt Recredit Provisions has de minimis value to the Class, and other

injunctive relief provisions of the Proposed Settlement have no value to the Class.

In *Saccaccio*, this Court noted that, at least in theory, the rules propounded by outside

regulators could be reversed tomorrow. *Saccaccio v. J.P. Moran Chase Bank, N.A.*, 297 F.R.D.

683, 698 (S.D. Fla. 2014), but there is no evidence to support that the contention any reversal is

being contemplated. In that same vein, however, the Defendants' prospective relief obligations

are subject to "changes in applicable law or changes in investor requirements that would prevent

Defendants form implementing  such prospective relief." Thus, while reversal of current

regulations is theoretically possible, legal changes could also excuse the Defendants from

providing any prospective relief. What is clear is that under current law, the defendants'

proposed prospective relief provides no value to the class.

For the settlement's prospective relief to have any value to a member this settlement

class, the following must occur:

1. The settlement class member owns property during the prospective relief time
period.
2. The settlement class member has debt that is secured by the property and
Defendants service the mortgage.
3. The debt agreement requires the class member to have hazard insurance on the
property.
4. The class member fails to keep appropriate hazard insurance on the property.
5. The Defendants are not under any agreement with an Attorney General already
requiring the Defendants to be in compliance with the items set forth in the
Prospective Relief provided by this settlement.

6.  The mortgage service laws and regulations that prohibit bad conduct or overcharging in the field of force-placed insurance are changed.
7.  Defendants force place the settlement class member's insurance.
8.  Defendants overcharge the current class member for the insurance.

What are the chances of this happening?  For how many, if any, class members wil this prospective relief have any positive impact?  There is no credible evidence that this prospective relief has any value to the members of this settlement class.

### Attorneys' Fees

The parties have a clear-sailing provision whereby the Defendants will not contest attorneys' fees up to $16 million dollars.  The attorneys are guaranteed a recovery regardless of the actual amount distributed to the class.  The ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of the (1) the fee to (2) the fee plus what the class members received.  *RadioShack Corporation v. Rosman*, 2014 U.S. App. LEXIS 18181 *16 (7th Cir. Sept. 19, 2014).  This settlement's structure will likely result in a class counsel fee award that will exceed the actual class recovery. *Jones v. GN Netcom, Inc.* (*In re Bluetooth Headset Prods. Liab.Litig.*) 654 F.3d 935, 943 (9th Cir. 2011).

Assuming a 1.1% claims rate, the attorneys fees would constitute 86.44% of the total settlement proceeds.  That is excessive.  See *Trombley v. Bank of Am. Corp.*, No. 08-cv-456-JD, 2012 U.S. Dist. LEXIS 63072, at *8 (D. R.I. May 3, 2012) (finding an attorney award that consumed 66% of the settlement to be "excessive" and grounds for denying final approval); *Ferrington v. McAfee, Inc.*, No. 10-cv-1455-LHK, 2012 U.S. Dist. LEXIS 49160, at *36-37 (N.D. Cal. Apr. 6, 2012) (finding an attorney award that constituted 83% of the settlement amount was disproportionate and grounds for denying final approval); *Strong Bell v. BellSouth Telecoms., Inc.*, 173 F.R.D. 167, 172 (W.D. La. 1997), *aff'd* 137 F.3d 844 (5th Cir. 1998) ("A request for $6 million in attorneys' fees where counsel has provided no more than $2 million in

benefits to the class is astonishing. It is a sad day when lawyers transmogrify from counselors

into grifters.")

This Court held in *Saccaccio v. J.P. Morgan Chase Bank*, 297 F.R.D. 683, 694, as

follows:

