**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 12-cv-22700-MORENO/GARBER**

CHERYL HALL, *et al.,* on behalf of
themselves and all others similarly situated,

      Plaintiffs,

v.

BANK OF AMERICA, N.A, individually and
as successor by merger to BAC HOME LOANS
SERVICING, *et al.*,

      Defendants.

_____/

**PLAINTIFFS' CONSOLIDATED RESPONSE TO ALL**
**OBJECTIONS TO THE *HALL* CLASS ACTION SETTLEMENT**

From a class of more than one million Bank of America mortgagors, only five objections have been submitted by a total of ten objectors.[1]  Plaintiffs now respond to these objections, which the Court should overrule in their entirety for the reasons set forth below.

## INTRODUCTION

The objectors to this class action settlement comprise only 0.00094% of the settlement class, and seek to delay or obstruct the award of significant settlement benefits to a class of more than one million borrowers.  The most substantial objections have been submitted by attorneys who have objected to most of the force-placed insurance settlements submitted to this Court and seek to derail the settlement to serve their own interests.  They aim to defeat approval of this settlement so that they may proceed with their own cases or extract attorneys' fees for themselves.  That aside, their objections are baseless.

The objectors challenge the "claims-made" structure of the settlement and Class Counsel's proposed fee award primarily by drawing strained analogies to consumer-product settlements recently rejected by various appellate courts.  But the opinions on which the objectors rest their arguments are the worst examples of claims-made agreements, and are entirely distinct from the parties' settlement here.  In *Eubank v. Pella*, for example, Judge Posner reversed the approval of a claims-made, class action settlement that he termed "inequitable—even scandalous." 753 F.3d 718, 721 (7th Cir. 2014).  The settlement presented to the court reflected "almost every danger sign in a class action settlement," including "fatal conflicts of interest"; opposition by named plaintiffs; a provision requiring class members to risk recovering nothing by submitting their claims to arbitration, where the defendants had reserved defenses, in order to be eligible for any meaningful settlement distribution; an award of only coupons to a portion of the class; twelve- to thirteen-page claim forms requiring class members to submit "a slew of arcane data, including the "product identity stamp," "Unit ID Label," and purchase order

---

[1] This count does not include the "objections" of Rasheeda Michelle-Maria Karim (D.E. 395), James Smith and Gwendolyn Dent-Smith (D.E. 417), or Teresa Dunne and David and Kathleen Brunetto (D.E. 420).  Ms. Karim's objection is unintelligible and seems not to address the parties' settlement.  Class counsel has contacted the Smiths and confirmed that their submission was not, in fact, an objection, and they will be filing a claim.  Ms. Dunne and the Brunettos' objection states only: "Object to settlement.  Predatory lending not addressed completely.  Will not appear." (D.E. 420.)  This objection does not appear to address the Settlement's terms, and without further elaboration in the papers or at the final fairness hearing, Plaintiffs cannot address this objection, nor should the Court consider it.

number of the product at issue; and an unnecessarily complex settlement notice.

Similarly, in the *Pampers* litigation relied upon by several objectors, class members were awarded "nearly worthless" injunctive relief for their economic claims, and only injunctive relief, while the class representatives alone were singled out for a monetary award; and class counsel took millions in fees despite the illusory nature of the relief provided, and despite the fact that they had not conducted any discovery or responded to motions to dismiss. *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013). And the settlement in *In re Bluetooth Headset Products Liability Litigation*, 654F.3d 935 (9th Cir. 2011), provided the class no monetary award for their claims asserting economic injury, and the district court did not sufficiently explain its approval of counsel's fee award, which was calculated using a lodestar approach with no cross-check.

The settlement here does not present any of the "danger signs" that defeated approval of the *Eubank*, *Pampers*, and *Bluetooth* settlements. There are no conflicts of interest, nor was there any collusion among the parties. The parties agreed to a claims-made settlement structure only after Class Counsel had conducted discovery to confirm that a claims process was necessary, and it is. Class members who submit valid claims forms will receive a settlement award without submitting any supporting documentation or details about their loans, and the claim forms only require that they provide basic biographical information and check a box indicating whether they paid the amounts charged them or still owe them, for settlement administration purposes, and in some cases, a witness's signature or other authentication.

Moreover, unlike the *Eubank, Pampers*, and *Bluetooth* settlements, the settlement makes valuable injunctive *and* monetary relief available to the class, prohibiting Defendants from engaging in the practices complained of for five years following approval, and awarding class members who make a claim monetary relief comparable to that they might have secured had the prevailed at trial. Class members will recover this award simply by filing a claim form, and without confronting any of the risks or expenses associated with further litigation. This is especially valuable where, as here, Defendants have raised dispositive defenses that have succeeded in similar actions.

The settlement was due in no small part to Class Counsel's significant labor. During the two-plus years that this case has been pending, counsel has briefed multiple dispositive motions, including motions to dismiss, motions to transfer, and a motion for class certification; undertaken

significant discovery, including written discovery and depositions; and spent more than four months negotiating a settlement that provides broad and valuable relief to more than one million class members.  Class Counsel also opposed efforts by competing plaintiffs' counsel to transfer this case to another district in multidistrict litigation.  Both this work and the excellent results procured support an award of the proposed fees, which amount to only 7% of the value of the monetary portion of the settlement alone.

Of course, no settlement of this size and scope will satisfy each and every class member. Recognizing this, the settlement notice offers class members the opportunity to opt out and pursue their claims in individual litigation.

The Court should approve the parties' settlement and overrule all objections.

## ARGUMENT

I.    **A CLAIMS-MADE SETTLEMENT IS NOT ONLY FAIR, REASONABLE AND ADEQUATE, BUT ALSO NECESSARY.**

Several objectors contend that the claims-made structure of this settlement, as well as the claim form and procedures, were designed to minimize the number of class members who obtain relief from Defendants.  But the claims-made structure of this settlement is not only necessary— as established in Plaintiffs' final approval papers—but also fair, as it provides more than one million class members an opportunity for near-complete recovery.  Plaintiffs' responses to these objections are set forth more fully below.