> "[A] litigant or a lawyer who recovers a common fund for the benefit of
> persons other than himself or his client is entitled to a reasonable attorney's fee
> from the fund as a whole." citing *Boeing Co. v, Van Gemert*, 444 U.S. 472, 478,
> 100 S. Ct. 745, 62 L. Ed. 2d 676 (1980). The "common fund" analysis is
> appropriate even where the fee award will be paid separately by Defendants. See
> *David v. American Suzuki Motor Corp*., 2010 WL 1628362 at *8 n.14 (S.D. Fla.
> April 15, 2010) (citing *Duhaime v. John Hancock Mut. Life. Ins. Co*., 183 F.3d 1,
> 4 (1st Cr. 1999). "Attorneys' fees awarded from a common fund shall be based
> upon a reasonable percentage of the fund established for the benefit of the class."
> *Camden I Condo. Assn, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cr. 1991). The
> attorneys' fees in a class action can be determined based upon the total fund, not
> just the actual payout to the class. See *Waters v. Int Precious Metals Corp*., 190
> F.3d 1291, 1295-96 (11th Cir. 1999). The typical common fund fee awarded is
> between 20% and 30% of the fund. *Camden I Condo. Assn, Inc. v. Dunkle*, 946
> F.2d at 775.

Here is an analysis of the cases cited by this Court in *Saccaccio*:

In *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980), Van Gemert and others brought a

securities class action against Boeing. *Id.* at 474. The District Court entered a judgment in favor

of the class for damages in the amount of $3,289,359 together with prejudgment interest. *Id.* at

475-6. The court then fixed the amount that each member of the class could recover as a

principal amount of $100 in debentures. Finally, the district court ordered *Boeing* to deposit the

amount of the judgment into escrow at a commercial bank. *Id.* Claims were received for about

47% of the applicable securities. *Id.*

*Boeing* appealed only one provision of the judgment. *Id.* at 477. It claimed that

attorneys' fees could not be awarded from the unclaimed portion of the judgment fund. At the

Supreme Court, *Boeing* contended that the judgment in the case was simply a procedural device

ordering Boeing to pay into escrow its maximum potential liability to the class.  *Id.*  at 480, n.5.

Boeing argued that the judgment was not final until absentee class members presented their

individual claims.  Thus, Boeing concluded, the judgment fund conferred no benefit on class

members who fail to claim against it.  *Id.*  The Supreme Court noted that the District Court

explicitly ordered that the plaintiff class shall recover as their damages herein from the

defendants the principal sum of $3,289,359 together with interest…*Id.*  Nothing in the district

court's order made Boeing's liability for this amount contingent upon the presentation of

individual claims.  *Id.*  Critically, the Court provided "Thus, we need not decide whether a class-

action judgment that simply requires the defendant to give security against all potential claims

would support a recovery of attorneys' fees under the common-fund doctrine."  *Id.*

       *Boeing* does not apply to a case that does not involve a traditional common fund.  *Strong*

*v. BellSouth Telecoms*., 137 F.3d 844,852 (5th Cir. 1998).  The Fifth Circuit noted that in *Boeing*

the district court entered judgment and then ordered Boeing to deposit the amount of the

judgment in escrow at a commercial bank. *Id.* citing *Boeing*, 444 U.S. at 476, 100 S. Ct. at 748.

In contrast to *Boeing*, the Fifth Circuit provided that in the BellSouth "settlement no money was

paid into escrow or any other account --- in other words, no fund was established at all in this

case." *Id.*  The Fifth Circuit also noted that the BellSouth settlement also differed from the

*Boeing* settlement with regard to the source of the payment.  Unlike in *Boeing*, where the

attorneys' fees were deducted from payments to the class, BellSouth agreed to pay the fees

separately from any payment made to class members.  *Id.*  See also *Petruzzi's, Inc. v. Darling*

*Delaware Co.*, 983 F. Supp. 595 (M.D. Pa. 1997) (*Boeing* is inapplicable because there is no

common fund.).

*Camden I Condo Ass'n. v. Dunkle,* 946 F.2d 768 (11th Cir. 1991) provides that "Henceforth, in this Circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class. *Id*. at 774.  As *Camden I* noted, for the common fund doctrine to apply the common fund is created for the class and the attorneys recover their fees as a percentage of the total common fund.  *Id*. at 771. Simply put, here there is no fund.  This portion of *Camden* I is not applicable to this case.