### A. The Claims-Made Process Is Necessary and Will Provide Near-Complete Relief to Those Who Submit a Claim.

Certain objectors challenge the "claims-made" structure of the parties' settlement, arguing that it does not provide the best-possible relief to the maximum number of class members, and suggesting that it is unnecessary.  (D.E. 408 at 3-4; D.E. 412 at 2-4; D.E. 413 at 4-8.)  They suggest that a direct-payment structure should have been considered and adopted by the parties, and that the parties' settlement should be rejected because it was not. The Sanderson Objectors take this argument one step further, suggesting that the parties' use of a claims-made process was a result of Bank of America's "improper record keeping" or collusion among the parties.  (D.E. 413 at 8-10.)   These arguments arise from a basic misunderstanding of the discovery taken from the Defendants in this case.  The possibility of a direct-pay settlement structure was considered *and investigated* by Class Counsel. (D.E. 403 at 13-14; D.E. 403-3 ¶¶ 34-36.)  Class Counsel have taken considerable confirmatory discovery from Defendants, in this

and other cases, to examine Defendants' assertion that it would be practically impossible to provide direct payments to a nationwide class. (*Id.*)  This discovery confirmed that the claims process is not only necessary, but it is also the *only* possible method of distribution of the substantial settlement proceeds agreed to by the parties here, in a settlement class of more than one million Bank of America borrowers, and will maximize the relief available to class members who opt to file a claim.  The same conclusion has been reached by courts approving settlements in other force-placed insurance class actions, and by state regulators settling borrowers' claims against the force-placed insurers that control the force-placed insurance market.  *See, e.g., Saccoccio v. JPMorgan Chase Bank, N.A.*, 297 F.R.D. 683, 696 (S.D. Fla. 2014) (overruling objection based on evidence that that defendants could not determine which class members had paid on system-wide basis); *Casey v. Citibank, N.A.*, No. 5:12-cv-820, 2014 U.S. Dist. LEXIS 118252 (N.D.N.Y. Aug. 21, 2014) (granting final approval of claims-made force-placed insurance settlement); Consent Order, *In the Matter of Am. Sec. Ins. Co., et al.* (N.Y.D.F.S. 2012), *available at* http://www.dfs.ny.gov/about/press2013/assur-order-130321.pdf.  These settlements have direct relevance here because all of the major mortgage lenders use similar systems to house data on borrowers' mortgage loans and, as a result, none of the lenders is able to query its systems to produce information automatically to identify borrowers who have paid force-placed premiums or who have been charged but have not paid, among other things.[2]

The Rosen and Sanderson Objectors believe that the claims process is unnecessary because Bank of America knows the identity of its borrowers with force-placed insurance, and has access to information about their mortgage loans and the insurance premiums charged them. (D.E. 408 at 3; D.E. 413 at 8.)  This argument misses the point; Bank of America does have information about borrowers' premiums, but it cannot query on a system-wide basis data revealing whether borrowers paid or still owe any portion of the net premiums charged them. (D.E. 403 at 14.)  As a result, it would be impossible to discern whether borrowers had paid any

---

[2] Class Counsel here has also confirmed this and that a claims-made process is necessary in other force-placed insurance class actions pending in this district against other major mortgage lenders. *See, e.g., Saccoccio*, No. 13-cv-21107 (S.D. Fla.) (D.E. 128) (claims-made process reasonable in light of the evidence that the Defendants would have to manually review each class member's files); *Braynen v. Nationstar Mortg., LLC*, No. 14-cv-20726 (S.D. Fla.) (D.E. 46) (discussing discovery in support of  approval); *Hamilton v. SunTrust Mortg., Inc.*, No. 13-cv-60749 (S.D. Fla.) (D.E. 168) (same); *Diaz v. HSBC Bank USA, N.A.*, No. 13-cv 21104 (S.D. Fla.) (D.E. 156) (same); *Fladell v. Wells Fargo Bank, N.A.*, 13-cv-60721 (S.D. Fla.) (D.E. 182) (same).

amount of their force-placed insurance charges, or whether a borrower's debt has been extinguished in bankruptcy, without a considerable delay in relief to the class—the manual, file-by-file review that Defendants would have to undertake would take considerable time to complete at a considerable cost to Defendants and Bank of America borrowers.  (D.E. 403-3 ¶¶ 34-36); *cf. Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 593-94 (N.D. Ill. 2011) (approving claims-made settlement where there would be "costs associated with investigating how much is owed each Class Member under the settlement and distributing payments.  Had the onus of that process been placed on Defendant, there may have been less money available for them to pay claims."); *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 198 (D.D.C. 2011) ("the case might not have settled if a condition of the agreement required PNC to mine [its] computer systems for such data").

This argument also fails to take into account the considerable and valuable relief that the settlement will provide to class members who opt to submit a claim.  The settlement offers monetary relief to class members that will compensate them for a significant part of the allegedly inflated portion of the force-placed premiums that they either paid or were charged.  All class members in the "BOA Legacy" portfolio who were charged for hazard LPI between January 1, 2008 and December 31, 2009 and submit a valid claim form will recover a sum equal to 11% of the net premium *charged* to the class member during the class period, as long as the class members either paid a portion of that premium to BOA or still owe any amounts on it.[3]  (D.E. 403-1 ¶¶ 2.32, 4.5, 4.5.1(a).)  The BOA Legacy portfolio was comprised of approximately two million loans that had been serviced by the BOA Defendants before BOA merged its own portfolio of loans with those it acquired through its acquisition of Countrywide Financial Corporation in 2008.  (*Id.* ¶ 4.5.1 (a).)

Unlike borrowers in the BOA Legacy portfolio, borrowers in the Countrywide and aligned portfolios were not charged for commissions (which Plaintiffs allege to have been kickbacks) in connection with their LPI coverage, and certain expenses may have been deducted from the amounts they were charged for coverage.  All class members in the "Countrywide Legacy" portfolio who were charged for hazard LPI between January 1, 2008 and December 31,

---

[3] A claims-made process is appropriate here, as the BOA and QBE Defendants have represented that they cannot, on a system-wide basis, determine the amount of force-placed premiums paid or currently owed by a borrower.