In *Waters v. International Precious Metal Corporation*, 190 F.3d 1291 (11th Cir. 1999), the parties settled and one of the defendants created a 40 million dollar fund to pay claims of class members and the fees and expenses of the plaintiffs' attorneys.  *Id.* at 1292.  The fund was reversionary, meaning that any unclaimed amounts would revert to the defendant who created the settlement fund.  *Id.*  As part of their settlement, the settling parties agreed that Class Counsel would apply for attorneys' fees in an amount up to one-third of the reversionary fund and the defendants expressly pledged not to directly or indirectly oppose Class Counsel's application for fees. *Id.* at 1292-93.  Moreover, according to the District Court's order in the case, Defendants' counsel represented to the court that the fee application specifically contemplated by the settlement, ie. $13,333,333… was reasonable and that its reasonableness was supported by his experience in other class actions.  *Id.* at 1297.  No class members opposed the fee award.  *Id.*

The district court approved the settlement awarded plaintiffs' counsel 13.33 million dollars in fees. *Id.* at 1295.  The actual payment to class members was $6,485,362.15.  The defendants argued that the district court erred by basing the attorneys' fee award a percentage of the total fund rather than the actual payments made to class members.  *Id.* at 1295.  The Court rejected the Defendants' argument.  The Court noted that the Defendant not only knew that class counsel would seek to recover fees on the gross amount of the fund recovered (regardless of

whether some part of that fund was not claimed), but also agreed to a mechanism and formula by

which class counsel could do so.  *Id*. at 1297.  The Court noted that Defendants could not

complain now that class counsel sought to do what the settlement agreement explicitly

contemplated.  *Id*.  The Eleventh Circuit distinguished *Strong* because *Strong* never established a

common fund from which money would be drawn.  *Id*. at 1296 citing *Strong*, 137 F.3d at 852

("No fund was established at all in this case.").

The Defendants filed a Petition with the United States Supreme Court.  Justice O'Connor

drafted a Statement respecting the denial of the petition for a writ of certiorari, which is

instructive for this case.  *International Precious Metals Corporation v. Waters*, 530 U.S. 1223

(2000)

> This case involves an award of attorney's fees that, by any measure, is
> extraordinary.  Respondents brought a securities class action, alleging that
> petitioners had fraudulently solicited and stimulated excessive trading of
> commodities options. The parties ultimately settled the suit, whereby petitioners
> agreed to create a $ 40 million 'reversionary fund" for the class plaintiffs. Under
> the terms of the settlement, the portion of the fund not claimed by class members
> and not paid to respondents in attorney's fees and expenses was to revert to
> petitioners.
>
> After the parties reached their agreement, the District Court approved
> respondents' application for attorney's fees in the amount of $ 13,333,333, or one-
> third of the reversionary fund. The figure was unrelated to the amount actually
> claimed by class plaintiffs. As it later turned out, the actual distribution to class
> members was $ 6,485,362.15. Accordingly, the fee award approved by the
> District Court was more than twice the amount of the class' actual recovery. The
> Court of Appeals affirmed the award, holding that the District Court had not
> abused its discretion. *Id*. at 1223-1224.  See 190 F.3d 1291, 1293 (CAll 1999).
>
> In  *Boeing Co. v. Van Gemert*, 444 US. 472 (1980), we upheld an award of
> attorney's fees in a class action where the award was based on the total fund
> available to the class rather than the amount actually recovered. *Boeing*, 444 U.S.
> at 480-481. We had no occasion in *Boeing*, however, to address whether there
> must at least be some rational connection between the fee award and the amount
> of the actual distribution to the class. The approval of attorney's fees absent any
> such inquiry could have several troubling consequences. Arrangements such as
> those at issue here decouple class counsels financial incentives from those of the

class, increasing the risk that the actual distribution will be misallocated between attorney's fees and the plaintiffs recovery. They potentially undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing class counsel to settle lawsuits in a manner detrimental to the class. And they could encourage the filing of needless lawsuits where, because the value of each class member's individual claim is small compared to the transaction costs in obtaining recovery, the actual distribution to the class will inevitably be minimal. The Court of Appeals have differed in their approaches to the problem. Compare *Strong v. BellSouth Telecommunications, Inc*., 137 F. 3d 844, 852 (CA5 1998) (District Court did not abuse its discretion in basing fee award on actual payout rather than reversionary fund), with *Williams v. MGM-Pathe Communications Co*., 129 F.3d 1026, 1027 (CA9 1997) (benchmark for fee award is 25% of entire fund, and District Court abused its discretion in basing award on actual distribution to class).