2009 and submit a valid claim form will recover a sum equal to 6.5% of the net premium *charged* to the class member during the class period, as long as the class members either paid a portion of that premium to BOA or still owe any amounts on it. (*Id.* ¶¶ 2.32, 4.5, 4.5.1(b).) The Countrywide Legacy portfolio held approximately ten million loans serviced by Countrywide before the Countrywide-BOA transaction. (*Id.* ¶ 4.5.1 (a).)

Class members with loans in the BOA "aligned" portfolio, created after the BOA Legacy and Countrywide portfolios were combined, who were charged for hazard LPI between January 1, 2010 and February 3, 2014, will recover a sum equal to 5% of the net amount charged them during the class period if they submit a valid claim form, as long as the class members either paid a portion of that premium to BOA or still owe any amounts on it. (*Id.* ¶¶ 2.32, 4.5, 4.5.1(c).)

The 11%, 6.5%, and 5% amounts are calculated from the entire premium, rather than the alleged "excess" or inflated portion of the premium, since a considerable portion of the premiums charged, in fact, were applied to pay for insurance to cover the borrower's property. Borrowers who believe they were charged premiums in error and seek to recover the amounts that they paid in their entirety have been given the option to opt out of the class and seek individual relief from Bank of America directly. The majority of the settlement class, however, will have a strong incentive to submit a claim form—the 5%-11% recovery made available to individual borrowers may yield settlement payments of hundreds or thousands of dollars if a claim is filed. As this Court reasoned in approving the *Saccoccio* settlement, this relief "very likely exceeds what Plaintiffs could have won at trial." 297 F.R.D. at 693.

Objectors' suggestion that claims-made settlements are presumptively unreasonable is directly contradicted by the prevailing authority. "There is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment." *Saccoccio*, 297 F.R.D. at 696 (quoting *Schulte*, 805 F. Supp. 2d at 593). Filing a claim form is a "reasonable administrative procedure" which generally does not impose an undue burden on members of a settlement class. *See Turner v. Gen. Elec. Co.*, No. 2:05-cv-186-FtM-99DNF, 2006 U.S. Dist. LEXIS 65144, at *7 (M.D. Fla. 2006). Moreover, a claims process may "strike a proper balance between, on the one hand, avoiding fraudulent claims and keeping administrative costs low, and on the other hand, allowing as many class members as possible to claim benefits." *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1010 (E.D. Wis. Aug. 16, 2010). This is particularly important where a case presents a class of this

size, and determining the amounts to be paid under a direct-pay structure would potentially make settlement more costly than litigation. *See Saccoccio*, 297 F.R.D. at 696 (citing evidence that performing a manual review of all borrowers files for a class of approximately 800,000 borrowers—approximately 500,000 *fewer* class members than covered by the settlement here— "would take a thousand people … every month").

A direct-pay structure could also present a significant risk of fraud, with checks (here in amounts up to thousands of dollars) being sent to outdated addresses or cashed by individuals other than the mortgagor at the same address. The purpose of ensuring certainty in the administration of monetary relief to a class of more than one million borrowers nationwide is also served by the submission of basic biographical admission required by the claims form. *See, e.g., Trombley*, 826 F. Supp. 2d at 201 (a "claims process is often used to ensure that money is fairly distributed for valid claims").

Where, as here, a claims-made process is the only reasonable method for providing prompt and substantial relief to the class, requiring class members to file claim forms also maximizes the relief available to class members who opt to submit a claim. *See, e.g., In re Sw. Airlines Voucher Litig.*, No. 11 C 8176, 2013 WL 4510197, at *9 (N.D. Ill. Aug. 26, 2013) (claims-made process "reasonable and appropriate" in settlement requiring defendant to replace vouchers where defendant lacked data to determine how many vouchers remained outstanding). Indeed, district courts routinely approve reasonable claims-made settlements, including those involving force-placed insurance. *See, e.g., Saccoccio*, 297 F.R.D. 683; *Williams*, No. 11-cv-21233 (D.E. 356) (claims-made settlement in force-placed insurance class action was "in all respects fair, reasonable, and adequate"); *Trombley*, 826 F. Supp. 2d at 201 (approving claims-made settlement and observing that "a claims process is often used to ensure that money is fairly distributed for valid claims"); *Wahl v. Am. Sec. Ins. Co.*, No. C08-00555 (N.D. Cal.) (D.E. 189) (claims-made force-placed insurance settlement was "entered into in good faith and … fair, reasonable, and adequate").

The Rosen, Sanderson, and Trapasso Objectors also argue that the Court should delay final approval until after the claims process is complete, so that it can take into account how many claims are submitted in determining whether the settlement is fair and reasonable.[4] (D.E.

---

[4] On March 7, 2014, the Sanderson Objectors' counsel, Squitieri & Fearon, LLP, took the exact opposite position in seeking attorney's fees for their own class action settlement. *See Katz v.*

408 ar 4; D.E. 412 at 3; D.E. 413 at 11.)   But the settlement's fairness is determined by the opportunity created for the class members, not by how many ultimately submit claims.  *See, e.g., Saccoccio*, 297 F.R.D. at 696 (overruling same objection); *In re Apple iPhone4*, 2012 WL 3283432 (N.D. Cal. Aug. 10, 2012); *Shames*, 2012 WL 5392159, at *9 (rejecting objection that court "should wait until the claims are in, and it is determined how much was actually paid to the class before determining a reasonable percentage for class counsel").

The Objectors' arguments also fail to account for the significant costs and hurdles the class would have faced had they proceeded with litigation. (D.E. 403 at 9-10, 11.)   Accounting for these risks highlights the reasonableness of the proposed settlement.  (D.E. 403-4 ¶¶ 24-32.)