Although I believe this issue warrants the Court's attention, this particular case does not present a suitable opportunity for its resolution. As part of their settlement, the parties agreed that respondents would apply for attorney's fees in an amount up to one-third of the reversionary fund, and petitioners expressly pledged not to "directly or indirectly oppose [respondents] application for fees." App. to Pet. for Cert. G-36. Moreover, according to the District Courts order approving the settlement, petitioners' counsel represented to the court that "the fee application specifically contemplated by the [settlement], i.e. $ 13,333,333 ... was reasonable and that its reasonableness was supported by his experience in other class actions." *Id.*, at S-4.

Consequently, petitioners appear to have waived any right to challenge the reasonableness of the fee award in this case. I therefore agree with the Courts decision to deny the petition for a writ of certiorari. Nonetheless, I believe the importance of the issue counsels in favor of granting review in an appropriate case. *Id*. at 1223-1225.

The crux of this objection is the concern Justice O'Connor raised in *Waters*.  The issue is

whether there must be at least some rational connection between the fee award and the amount of

the actual distribution to the class.  In *Waters*, the fees were just over twice the amount of money

actually distributed to the class, an amount Justice O'Connor noted, "that, by any measure, is

extraordinary."  In this case, the Settling Parties, in practical terms, are taking the position that an

award of fees that is greater than six to one to the money actually received by the class is

acceptable.  ($16,000,000 fee as compared to a $2,580,000 actual recovery for the class

assuming a 1.1% claims rate)That is directly contrary to the guidance and commentary of Justice O'Connor in *Waters*.

Contrary to the Fifth Circuit's position in *Strong* that *Boeing* only applies to a common fund case, this Court took the position in *Saccaccio* that the "common fund analysis" is appropriate even where the fee award will be separately paid by the Defendants.  This Court cited *David v. American Suzuki*, which, in turn, cited *Duhaime* as support for this proposition.

In *Duhaime v. John Hancock Mut. Life Ins. Co., 183 F.3d 1 (1st Cir. 1999),* certain class settlement objectors withdrew their appeal and entered into a side settlement.  Duhaime moved to compel post-judgment discovery of the side settlement.  The district court denied Duhaime's motion and the First Circuit affirmed.  In dicta, the First Circuit provided that noting "the danger that the lawyers might urge a class settlement of a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees (citation omitted) we have directed district courts to exercise their equitable jurisdiction to review counsel-fee arrangements negotiated in connection with class-action settlements – even where the counsel fees are not taken from a common fund but are instead paid separately by a class action defendant." *Id*. at 4.

This First Circuit case cannot reasonably be relied upon to award attorneys' fees, in a case where there is no common fund, based on the maximum potential recovery of the class rather than the actual recovery, nor is it authority to award attorneys' fees in an amount substantially greater than what the class actually receives.  The case simply says that a court has a right to review fees even when they are paid separately by the defendant.

In *David v. Am. Suzuki Motor Corp*., 2010 U.S. Dist. Lexis 146073 (S.D. Fla. 2010), the District Court provided as follows:

While I recognize that the fee award requested by Class Counsel will be paid separately by Defendants and is not drawn from a "common fund" in the traditional sense, there is authority directing "district courts to exercise their equitable jurisdiction to review counsel-fee arrangements negotiated in connection with class-action settlements - even where the counsel fees are not taken from a common fund but are instead paid separately by a class-action defendant." *Duhaime v. John Hancock Mut. Life Ins. Co., 183 F.3d 1 (1st Cir. 1999)*; see also Fed. R. Civ. P. 23(h). Here, unlike other cases where the common fund approach has been rejected because the non-monetary settlement's value was inflated, difficult to calculate, or illusory because of the nature of the benefits, see e.g., *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 853 (5th Cir. 1998), the value of the proposed settlement's benefits is ascertainable and has been estimated at approximately $5 million. Accordingly, I will exercise my equitable jurisdiction and determine the reasonableness of class counsel's fee award as if I were dealing with a class action settlement that generated a $5 million common fund from which a $1 million fee award has been requested. *Id*. at *26-*28.