The Trapasso Objectors base much of their argument on the unfounded assumption of a 1.1% claims rate.   (D.E. 412 at 6, 10, 15-16.)   Not only is there no basis for their assumption, but the claims rate in the only force-placed insurance class action in which the claims deadline has passed also undermines their conclusion.[5]  In *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233-RNS (S.D. Fla.), 14.4% of the settlement class submitted valid claims. Accounting for those class members to whom notice was undeliverable and subtracting their number from the total number of settlement class members, the rate rises to 17.8%.  Although *Williams* does not necessarily foreshadow the claims rate in this case, it casts doubt upon the Trespasso Objectors'

---

*Live Nation, Inc.*, No. 09-03740 (D.N.J.) (D.E. 88-2) ("*Katz*").   In *Katz,* the Squitieri Firm resolved a class action on a claims-made basis with no cash payment component.  *Id.*   Rather, class members could make claims to receive coupons and vouchers for free concert tickets which could be redeemed at certain concerts over a four-year period.  *Katz* at (D.E. 97 at 6) ("The only consideration they can ever receive in exchange for giving up their claims against Live Nation is the free concert tickets and coupon, for which they must file a claim by April 30, 2014").  Rather than waiting until all coupons and vouchers were redeemed and then used, Squitieri and Fearon sought an immediate payment of $1,699,999.00 in attorney's fees, arguing that "Class Counsels' fees in this matter have already been set and do not depend in any manner on the number of Class Members who claim their relief."  *Katz* at (D.E. 97 at 6).  Finally, the firm described their coupon claims-made settlement as a "common fund" and argued, without any claims data, that the nearly $1.7 million dollar fee "award [wa]s also reasonable if a percent-of-fund were applied."  *Katz* at (D.E. 96 at n. 6).

[5] The Sanderson Objectors also cite *Williams* as support for their opposition to a claims-made process, (D.E. 413 at 7-8), but Judge Scola granted final approval of the *Williams* settlement, reasoning that its elements were "in all respects, fair, reasonable, and adequate." *Williams* (D.E. 356).   The Sanderson Objectors also misrepresent critical facts regarding the *Williams* settlement, stating that only 9.59% of class members returned claims forms.

conclusion that the rate here will barely rise above one percent.

The Court should overrule any objections relating to the claims process because it is reasonable and will provide maximum relief to the class. *See, e.g., McKinnie v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 811-12 (E.D. Wis. 2009) (claims-made settlement "eminently reasonable" because class members would be made whole).

**B.  The Claim Form Does Not Place an Undue Burden on Class Members.**

Certain objectors challenge the claims process as confusing or burdensome, but the Claim Form requires borrowers to submit the minimal amount of information necessary to confirm borrowers' identities, ascertain whether they are entitled to a 5%, 6.5%, or 11% recovery under the terms of the settlement, and determine whether they should be paid by check or with a credit to their escrow accounts.[6]  (D.E. 403-1 Ex. C.)  The same biographical information—and the request that borrowers check a box if they have undertaken bankruptcy proceedings—will allow Defendants to determine if individual borrowers' claims have already been discharged.  Indeed, the Claim Form requires nothing more than for class members to provide this basic biographical information and their policy numbers, check a box indicating whether they actually paid force-placed insurance premiums or have simply been charged for the premiums, and, verify their identities and the accuracy of the information in the Claim Form.  (*Id.*)  The policy numbers are included on the notices sent to class members.  The Claim Form does not require claimants to submit any supporting documentation or provide information about the details of their loans— borrowers who were charged for, but did not pay, force-placed premiums are asked only to sign the form and provide the last four digits of their social security numbers, while claimants who paid the premiums are asked also to provide a witness's signature, a copy of a valid photo identification, a Wells Fargo mortgage statement, or a notarized claim form.  (*Id.*)    And settlement class members may download blank claim forms from the settlement website, and submit the form either by uploading it to the site or by sending it through the mail.  This hardly places an onerous burden on class members. *See Sacccoccio*, 297 F.R.D. at 698 (approving same claim form); *Mangone v. First USA Bank*, 206 F.R.D. 222, 235 (S.D. Ill. 2001) (approving an indistinguishable claims process that required claimants to check a box and declare under penalty of perjury that the information was correct).

---

[6] In *Katz,* the Sanderson Objectors' counsel argued that requiring information on a claim form (such as writing in the exact concert attended) was "a modest and acceptable measure to discourage false claims, and is in no way unfair or objectionable."  *Katz,* (D.E. 88-2 at n.4).

Certain objectors also question the requirement that class members verify by their signatures that they have not had their mortgage indebtedness discharged in bankruptcy. (D.E. 412 at 2; D.E. 413 at 14.) This requirement, however, will not exclude Bank of America borrowers who held valid claims in litigation, because those affected have no actual damages.[7]

## II.   OBJECTIONS TO THE ADEQUACY OF THE SETTLEMENT'S MONETARY AND INJUNCTIVE RELIEF ARE UNPERSUASIVE.

### A. Monetary Relief

Objector Mayo questions the adequacy of the value of the settlement, suggesting that class members should receive more than 5%, 6.5%, or 11% of the force-placed insurance premiums they paid. (D.E. 407 at 2.) He points to *Farmer v. Bank of America, N.A.*, No. 5:11-cv-00935 (W.D. Tex.), and asks why members of the settlement class in that case received 100% recovery while class members here will recover a percentage of the premiums charged them.

This objection is unpersuasive because it misconstrues both the *Farmer* settlement and the value of the relief afforded here. The plaintiffs in *Farmer* were Texas borrowers whose claims against Bank of America arose from mortgage terms unique to Texas borrowers' loans that expressly provided that the borrower was *not* required to procure certain types of hazard insurance for their properties. *See Farmer* Preliminary Approval Motion, attached as **Exhibit A**, at 3. Plaintiffs alleged that despite these clear provisions, Bank of America sent a cycle of notices to Texas borrowers requiring such insurance, and forced coverage where the borrower had failed to provide it. (*Id.* at 3-4.) The settlement class was comprised of 40,000 borrowers, only 5,000 of whom had coverage wrongfully forced on their properties. (*Id.*)

The *Farmer* settlement provided four classes of relief. The Settlement Agreement provides for a full refund to settlement class members with coverage in effect on their properties; a 60% refund to settlement class members who had coverage forced during that class period that was no longer in effect; a 30% refund to settlement class members who had gone into foreclosure after coverage was forced; and a share of a $2.16MM fund to class members who had purchased voluntary coverage from their preferred carrier in reliance on the notice letters they received

---

[7] Notably, Judge Scola excluded certain borrowers from the certified Florida class in *Williams*. *See Williams*, 11-cv-21233, (S.D. Fla.) (D.E. 211). Judge Scola ultimately excluded six categories of borrowers from the *Williams* class. *See Williams*, D.E. 257. These categories of borrowers are included in the *Fladell* settlement and will recover a portion of the premiums they were charged or paid.

from Bank of America.  *See Farmer* Settlement Agreement, attached as **Exhibit B**, § 2.01. Settlement class members recovered up to 100% because coverage should never have been forced on their properties in the first instance—their mortgage agreements did not authorize the placements.  (Ex. A at 3.)  The Settlement Agreement presumably provided for direct pay to all but the last category of class members because the class size was considerably smaller than the class at issue here; ascertaining amounts owed to a class of 5,000 Texas borrowers is considerably less burdensome a task than doing the same for more than one million nationwide.