In this case, contrary to *David*, the monetary as well as the non-monetary relief is inflated, difficult to calculate and illusory.  No one thinks that 228 million dollars will be distributed to the class.  That number is inflated and illusory. Further, since the Settling Parties refuse to provide claims data and do not have to disclose claims data until after a final judgment is entered the actual value of the settlement is not just difficult to ascertain, it is impossible. Thus, contrary to the situation in  *David*, this settlement's value is not ascertainable.  *David* did not support this Court's fee award in *Saccaccio* and it does not support the fee award in this case.

This class would have a potential recovery of approximately $228 million dollars if every class member made a claim, all were valid claims, and none of the class members had filed for Chapter 7 since the issuance of the Forced place insurance and their mortgage had not been discharged or compromised in bankruptcy.  Based on this fiction, Class Counsel claims their $16 million dollar fee request is reasonable.  The proper evaluation of the settlement is what the class actually receives. See Notes of Advisory Committee on 2003 Amendments to Rule 23 ("it may be appropriate to defer some portion of the fee award until actual payouts to class members are

known" (emphasis added)); *Id.* ("fundamental focus is the result actually achieved for class members" (emphasis added); *Id.* (citing 15 U.S.C. § 77z-1(a)(6); 78u-4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class" (emphasis added))). *See also ALl Principles* § 3.13; Federal Judicial Center, Manual for Complex Litigation (Fourth) 21.71(2004) ("the fee awards should be based only on the benefits actually delivered."). "[N]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed." *In re Prudential Ins. Co. America Sales Practices Litig*., 148 F.3d 283, 338 (3d Cir. 1998). The "key consideration in determining a fee award is reasonableness in light of the benefit actually achieved" *HP Inkjet*, 716 F.3d at 1177 (9th Cir. 2013) (emphasis added) (internal citation and quotation omitted). "[T]]he actual benefit provided to the class is an important  consideration when determining attorneys' fees." *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 179 n.13 (3d Cir. 2013); *Bluetooth*, 654 F.3d 3d at 943 (reversing and remanding after district court failed to make comparison between attorney award and value of settlement benefit to class); *cf  Dennis*, 697, F.3d at 868 (instructing that settlement valuation "must be examined with great care to eliminate the possibility that it serves only the 'self interests' of the attorneys and the parties, and not the class by assigning a dollar number to the fund that is fictitious").

The settlement also provides prospective injunctive relief.  For all of the reasons earlier set forth in this objection, the prospective relief has no value to this class.  The calculation of attorneys' fees based upon a percentage of the settlement including value placed on prospective relief is erroneous.

## CONCLUSION

Objector respectfully requests that this settlement not be approved and the attorneys' fees be a reasonable percentage in proportion to the amount actually distributed to the class.


/s/ Michael & Jill Trapasso                    /s/ Gregory N. Woods
_____        _____
Michael & Jill Trapasso                            Gregory N. Woods, Esq.
                                                              Woods, Weidenmiller, Michetti & Rudnick
/s/ Gordon K. & Alacia L. James                Florida State Bar Number: 175500
_____        9045 Strada Stell Court, Suite 400
Gordon K. & Alacia L. James                     Naples, Florida  34109
                                                              (239) 325-4070

                                                              Counsel for Michael & Jill Trapasso,
                                                              Gordon K. & Alacia L. James,


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been served via transmission of Notices of Electronic Filing generated by CM/ECF on September 26, 2014 and was filed with the Clerk of Court using CM/ECF, and that as a result a copy of this filing has been served upon every counsel of record. The below individuals are also being mailed a copy on this, the 26th day of September 2014.

                                                              /s/ Gregory N. Woods

Adam M. Moskowitz
KOZYAK, TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon Blvd, 9th Floor
Coral Gables, FL.  33134

David L. Permut
GOODWIN PROCTER, LLP.
901 New York Ave. NW
Washington, DC  20001

Robyn C. Quattrone
BUCKLEYSANDLER, LLP.
1250 24th Street, NW
Suite 700
Washington, DC.  20037