The claims presented here are materially distinct from those at issue in *Farmer*.  The mortgage contracts in *Farmer* expressly provided that Texas borrowers were *not* required to provide hazard coverage to protect their properties and gave the bank no authority to force coverage under any circumstance.  (*Id.*)  Borrowers who were members of the class here were required by their mortgage agreements to maintain hazard coverage on their properties and the bank, in turn, was authorized to place coverage in the event of a lapse.  (D.E. 179 ¶ 40.) Plaintiffs here have not alleged that Bank of America forced coverage on their properties in error; they instead challenge the bank's practice of charging them costs beyond the cost of coverage that were not authorized by their contracts or governing law.  (*Id.* ¶¶ 45-56.)  It is these additional costs that provide the basis for recovery in this settlement and, as with the *Farmer* settlement, class members will recover a considerable percentage of their total damages—lender-placed "commissions" were generally paid bo force-placed insurers to a lender's affiliate at approximately 10%-15% of the net written premium.  *See, e.g., Kunzelmann*, No. 11-cv-81373 (S.D. Fla.) (D.E. 62).  Thus, a comparison of this settlement to the settlement in *Farmer*—to the extent that one can reasonably be drawn—reveals that the recovery to settlement class members in both cases was in some sense equivalent.

Objector Mayo's concerns are also divorced from any consideration of the relative strength of the Class's claims.  *See Nwabueze v. AT&T Inc.*, No. C 09–01529, 2013 WL 6199596, *8 (N.D. Cal. Nov. 27, 2013) ("That a settlement could potentially have reached a more favorable result for certain individuals in the class does not demonstrate that the agreed-upon settlement is not fair, adequate, and reasonable."); *Henderson v. Volvo Cars of N. Am.*, No. 09–4146, 2013 WL 1192479, at *9 (D.N.J. Mar. 22, 2013) (collecting cases rejecting objections that merely complained about the lack of full relief and holding that "[o]bjections based solely on the amount of the award lack merit"); *Apple iPhone4*, 2012 WL 3283432 at *2 ("[O]bjections

seeking a 'better' result are not sufficient to overturn a settlement agreement.").

> Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion. In this regard, the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness.

*Hanlon v. Chrysler Corp.*, 150 F.3d at 1011, 1027 (9th Cir. 1998).  As in *Hanlon*, the fact that the overwhelming majority of the class did not opt out presents significant positive commentary as to its fairness.  Additionally, as the court noted in *Hanlon* and the Eleventh Circuit established in *Leverso*, the dispositive question for this Court is not whether the Settlement fully compensates Class Members for their injuries, but whether it is fair, adequate, and free from collusion.  *Leverso*, 18 F.3d at 1530 n.6.   To the extent that an objector believes that his or her claims are unique and entitled to additional compensation, he or she was given the opportunity to opt out of the Settlement and pursue claims individually.  The objectors chose, however, to stay in the Settlement, apparently feeling "entitled to the bird in the hand while pursuing the flock in the bush.  If the objectors felt they could do this, that was their prerogative but in so doing they accepted the risk that they would be precluded."  *Corrugated Container Antitrust Litig.*, 643 F.2d at 222-23.

Plaintiffs and the Settlement Class faced significant hurdles had they proceeded with litigation, including case-dispositive defenses raised by all defendants and the difficult task of certifying a nationwide class on the various state law claims.  (D.E. 403-4 ¶¶ 24-32); *Saccoccio*, 297 F.R.D. at 692-93 ("granting final approval and stating "there is strong authority to suggest that Plaintiff may not have prevailed").  Although Class Counsel does not believe that these defenses have any merit, courts have been divided on their application in similar cases.  The negotiated settlement offers class members extraordinary relief, and particularly so taking these risks into consideration.

### B.  Injunctive Relief

The Mayo, Trapasso, Hall, and Sanderson Objectors question the value of the injunctive relief to which the parties agreed in the Settlement, claiming that the relief is inadequate, and duplicates relief afforded by regulatory action and the activities of others.  (D.E. 407 at 2; D.E. 408 at 6-10; D.E. 413 at 15-17.)  In particular, these objectors point to Consent Orders that the Assurant Defendants entered into with state regulators in Florida and New York, recently announced Fannie Mae Servicing Guidelines, the National Mortgage Servicing Settlement

("NMS"), and Regulation X, 12 C.F.R. part 24.  The Objectors are simply incorrect, because none of these developments requires the Defendants to change their practices to the same extent as the Settlement.

In the New York Consent Order, for example, the QBE Defendants agreed to stop paying servicers commissions and entering into reinsurance agreements with servicers, but only with respect to New York borrowers.  The significant injunctive relief negotiated by the parties, by contrast, benefits borrowers nationwide.  These consent orders also bind only the insurance defendants—they do not enjoin the mortgage lenders from continuing these practices with another insurer.  *See* Consent Order, *In the Matter of Balboa Ins. Co., et al.* (N.Y.D.F.S. 2012), *available at* http://www.dfs.ny.gov/about/ea/ea_201304181_balboa.pdf.

Similarly, the restrictions imposed by the Guidelines extend only to Fannie Mae mortgages.  Moreover, the Guidelines are the product of the political process, and thus can change at any moment.  The Settlement, by contrast, binds the Defendants for the next five years.

The NMS binds Bank of America only until 2015, applies only to hazard coverage, and requires only that force-placed coverage be purchased for "a commercially reasonable price," without prohibiting the specific practices alleged here or providing guideline for ascertaining commercial reasonableness.  12 C.F.R. § 1024.17(h) similarly binds requires only that force-placed charges be "reasonable."

The Hall Objectors also challenge the settlement's injunctive relief on the ground that it compensates future Bank of America borrowers rather than class members who have done business with defendants in the past. (D.E. 415 at 4-6.)  While this objection may carry some weight when aimed at settlements involving one-off consumer transactions and providing primarily injunctive relief, it does not apply where, as here, the settlement class will recover near-complete monetary relied and is composed of consumers who have contracted to do business with Defendants for years into the future.  The nationwide class here is comprised of more than one million Bank of America mortgagors, many, if not most, of whom still are party to mortgage contracts with the Bank of America Defendants.  Regardless of whether individual borrowers currently have forced coverage on their properties, they continue to be bound by the forced-placed provisions in their mortgage agreements, and are subject to the possibility that coverage will be forced on their properties in the future for any of a number of reasons.

The Hall Objectors contend that certification of a settlement class comprised of some

members who will benefit from injunctive relief and others who may not would create intra-class conflict, (D.E. 415 at 5), but this is no more the case here than with any class action settlement where injunctive relief is afforded to a consumer class—some settlement class members may purchase the product in the future, while others may not. Here, at the very least, it is highly likely that a significant segment of the class will continue to be bound by the force-placed insurance provisions in their mortgage contracts for the duration of the five-year injunction. And contrary to the Hall Objectors' contention, this arrangement does not give rise to the risk that one segment of the class "would wish to maximize financial compensation with no injunction while the latter would prefer an injunction." (*Id.*) This risk might arise in a case like *Pampers* or *Bluetooth*, where consumer class action settlements alleging economic damages offered the class little to no monetary relief, but here the settlement class will recover a significant percentage of their losses from the defendants. (D.E. 403 at 11-12.) The settlement already maximizes the class's financial compensation; the injunctive relief is an added benefit with no cost to the class.

Objector Mayo objects that a five-year injunction will not preclude defendants from reinstating their practices once the time allotted has expired, but again, "[s]ettlement is the offspring of compromise." *See* p. 12, *supra*. Moreover, the injunctive relief provided by the Settlement is more comprehensive that that provided by other sources, *see* pp. 12-13 *supra*, and the notion that Defendants are likely to reinstate practices that generated multiple class action lawsuits against them—and more than one hundred against all mortgage lenders and either QBE or Assurant nationwide—is unfounded and illogical.

Class Counsel's fee award should account for the value the Settlement's injunctive relief will confer on the class. (D.E. 403-4 ¶¶ 28-30.)

## III.   THE PROPOSED CLASS COUNSEL FEE AWARD IS EMINENTLY REASONABLE.

The prevailing method for calculating attorneys' fees from a common fund is to apply the percentage-of-recovery method to the entire value of the settlement, not just the value of the claims actually paid. (D.E. 403 at 16-19; D.E. 403-4 ¶¶ 37, 38). The Rosen and Trapasso Objectors cite district and appellate court opinions issued outside the Eleventh Circuit to support the contention that Class Counsel's fees should be based on the value of the claims actually paid to class members, but their argument rests on a mischaracterization of the law and disregards controlling Supreme Court and Eleventh Circuit precedent.

The Supreme Court's decision in *Boeing v. Van Gemert*, 444 U.S. 472 (1980), and the

Eleventh Circuit's decision in *Waters*, 190 F.3d 1291, should end any dispute on this issue.  Both cases expressly approve applying the percentage-of-recovery method to the total value of the settlement.  The objectors contend that the Court should not follow *Boeing* and *Waters* because they are outdated opinions that have not been followed as prevailing law since CAFA was enacted in 2005.  This is simply false.  *See, e.g., Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437-38 (2d Cir.2007) (citing *Waters* and rejecting both relevance of CAFA to fee determination and proposition that counsel award should be based on claims made because, *inter alia*, "[t]he entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class"); *Bozak v. FedEx Ground Package Sys.*, No. 3:11-cv-00738, 2014 U.S. Dist. LEXIS 106042, at *17-18 (D.N.J. July 31, 2014) ("In applying the common fund method, the Supreme Court, the Second Circuit, and other Circuit Courts have held that it is appropriate to award attorneys' fees as a percentage of the entire maximum gross settlement fund, even where amounts to be paid to settlement class members who do not file claims will revert to the Defendants."); *Curry v. AvMed, Inc.*, No. 10-cv-24513, 2014 U.S. Dist. LEXIS 48485, at *6 (S.D. Fla. Feb. 28, 2014) (citing *Waters* awarding fee of 25% of total value of the settlement achieved for the class); *Saccoccio*, 297 F.R.D. at 694-95 (citing *Boeing*, *Waters*, and *Camden I*).

The Rosen, Trapasso, and Hall Objectors also take issue with the reversion of unclaimed funds to Defendants and the so-called "clear sailing" provision. (D.E. 408 at 3; D.E. 412 at 10; 415 at 10.) Though these terms may warrant a court giving closer scrutiny to a settlement, they do not compel rejection of a settlement that is otherwise reasonable.  *See, e.g., Laguna v. Coverall N. Am., Inc.*, 753 F.3d 918, 925 (9th Cir. 2014) (where fees are reasonable, "it is sufficient that a district court recognizes and balances potentially collusive provisions, such as the reversion to the defendants of unclaimed funds, against the other terms of the settlement agreement"); *Blessing v. Sirius XM Radio, Inc.*, 507 Fed. App'x 1, 6 (2d Cir. 2012) (reversionary and clear-sailing provisions did not provide grounds for vacating awarded counsel fee where "fee was negotiated only after settlement terms had been decided and did not … reduce what the class ultimately received"); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 426 (6th Cir. 2012) (recognizing that "not every 'clear sailing provision demonstrates collusion,'" and finding "collusion particularly unlikely … where the 'clear sailing' provision cap[ped] attorney compensation at 2.3% of the total expected value of the settlement," as opposed to the 20% to

15

30% typical of common fund fee awards).

As demonstrated in Plaintiffs' Motion for Final Approval, the settlement negotiated by the parties is eminently reasonable, as is Class Counsel's negotiated fee award.  Class Counsel worked for years to secure approximately $228 million in monetary relief for a class of more than one million Bank of America mortgagors.  (D.E. 403 at 3-7, 16; 403-4 ¶ 23.)  The fee that they have requested amounts to only 7% of the gross monetary settlement achieved for the class, which also includes considerable injunctive relief.  (D.E. 403 at 16; 403-4 ¶ 30.)  This award will not be taken from the amount made available to the class, and was negotiated after the other terms of the settlement had been reached, (D.E. 403-3 ¶ 69); thus the allocation "defects" cited by the Hall Objectors do not taint this settlement.  (D.E. 415 at 6-7.)  These indicia of fairness extinguish any suggestion of collusion.  *See, e.g., Stokes v. Saga Int'l Holidays, Ltd.*, 376 F. Supp. 2d 86, 89 (D. Mass. 2005) (citations omitted) ("Arm's length negotiations of attorneys' fees that would not diminish the common fund available to the members of the class action do not have the potential for the evils of extortion and collusion.").

These characteristics also distinguish this case from *In re Baby Products Antitrust Litigation*, 708 F.3d 163 (3d Cir. 2013), upon which the Trapasso and Hall Objectors rely to support their contention that Class Counsel's fees should be based on the claims made rather than the amount made available to the one-million member Settlement Class.  (D.E. 412 at 3, 5-6; D.E. 415 at 3, 7.)  The settlement at issue in *Baby Products* provided a $35.5 million common fund, from which $18.5 million was expected to go to *cy pres* recipients, $14 million would go to Class Counsel, and roughly $3 million would ultimately be distributed to settlement class members who made a claim.  *See Baby Prods.*, 708 F.3d at 169-70.  The majority of class members who made a claim would receive a $5.00 payout for claims valued at up to $180 for class members who had purchased just one product.  *See id.* at 171 (each claim "entitl[ed] the claimant to three times 20% of a $300 baby product").  The Court vacated the fund allocation plan out of concern both that the district court had been unaware that most claimants would ultimately be entitled to only a $5.00 payout, "resulting in minimal … compensation going directly to class members[,]" *id.* at 176, and that "the current distribution of settlement funds arguably overcompensates class counsel *at the expense of the class*[,]" and thus did not "adequately prioritize[] direct benefit to the class[.]"  *Id.* at 178, 179 (emphasis added).

Here, as explained above, the direct benefit to the class was prioritized above all else.

Class members who file a claim will recover a significant percentage of their actual damages, in addition to the settlement's injunctive benefits.  *See* Section I.A, *supra*.  This was negotiated before counsel's fees, and those fees will not be taken from money set aside for the class's benefit; they will not, that is, be taken at the class's expense.  Finally, there is no ceiling on the funds that may be paid out—the gross value of the settlement is approximately $228 million, and if all class members filed claims, then that is the amount that Defendants would pay.  The court in *Baby Products* acknowledged the propriety of basing counsel's fees on such an amount:

> There are a variety of reasons that settlement funds may remain even after an exhaustive claims process—including if the class members' individual damages are simply too small to motivate them to submit claims. Class counsel should not be penalized for these or other legitimate reasons unrelated to the quality of representation they provided. Nor do we want to discourage counsel from filing class actions in cases where few claims are likely to be made but the deterrent effect of the class action is equally valuable.

*Baby Prods.*, 708 F.3d at 178.

The fee award in this case was also contingent on a good result (D.E. 403-4 ¶ 40); Class Counsel would have recovered nothing if it had not secured recovery for the class.  "For a complex and sophisticated case such as this one, class counsel took considerable financial risk in pursuing the case."  *Saccoccio*, 297 F.R.D. at 695.  Class Counsel also spent considerable time litigating and settling the class's claims, defending against multiple dispositive motions, briefing class certification and preliminary and final approval, taking considerable discovery, and spending several months negotiating the mediated settlement. (D.E. 403-3 ¶¶ 7-17.)

Finally, there is no evidence of collusion among the parties, nor did any occur.  To the contrary, the parties' mediation was overseen by an experienced, neutral mediator.  (D.E. 403 at 3.)  The Court should overrule all objections that the proposed fee award is unreasonable.

## IV.   THE RELEASE IS FAIR AND REASONABLE AND SHOULD BE EFFECTIVE AS TO ALL CLASS MEMBERS.

The Sanderson Objectors also argue that the Release should extinguish the claims of only those class members who are paid or credited funds as a result of the settlement, that is, only those class members who submit claim forms.  (D.E. 413 at 12-13.)  This proposal defies logic, as its application would leave future defendants with little incentive to settle class action lawsuits on a claims-made basis.  A release of the class's claims is necessary precondition to Defendants' agreement to settle; without it, they could be subject to individual lawsuits by individual class members for years to come, and would incur the additional costs associated with litigating those

actions.  Class members who wish to retain their claims and except themselves from the settlement's terms, including the release, have been given the opportunity to do so by opting out. This is fair, reasonable, and sufficient under the law.

Objector Mayo also objects to the Release as overbroad because it releases Defendants from liability for the claims of all members of the Settlement Class, "and their respective family members, heirs, administrators, successors, and assigns," as well as for claims arising from policies issued for Bank of America during the class period by other insurance carriers.  (D.E. 407 at 2-3.)  The release of claims belonging to class members and their family members, heirs, administrators, successors, and assigns simply releases Defendants' from liability for claims arising from a class member's forced coverage regardless of by whom the claim is brought.  A "family member" with his or her own coverage is a member of the Settlement Class in his or her own right, and will release his or her claims absent a decision to opt out.

The release of claims against other carriers issuing coverage for Bank of America does not broaden the release to cover carriers unaffiliated to Balboa or QBE.  The Settlement Class is comprised only of Bank of America borrowers who had coverage forced by these two entities.  (D.E. 403-1 ¶ 3.1.)  Because only a Settlement Class member can release a claim, only borrowers with coverage provided by QBE or Balboa will have the power to do so, and all claims release will be against these defendants and their affiliated entities.

## V.      THE NAMED PLAINTIFFS ARE ADEQUATE CLASS REPRESENTATIVES.

The Sanderson Objectors object to the parties' decision to seek approval of a nationwide settlement, suggesting that this was not proper because it somehow renders the named plaintiffs inadequate class representatives. (D.E. 413 at 18-19.) This objection reflects a misunderstanding of a well-established distinction between the certification of litigation and settlement classes: whereas litigation classes require a plaintiff to demonstrate that the trial of claims brought on behalf of a multistate or nationwide class would be manageable, manageability concerns are not relevant to certification of a settlement class. *See, e.g., Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 302-03 (3d Cir. 2011) ("The correct outcome is even clearer for the certification of a settlement class because the concern for manageability that is a central tenet in the certification of a litigation class is removed from the equation.  Indeed, the class settlement posture of this case largely marginalizes the objectors' concern that state law variations undermine a finding of predominance."); *Louisiana Wholesale Drugs Co. v. Abbott Labs.*, 99-MDL-1317, 2005 U.S.

Dis. LEXIS 46189, at *15 (S.D. Fla. Mar. 18, 2005) ("All proposed classes must meet the requirements of Rule 23, but the fact of settlement can have an effect on the analysis.") (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 619-20, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) ("Settlement is relevant to a class certification and can alleviate manageability concerns that otherwise may arise.") (internal quotations omitted).

The Sanderson Objectors contend that "[t]he fate of the claims by Sanderson and other Tennessee borrowers should not depend upon borrowers from out-of-state with no connection to Tennessee[,]" without explaining how they might be prejudiced by this aspect of the settlement. (D.E. 413 at 18.)  They will not—the relief sought and secured for borrowers in all states is precisely the same, and will be distributed regardless of whether a borrower paid the amounts charged for force-placed insurance or not.  The suggestion that courts have refused to certify classes on this basis falls flat, because courts have declined to certify only nationwide *litigation* classes due to differences in state law.  (*Id.* (citing cases declining to certify litigation classes).) Where, as here, parties to a force-placed insurance class action have sought to certify a nationwide settlement class, district courts have certified the settlement class and granted final approval.  *See Casey*, 2014 U.S. Dist. LEXIS 118252 (N.D.N.Y Aug. 21, 2014); *Saccoccio*, 297 F.R.D. 683; *Pulley*, 2013 U.S. Dist. LEXIS 188088, (S.D. Fla. Nov. 25, 2013).

## VI.    THE CLAIMS RATE IS UNKNOWN BECAUSE THE DEADLINE FOR FILING CLAIMS HAS NOT YET PASSED.

The Sanderson Objectors argue that the Court should not grant final approval before the claims deadline, (D.E. 413 at 11), but district courts often grant final approval of class actions settlements before the final claims rate is known.  *See, e.g., Saccoccio*, 297 F.R.D. at 696 (overruling same objection because courts in this district have upheld settlements with low claims rates and because claims deadline had not yet passed); *Shames v. Hertz Corp.*, No. 07-cv-2174, 2012 WL 5392159, at *9 (S.D. Cal. Nov. 5, 2012) (rejecting notion that court "should wait until the claims are in, and it is determined how much was actually paid to the class before determining a reasonable percentage for class counsel"); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1383 (S.D. Fla. 2007) (court need not wait for final claims data to approve).  Had the claims deadline been set on an earlier date, class members would have had less time to submit claims forms, guaranteeing a lower claims rate.  The plan proposed by the settlement provides class members the best opportunity to file claims and ensures a higher claim rate.

The only other federal court to address the approval of a proposed nationwide settlement

in a force-placed class case (a settlement that was admittedly structured based upon the same terms of Class Counsel's settlement in *Saccoccio* before this Court), specifically rejected an argument that the claims rate was relevant to whether the proposed settlement was fair and reasonable citing specifically to this Court's order in *Saccoccio*:

> Such additional evidence and reports are irrelevant to the underlying issue; to wit, whether the proposed settlement agreement is fair, reasonable, and adequate. While a direct payment structure would obviously result in more, and possibly all, class members receiving a share of the $110 million settlement, there is no reason to believe the defendants would agree to such terms. In fact, during oral argument, counsel for the Citi defendants indicated that his clients would not entertain a direct payment structure even if such a procedure was, in fact, feasible to enact. Thus, discovery regarding the feasibility of a payment structure that is not part of the proposed settlement is irrelevant. *See Uhl v.Thoroughbred Tech. & Telecomms., Inc.,* 309 F.3d 978, 986 (7th Cir. 2002) (because the inquiry into a proposed settlement structure "is limited to whether the settlement is lawful, fair, reasonable and adequate[,] . . . [an objector] must do more than just argue that she would have preferred a different settlement structure"); *Saccoccio v. JP Morgan Chase Bank, N.A.,* 2014 WL 3738013 (S.D. Fla. July 28, 2014) (denying objectors' request for discovery of material that did not relate to the fairness, adequacy, or reasonableness of the underlying settlement agreement).
>
> … As noted by plaintiffs' counsel, it is entirely possible that the United States Court of Appeals for the Second Circuit may, in the near future, join other Circuits and determine that many of the underlying claims in this case are not actionable. … Therefore, there is a real risk that none of the class members will receive any payment. This actual risk, not the amorphous collusion suggested by the objectors, is the more likely motivation for the timing and structure of the proposed settlement.

*Casey*, No. 5:12-cv-00820-DNH (D.E. 221 at 4-7) (one citation omitted).

The Sanderson Objectors also complain that the two-month opt out and objection periods were too short (D.E. 413 at 13), but federal district and appellate courts routinely approve shorter opt-out and objection periods, *see, e.g., In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144, 2009 U.S. Dist. LEXIS 120953, at *67 (S.D.N.Y. Dec. 23, 2009) (approving thirty-day objection period and citing opinions approving periods of nineteen to thirty-four days) (citations omitted), and no class member has complained that they did not have time to opt out or object. In fact, this very challenge comes from class members who managed to timely file a lengthy objection. (D.E. 413.)

## CONCLUSION

The Court should overrule all objections in their entirety.

Respectfully submitted this 15th day of October, 2014.

By: /s/ Adam Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK, TROPIN, &**<br>**THROCKMORTON**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiffs* | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>pprieto@podhurst.com<br>Matthew Weinshall, Esq.<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiffs* |
| Lance A. Harke, P.A.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:     (305) 536-8229<br>*Counsel for Plaintiffs* | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on

the 15th day of October, 2014 and served by the same means on all counsel of record.

By:  <u>/s/ Adam Moskowitz</u>