```
             UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
                   MIAMI DIVISION
             CASE NO.  12-22700-CIV-FAM



CHERYL HALL,

              Plaintiff,

     vs.

                              Miami, Florida
                              October 29, 2014
BANK OF AMERICA,

              Defendant.
_____


               TRANSCRIPT OF FAIRNESS HEARING
          BEFORE THE HONORABLE FEDERICO MORENO
               UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:
                    Kozyak, Tropin & Throckmorton, P.A.
                    BY:  ADAM MOSKOWITZ, ESQ.
                    BY:  HARLEY TROPIN, ESQ.
                    BY:  THOMAS A. TUCKER RONZETTI, ESQ.
                    2525 Ponce de Leon Boulevard
                    Suite 900
                    Coral Gables, Florida 33134

                    Harke, Clasby & Bushman, LLP
                    BY:  LANCE A. HARKE, ESQ.
                    9699 Northeast Second Avenue
                    Miami Shores, Florida 33138

                    Podhurst Orseck, P.A.
                    BY:  PETER PRIETO, ESQ.
                    25 West Flagler Street
                    Suite 800
                    Miami, Florida 33130
```

1    **FOR THE DEFENDANT:**
                            *Goodwin Proctor, LLP*
2                           **BY:  JOHN C. ENGLANDER, ESQ.**
                            53 State Street - Exchange Place
3                           Boston, MA  02109

4                           *Goodwin Proctor, LLP*
                            **BY:  DAVID L. PERMUT, ESQ.**
5                           901 New York Avenue, NW
                            Washington, DC  20001

6

7    **FOR OBJECTORS JEFFREY SANDERSON & RAYAR JOHNSON:**

8                           *Squitieri & Fearon, LLP*
                            **BY:  STEPHEN J. FEARON, JR., ESQ.**
9                           32 East 57th Street - 12th Floor
                            New York, New York, 10022

10

11   **FOR OBJECTORS MICHAEL AND JILL TRAPASSO & GORDON
     K. JAMES & ALACIA L. JAMES:**

12                          *Woods, Weidenmiller, Michetti & Rudnick*
                            **BY:  GREGORY N. WOODS, ESQ.**
13                          Newgate Tower
                            5150 Tamiami Trail N.
14                          Suite 603
                            Naples, Florida 34103

15

16   **REPORTED BY:          DAWN M. WHITMARSH, RPR
                            Official Court Reporter
17                          400 N. Miami Avenue, 10S03
                            Miami, Florida  33128
                            Telephone:  305-523-5598**

18   _____

19                        P-R-O-C-E-E-D-I-N-G-S

20          THE COURT:  Good afternoon, everybody.  Let me

21   apologize, please be seated.  We're here on Cheryl Hall versus

22   Bank of America, et al, 12-22700-civil.

23          As you all know, there was an investiture which was

24   scheduled after the fairness hearing had been notified.  If it

25   was any other type of hearing, I would, of course, have changed

1   it.  Because it's a fairness hearing and it involves notices and

2   all of that for the objectors, I really didn't have a choice

3   since they use my courtroom for those things now, and I'm not

4   complaining about it because that's how I get to keep it, you

5   know.  As long as I can rent it out at no cost, Judge Moore says

6   he would rather have me do it so he could do whatever he wants,

7   whenever he wants.  So that's the reason.  And, you know, I had

8   all of the court of appeals judges, I think all of them. I think

9   all of them were here.  All the active ones and a couple senior.

10  You got to be a gracious host.  So I joked with them that maybe

11  they wanted to come and stand behind me and that way we can save

12  a lot of time and money, since they seemed to be a very jovial

13  mood.  They did not accept, they would rather be there eating.

14  And so that was the reason for it.  And I know that some of you

15  actually were in there so you know that's where we were, okay?

16         Now we're here for the fairness hearing.  We've gone

17  through this in similar cases before.  Let me start with any

18  objectors who want to be heard.  I think they should be heard

19  first.

20         MR. FEARON:  Good afternoon, Your Honor.

21         THE COURT:  Okay.  Come forward.  Is that lectern

22  always this close?  It's almost like being in state court.

23         MR. FEARON:  Good afternoon, Your Honor.  I'm Stephen

24  Fearon, on behalf of two objectors, Mr. Sanderson and Ms.

25  Johnson.

1          THE COURT:  Jeffrey Sanderson and Rayar Johnson, right?

2          MR. FEARON:  Yes, Your Honor.

3          THE COURT:  Okay.  What do you wish to say?

4          MR. FEARON:  Your Honor, we've set forth in our

5    objections in the papers that we filed, that was docket number

6    413.  So I don't want to repeat what's in there.  I also have

7    been before Your Honor on one other occasion.

8          THE COURT:  Yeah, you spoke for several hearings, I

9    would say.

10          MR. FEARON:  Well, Your Honor, just one actually.  The

11    Wells Fargo.

12          THE COURT:  No, but it was the equivalent of several

13    hearings is what I meant.  That's what I meant.  I know it was

14    only one.  In my courtroom.  But so now there's an appeal

15    pending on one of the cases, right?  Saccoccio is up on appeal?

16          MR. FEARON:  The Chase case, JP Morgan Chase, Your

17    Honor.

18          THE COURT:  All right.  So that will kind of decide.

19    Is there anything you want to add to it or to be consistent, you

20    know what I'm going to say, I know what you're going to say.

21          MR. FEARON:  I suspect I know what you're going to say

22    and that's why I don't want to repeat a lot of what's in our

23    papers and what we've been over in the Wells Fargo case.

24          However, I think here it's important to at least

25    examine the settlement on its own.  It is a claims-made

1    settlement and we do object to that.  I won't repeat why.

2          THE COURT:  All right.  It's preserved.

3          MR. FEARON:  It's preserved.  Thank you, Your Honor.

4          However, I think it's important to ask the question

5    here, as we have in our objection and we have to the counsel for

6    the parties here.  How much are they actually paying out?  That

7    is really the heart of our objection that I want to discuss

8    today.  And the reason that we think today there's not enough

9    evidence to approve this application.

10         THE COURT:  But then like I said before, the last time

11   we were together, how long ago was that?  A month?

12         MR. FEARON:  It was a month ago.

13         THE COURT:  Or whatever it was, was we would never be

14   able to approve anything, we would have to wait until they

15   collect it.  So it seems like -- I mean, I share, in part, your

16   concern which is probably why, after the last hearing, I came up

17   with that -- the possibility of some cy-près award and I'm

18   sometimes uncomfortable with that.  But I think I made it vague

19   enough to see whether -- and nobody really liked the idea, and

20   then I said that may mess things up because of -- my power is

21   limited.  I can't decide what to do, all I can do is look at

22   Rule 23 and see if it fits.  And the main concern that I have,

23   other than that -- that is a concern I had.

24         But what do we do about it?

25         MR. FEARON:  I think we just ask the question because

1   it's very simple to just ask the question.  And we know that the

2   Defendants know the answer to it and the Plaintiffs know the

3   answer to it.  They know what the answer to the questions that

4   we're asking and we think, respectfully, Your Honor should ask,

5   and that is what were the net written premiums here so that we

6   can have a measuring stick.  And second, what are the number of

7   claims that have come in to date --

8           THE COURT:  In this case.

9           MR. FEARON:  -- in this case, and what is the dollar

10  amount the Defendants, through today, will pay out because that

11  gives us the yardstick, the measuring stick to look at this

12  settlement and say is it fair.  Put aside the issue of the

13  claims-made settlement.  And as Your Honor noted, you know, we

14  won't get into that right now, but put that to the side.  Even

15  though it's a claims-made settlement and even if a claims-made

16  settlement is proper here, the court still should ask the

17  question how much are they paying out.  Because the answer to

18  that question, when you compare it on the upside to the net

19  written premiums and on the other side to the fees that are

20  being requested, is crucial to determine whether the settlement

21  is fair or not.

22          THE COURT:  Okay.  So what would be the outcome of

23  that?  If it's -- if the number is not as high as you think it

24  should be and then are the claimants worse off?  Who is better

25  off.

1          MR. FEARON:  What they note -- that's a tough question

2     to answer, but it's important to have the answer to it because

3     it does affect the fairness.  Right now, what class members --

4          THE COURT:  So if I said it's not fair because of that,

5     then what would happen in the future?

6          MR. FEARON:  I don't know.  I don't know.  I don't

7     know.

8          THE COURT:  And what would you do in the future?

9          MR. FEARON:  What I would do -- what this settlement is

10    preventing me from doing right now is pursuing my case in

11    Tennessee for Mr. Sanderson.  The preliminary approval order

12    stops me in my tracks.  And so I've brought that case --

13         THE COURT:  Because you cannot opt out.

14         MR. FEARON:  Because if I opt out, the settlement says

15    I can only pursue my case individually.

16         THE COURT:  Okay.

17         MR. FEARON:  Which is illusory, because what person in

18    their right mind would spend a lot of money to pursue a claim.

19         THE COURT:  Of course, that's why class actions

20    accomplish a lot of good.

21         MR. FEARON:  They do.

22         THE COURT:  But the problem is that the real complaint

23    is that you're not seated at that table.

24         MR. FEARON:  Well no, that's not my complaint.

25         THE COURT:  I'm pointing at the Plaintiff's table

8

 1    obviously, not the defense table.

 2              MR. FEARON:  I understand.  I understand that I can't

 3    have a seat at every table.  I understand that class actions get

 4    approved that I may think are unfair.  I understand also that

 5    claims-made settlements are approved.  What I'm saying here is

 6    that we have to ask the question at least how much is being paid

 7    out through today.  How many claims are coming in.  And they

 8    have that information.  And Your Honor, that's important because

 9    the information that's out there so far says that this is a cash

10    settlement fund of $228 million.  That's what's been told to the

11    homeowners who --

12              THE COURT:  And you believe it is not.

13              MR. FEARON:  First of all, I believe that unlike a lot

14    of other claims-made settlements that have been approved, there

15    was never any fund that was created.  There was never any pot of

16    $228 million that the Defendants put up.  That's why when the

17    Eleventh Circuit and Defendants cite the case, you know, with

18    the Waters decision, that was a common fund case and that was

19    defendant actually ponying up the money -- ponying up the money

20    and putting it into a fund and then the settlement flows from

21    that.  There's a little bit of pain that goes along with the

22    settlement.

23              Here on the other hand, the Defendants aren't putting

24    the money up.  The only money that they're putting up here is

25    long down the road with the exception of the attorneys fees.

1    The attorneys fees get put up a few days -- days after the court

2    approves the award and then those fees get funded and if the

3    settlement becomes final, then it gets transferred over to the

4    Plaintiffs' lawyers, with interest by the way.

5          Here, there's never any fund created for the class

6    members.  The Defendants have to pony up and there certainly

7    isn't a fund with interest that's created for these class

8    members.  So what I'm saying is the $228 million is illusory,

9    they could have picked any number.  But that's been told to the

10    borrowers here is it's 228 million.  It's not.  What is it?  I

11    don't know what it is.

12          But in the other cases that the parties cite from other

13    jurisdictions where there's been settlement approval, there's

14    been some sort of record created that establishes how much in

15    claims have come forward, how much the defendants will actually

16    pay out.  And here, there's nothing.  In fact, the --

17          THE COURT:  That's the same thing in Fladell, right?

18          MR. FEARON:  In Fladell, exactly.

19          THE COURT:  So I should be consistent when I enter a

20    rule on Fladell, Diaz, Hall.  Saccoccio is over and done with

21    but I should be consistent in all of those and reject the

22    settlement in all of those.

23          MR. FEARON:  Your Honor, I made a similar in Fladell in

24    Wells Fargo.  And so while I understand that the court wants to

25    be consistent and there are those who say you should always be

1    consistent and those who say consistency is --

2          THE COURT:  I should at least be consistent once I

3    realize a particular change, which was not something that I

4    believe was presented in Saccoccio.  Is there a difference

5    between this case and Saccoccio or it's the same thing?

6          MR. FEARON:  Your Honor I wasn't involved in Saccoccio.

7          THE COURT:  I know that.

8          MR. FEARON:  But I think that the problem is similar, I

9    just wasn't there to make the argument.

10         THE COURT:  Okay.  So what do I do?  I send two

11   inconsistent rulings?  I guess if I reject it that's not an

12   appealable order, so they would never get a chance.  I guess the

13   other alternative I could have is simply stay it since there's

14   an appeal in Saccoccio and find out what all those great judges

15   who were in my courtroom today think about it, or three of them.

16         MR. FEARON:  It's possible.

17         THE COURT:  And then but who benefits from that?

18   Defendants benefit because they don't have to dish out any money

19   during that time.  How about homeowners?  They don't benefit by

20   a delay of perhaps a year, though now they're almost on a full

21   court the Eleventh Circuit.  So what do I gain?  If I reject it

22   and then all of a sudden more money is spent by Defendants and

23   they'll say you know what, we're fighting it out.  Do I consider

24   those things?

25         MR. FEARON:  I think you do consider them.  I think if

1   you stayed this case or if you approved it and then there was an

2   appeal, I think fundamentally the class members are probably in

3   the same position because they don't get paid and they don't get

4   interest on their claims.

5           THE COURT:  What do you mean they don't get paid?

6           MR. FEARON:  The rest of my sentence was they don't get

7   paid and they don't get interest until the settlement becomes

8   final.

9           THE COURT:  And the settlement becomes final when?

10          MR. FEARON:  I believe the settlement becomes final

11  after either -- after a judgment, a final judgment is entered in

12  this case and the time for appeal has lapsed.

13          THE COURT:  So if there's a notice of appeal, nobody

14  gets any money.

15          MR. FEARON:  Then I believe the settlement only becomes

16  final after that appeal is finally decided.

17          THE COURT:  You know...

18          MR. FEARON:  So for me, I say I understand the need to

19  be consistent or the desire to be consistent.  I think each

20  settlement should stand on its own and I think here we've

21  identified a problem that I believe impacts the fairness and I

22  think the thing to do would be to ask for the information.

23          THE COURT:  All right.  Thank you.  Thank you for

24  waiting patiently, I apologize, and after this hearing you can

25  go upstairs and mingle with the appellate judges that are still

```
1       there and there's free food.
2               MR. FEARON:  Thank you, Your Honor.
3               THE COURT:  Okay.  Who else wants to argue on behalf of
4       an objector?
5               MR. WOODS:  Your Honor, Greg Woods on behalf of
6       objectors the Trapassos and the Jameses.
7               THE COURT:  Okay.
8               MR. WOODS:  I would adopt the arguments of Mr. Fearon
9       as well as the case law argument authority in our objection.
10              I would just make two additional very quick points for
11      the court.
12              THE COURT:  Okay.  Go ahead.
13              MR. WOODS:  The first, Your Honor, is we have a motion
14      to intervene and the only reason I raise this is in the Chase
15      appeal at the Eleventh Circuit, the Defendants are saying the
16      objectors should have intervened.  Eleventh Circuit hasn't
17      addressed the issue, but I at least want to have raised it in
18      front of this court.
19              THE COURT:  You now have a motion to intervene.
20              MR. WOODS:  Yes, Your Honor.
21              THE COURT:  And you filed that when?
22              MR. WOODS:  I want to say last week, Your Honor, but
23      I'm not sure.
24              THE COURT:  Okay.  All right.  And that would give you
25      more of a standing or -- to do what?  More than being an
```

1    objector or what difference does it make?

2            MR. WOODS:  I think the objector is enough standing,

3    but obviously because the Defendants have raised it on appeal,

4    we want to cover all our bases in an abundance of caution.

5            THE COURT:  See how we learn a lot more once there's an

6    appeal?  We learn more things. Okay.

7            MR. WOODS:  So we would like a ruling on that if we

8    could, Your Honor.

9            And the second point I would like to make in addition

10   to Mr. Fearon's is that in this case, the attorneys fees are not

11   connected to the actual recovery by the class and that's what a

12   fair attorneys --

13           THE COURT:  That's kind of like the same thing though,

14   because there's not the common fund that gets divided up.

15           MR. WOODS:  Correct, Your Honor.  Thank you.  That's

16   all I have, Your Honor.

17           THE COURT:  So what would you do?

18           MR. WOODS:  I agree with Mr. Fearon, there should be --

19   kick it back.

20           THE COURT:  And then what happens?

21           MR. WOODS:  Kick it back to the parties.

22           THE COURT:  And then what happens?

23           MR. WOODS:  Reach a settlement where there's a minimum

24   amount of a common fund.  $50 million or $60 million or whatever

25   it is.

1          THE COURT:  Of course if there's a minimum amount, that

2    would have an impact on the attorneys fees obviously.

3          MR. WOODS:  Correct, Your Honor.  And then it's tied to

4    a real number.

5          THE COURT:  Okay.  And how do your clients benefit?

6          MR. WOODS:  My clients benefit because there's

7    potentially more money available to the class.

8          THE COURT:  Okay.  All right.  Thank you.

9          Anyone else that's an objector?  Okay.

10          Settling Plaintiffs?  Who is going to speak for the

11    Plaintiffs.

12          MR. MOSKOWITZ:  I will, Your Honor, Adam Moskowitz.

13          THE COURT:  Well, what do you think?  Shouldn't we --

14    what's the harm in requiring a minimum amount of money to be

15    kicked in in the first place.  And that way it's a real -- I

16    don't want to use the words illusory because then we get kind of

17    hooked into some of the languages of some of the appellate

18    opinions, but that makes it a lot easier, right?  If people are

19    actually -- if we know how much money is being divided up,

20    there's not a windfall for the Defendants.  Right?  There will

21    be a windfall for the Defendants if there's a very low response

22    rate.

23          MR. MOSKOWITZ:  There will not be --

24          THE COURT:  We've been through that, but there will be,

25    right?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          MR. MOSKOWITZ:  No, there won't be.

2          THE COURT:  Why not?

3          MR. MOSKOWITZ:  There's no windfall because there's no

4     common fund that gets reverted back to the Defendants under the

5     settlement that we agreed to.

6          THE COURT:  But why is that a good thing?

7          MR. MOSKOWITZ:  Your Honor, if I could have gotten a

8     set common fund amount --

9          THE COURT:  You would be better off.

10         MR. MOSKOWITZ:  I begged for it and I fought for it and

11    we have eight settlements now and believe me, in every single

12    one of them we fought, we fought, we fought.  But at the end of

13    the day --

14         THE COURT:  But then you lost on that, you lost, you

15    lost, you lost, zero and eight.  You couldn't even be considered

16    for any playoff championship, that's for sure.

17         MR. MOSKOWITZ:  We tried to get the settlement, this is

18    the best settlement that we could get for the class.

19         There's two issues here, Judge, and I want to be very

20    focused about the take rate.  The first question the court needs

21    to ask is what is being made available to the class members

22    fair.  And we spent months on this.  What is that specific

23    number.  And as you'll see, Your Honor, we have eight

24    settlements.  They're different in every case.  And this is

25    because we spend weeks --

1          THE COURT:  Well the ones are what?  Saccoccio,

2    Fladell, Diaz, Hall, what else?

3          MR. MOSKOWITZ:  We have Chase, we have HSBC, we have

4    Wells Fargo, we have Bank of America, we had Williams

5    originally.

6          THE COURT:  Now, I know I'm jumping ahead and I

7    mentioned it the last time we were together, but in the case --

8    and Judge Cohn had a case too, right?  Which one was that?  Were

9    you involved in that?

10          MR. MOSKOWITZ:  We're lead counsel, that was Sun Trust

11    last week.  And he entered a final order and --

12          THE COURT:  And he awarded, what? $3.6 million

13    attorneys fees.  Is that what you asked for?

14          MR. MOSKOWITZ:  It is, Your Honor.  He awarded us

15    exactly what we asked.  And we went through the claims data.

16    We're not embarrassed.  We're not shy about it.  He asked how

17    many claims were submitted, we told him exactly the number, and

18    we explained to him that the question for the court is two-part.

19    Is what you're giving to the class members, what you're going to

20    make available to them a fair number.  And it has to be based on

21    real facts.  And for each case, you'll even see in this case we

22    have three different tiers, because during certain times the

23    Defendants took no commissions.  During certain times they had

24    increased tracking fees.  So we're very detailed in working with

25    our experts to come up with what is a really fair amount based

1      on what the state regulators have decided.  Because state --

2              THE COURT:  Of course, these claimants aren't going to

3      get any money because if Saccoccio went up on a appeal, so will

4      this one, so will all of them.  If they all go up on appeal,

5      that means nobody gets any money.

6              MR. MOSKOWITZ:  We hope that they don't go up on appeal

7      but if they do, we're very proud of these settlements.

8              THE COURT:  Okay.  But no one is going to get anything

9      for years anyway.  Including the attorneys or is there an

10     exception for the attorneys?

11             MR. MOSKOWITZ:  No, no.  Of course.  No money is paid

12     out.

13             THE COURT:  So there's no rush to this.

14             MR. MOSKOWITZ:  There is a rush, Your Honor, because if

15     you look at these three settlements in total --

16             THE COURT:  What I really should do is simply stay it

17     -- I mean the thing is sitting on my desk, on the other two.

18     But what I should do, because we've got another one coming up,

19     right?  But I should -- shouldn't I wait to see what the court

20     of appeals does?  I mean, I always seek guidance from them.

21             MR. MOSKOWITZ:  Absolutely not, Your Honor.  Because

22     the way these cases are going to get done is what Your Honor has

23     done for three years.  You move them along.  You move them along

24     instead of waiting.

25             THE COURT:  I know.  I know.  But we've done that

1    already.

2         MR. MOSKOWITZ:  And they're moving along.  We have 3

3    million class members in these cases.

4         THE COURT:  But they're not getting anything anyway.

5         MR. MOSKOWITZ:  But they will once we defeat the

6    appeals.

7         THE COURT:  But that takes a year anyway.

8         MR. MOSKOWITZ:  You never know, Your Honor.  We had a

9    lot more objectors at our last hearing than we have today.

10        Your Honor hit it right on the head.  This is about

11   fees.  A lot of these objectors want fees and we've been able

12   now with Chase, Your Honor, we only have two objectors left out

13   of everybody else.  And remember our friends from the north who

14   came down and objected to every case?  They're not here today.

15   The people who have actually litigated these cases have looked

16   at the facts, have looked at the evidence, they're not going to

17   come before Your Honor.  Now people are coming in and the

18   question is about fees.  So if Your Honor approves them, we're

19   going to move them along confidently.  We have a mediation in

20   November in another case before Judge Lenard.  That's where

21   we're going to consider cy-près and those types of issues. We're

22   settling these cases, we're moving them along and we're moving

23   them quickly.

24        If I can just make this point, Your Honor --

25        THE COURT:  If you were to total the amount of

1    attorneys fees so far in the cases before me, how much are you

2    talking about?

3            MR. MOSKOWITZ:  I think over $60 million.

4            THE COURT:  $65 million, I think.  I did a rough

5    addition.  Give or take.

6            MR. MOSKOWITZ:  I'm sorry?

7            THE COURT:  That's a lot of money.

8            MR. MOSKOWITZ:  It's not, Your Honor.

9            THE COURT:  It's not a lot of money?  $65 million.

10           MR. MOSKOWITZ:  It's a lot of money, Your Honor.  But

11   if you look at the Waters decision, which is binding precedent

12   Eleventh Circuit, there the defendant said you should wait to

13   see what's paid to the class members.

14           THE COURT:  Okay.

15           MR. MOSKOWITZ:  Plaintiff said no, you shouldn't

16   because the law here is what you're making available to people.

17           THE COURT:  But you're not going to get paid anyway if

18   there's an appeal.  You're going to wait anyway.

19           MR. MOSKOWITZ:  Your Honor --

20           THE COURT:  Right?

21           MR. MOSKOWITZ:  I don't believe so because if these

22   cases move along, then the appeals are going to go away.

23           THE COURT:  Well, how are they going to go away?

24           MR. MOSKOWITZ:  A lot of these people, and I'm not

25   talking about people in this courtroom, they have contact with

1    us.  We've met with the Eleventh Circuit mediator probably six

2    times.  We can't discuss what we're discussing --

3            THE COURT:  No, I don't want to hear.

4            MR. MOSKOWITZ:  But we're going through those

5    discussions.  But we need to move these cases along.  This court

6    is at the forefront in the country and people have looked to

7    this court.  We have opinions all around the country who say

8    it's this court that's moved these cases along, that's made the

9    rulings, that are moving these forced-place insurance cases

10   across the whole country.

11           The two issues, Your Honor, is are what we're making

12   available to class members fair.  Is 10 percent, 11 percent

13   fair.  Is it based on substance.  Of course it is.  You've never

14   heard an objector, Your Honor, come to your courtroom and say 11

15   percent is not right, you should have given them 15.  Nobody has

16   ever made that argument because you can't.  Because what the

17   case law -- as you know, we had the Greentree case dismissed,

18   these cases are very difficult.  So to give back a homeowner 100

19   percent of the money that the state of Florida said they

20   overpaid is an incredible result. So nobody is contesting the

21   amount is not fair.  So let's just look at the fees.  Let's

22   really get to the heart of this.

23           They're saying you shouldn't get a percentage.  Waters

24   is binding precedent, it says you don't look to what's made

25   available.  At the end of the day, you look at what's made

1    available if they want to claim it.  Waters gave 33.3 percent

2    and six class actions in this court have been 30 to 35 percent

3    of the award.  I can -- In Re Managed Care, all the bank

4    overdraft cases, Exxon Valdes, In Re Teronazin (ph), Gunner

5    versus Dupont and Waters Precious Metals.  All six of those

6    cases were over 30 percent of the settlement.

7           And Mr. Prieto can get up and talk about former judge

8    Scott who provided an extensive affidavit in this case.  And

9    judge Scott looked at all the records, looked at all the risks,

10   looked at the cases such as Waters, and Mr. Prieto can talk

11   about this and said that I think that in this case seven percent

12   -- that's all we're seeking in this case -- seven percent of the

13   monetary relief, Judge Moreno, just the monetary relief is fair.

14   We don't value the injunctive relief, which we believe is

15   extremely valuable.  And if we thought we had any question, I

16   promise Your Honor we would have had an expert come in and value

17   the injunctive relief.  Because especially in the Bank of

18   America case. This is five years of injunctive changes and in a

19   lot of the other settlements it's less.  And in the Bank of

20   America flood, which is a settlement in Oregon, it's only three

21   years.  So we have five years of changing all of these practices

22   all around the country which is extremely valuable.

23           THE COURT:  How many lawyers are we talking about who

24   have worked on this?

25           MR. MOSKOWITZ:  We have 14 different law firms in the

```
 1      Bank of America case that we're going to have to deal with on
 2      attorneys fees, and we have other firms that have other Bank of
 3      America cases who have asked us to work with them and avoid
 4      disputes.  Work with their lodestar.  So 14 different firms have
 5      worked on this case in particular.
 6                  THE COURT:  Okay.
 7                  MR. MOSKOWITZ:  And there's cases -- you know, I don't
 8      know Mr. Fearon --
 9                  THE COURT:  This is kind of like the same thing.  We've
10      gone over it before.
11                  MR. MOSKOWITZ:  Yes.
12                  THE COURT:  The next case is at what stage that I have?
13      Almonsar (ph)?  Isn't that the name.
14                  MR. MOSKOWITZ:  You have one that Your Honor just
15      started.
16                  THE COURT:  That's the only one I have left, right?
17                  MR. MOSKOWITZ:  Judge Lenard has the Ackman (ph) case
18      where we have mediation November 6th, and then Judge Cohn just
19      approved Sun Trust last week.
20                  THE COURT:  Okay.  So those are the only ones left here
21      in the Southern District of Florida.
22                  MR. MOSKOWITZ:  There's two others before Judge Goodman
23      against PNC Bank.
24                  THE COURT:  Before Judge Goodman by consent?
25                  MR. MOSKOWITZ:  By consent.
```

 1          THE COURT:  Who was the judge that had that?

 2          MR. MOSKOWITZ:  Judge Martinez.

 3          THE COURT:  By consent?  How come I don't get consents?

 4          MR. MOSKOWITZ:  We would be happy to consider it if you

 5   want us to.

 6          THE COURT:  No, we can't force consent.  I was just

 7   curious.  My rate of consent is very low, it's like nonexistent.

 8   I think I have to do something about that.

 9          But anyway, all right.  I mean, I have the same

10   reservations I had before, nothing really has changed.

11          MR. MOSKOWITZ:  In our new cases, Your Honor, in our

12   settlement mediation we are going to have a cy-près.

13          THE COURT:  You know, I mentioned it when we had our

14   hearing and then I did a notice.  I'm not there to interfere

15   with any settlement.  I just -- you know, whether you call it a

16   windfall or anything like that, I don't have the confidence that

17   you all do on the response rate, and I said that before which

18   is, you know, why people don't vote, why -- I read the other day

19   92 percent of the people could not pass the citizenship test.

20   And I was this close mentioning it at the naturalization a

21   couple days ago or last week when I did it, but I didn't.  I

22   mean, that just speaks about our society and there's probably

23   not much I can do about that.  And being a public servant, I see

24   -- it's just millions of dollars.  It just impresses me a lot.

25          But you know, I'll follow the law, continue to look at

1    the cases and see whether there are any distinctions with

2    Saccoccio and all of that.

3          What do you think the Seventh Circuit would do?

4          MR. MOSKOWITZ:  I don't know.  I really don't know.

5    Judge Posner's decisions are something that we need to deal

6    with.  But, you know, we make distinctions in our papers very

7    clearly from Judge Posner's cases because there there is

8    collusion.  There there is nothing being provided to the class

9    members.

10          THE COURT:  There's a lot of distinction.  I mean, that

11   was shocking.  I think he even used those words.  I don't know.

12          MR. MOSKOWITZ:  Judge, in the Williams case --

13          THE COURT:  There's none of this, and I don't think

14   anyone is claiming that, at least not at this stage, not in this

15   case.

16          MR. MOSKOWITZ:  We've given checks over $20,000 in our

17   previous settlements.  It's real money to people who actually

18   paid these charges.

19          THE COURT:  But they're not going to get it if there's

20   an appeal.  See?  So nobody gets it for a whole year.

21          MR. MOSKOWITZ:  So we have to deal with --

22          THE COURT:  So I'm trying to think what's the rush.

23   See, that seems to be -- once I've got a case on the pipeline up

24   on appeal, is there really a rush to get them going?  I mean,

25   I'm a believer, you know that.  I'm quick on the trigger, some

1    people say too quickly.

2            MR. MOSKOWITZ:  If I could point out one other point,

3    Your Honor.  There's a lot of other cases pending in the country

4    against these same defendants.

5            THE COURT:  I know but I'm not the Multi District Court

6    judge, remember?

7            MR. MOSKOWITZ:  But those cases aren't stayed.  If you

8    stay one case, those cases will proceed.

9            THE COURT:  I know.  But they probably move at a turtle

10   pace, I guess.  Because they're busy and doing all kinds of

11   stuff.  All right.

12           Anything else you want to say?

13           MR. MOSKOWITZ:  No, Your Honor.  Just --

14           THE COURT:  Mr. Prieto is there behind you though.  He

15   wants -- his firm is going to say something different now.  He

16   was also at the investiture.  He was very concerned that he was

17   going to be late.

18           Mr. Prieto.

19           MR. PRIETO:  Yes, Your Honor.  I actually paid more

20   attention to Your Honor than Judge Rosenbaum because I was

21   afraid you would sneak out.

22           THE COURT:  To see if I would sneak out.  I wouldn't

23   sneak out.  It was fun.

24           MR. PRIETO:  It was fun and Judge Marcus was fantastic.

25           THE COURT:  Was hilarious, wasn't he?  Someone told me

1   he's trying to out-do me since I can't do investitures anymore.

2         MR. PRIETO:  I wanted to start my argument by saying I

3   feel like Zsa Zsa Gabor's 8th husband, but I won't.  I want to

4   just address the issue of the stay.

5         THE COURT:  You better tell these people who weren't

6   there what you're talking about.  But okay, go ahead.

7         MR. PRIETO:  I can tell the joke, but I'll go on.

8         I just want to address the issue of the stay.  Your

9   Honor --

10         THE COURT:  What's the harm?

11         MR. PRIETO:  The harm is that the cases get resolved if

12   courts make --

13         THE COURT:  But this case has been resolved already.

14   So if I stay it, Defendants don't have to do anything, you don't

15   have to do anything, you work on other cases and then when

16   Saccoccio comes out, bingo, you tell me.  I read it too you

17   know, we get the opinions too, you know, if we want to.  And

18   then I say boom, now I'll approve it.  Or you know what, they're

19   worried about that, we got to figure something out.

20         MR. PRIETO:  But look what happens if it doesn't get

21   stayed and Your Honor approves the settlement.  Two things that

22   happen and both are good.  One, we settle with the objectors.

23   We're close to settling with the objectors in the Chase case.

24   In the Saccoccio case.

25         THE COURT:  Yeah, but you settle after the fact.  Why

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    don't you settle before the fact?  Because I'm moving too

2    quickly perhaps.

3         MR. PRIETO:  No, sometimes you can't, Your Honor.  You

4    can't settle pre and you have to settle post.

5         THE COURT:  Really?

6         MR. PRIETO:  Yes.  And with Saccoccio we're almost to

7    the point of settling with those two objectors.  So if you

8    approve this settlement and the objectors appeal, number one

9    there's a possibility there will be a settlement with them and

10   the case will get resolved.  And number two, there's an appeal

11   and there's a decision.

12        If you stay the case, what's going to happen is more

13   delay because whatever Your Honor does in this case there's

14   going to be an appeal.  So if you stay the case for six months

15   or a year --

16        THE COURT:  Not if you do the settling that you were

17   going to go with do with the objectors.

18        MR. PRIETO:  But we can do that settlement -- we have

19   -- a final approval, an order of final approval provides

20   leverage for both sides to sit down and talk.  A stay doesn't.

21   A stay just keeps things in limbo.  And as Your Honor knows the

22   quickest way to get a case to trial is to set it for trial and

23   the case either gets tried or it gets settled.  So a stay, I

24   think, would be counterproductive to Your Honor's efforts to

25   keep these cases moving.

1          If Your Honor approves the settlement, I think we're

2     either going to have a resolution by the Eleventh Circuit or

3     we're going to have the objectors settle.  Most of these

4     objectors and these objections get settled in one point or the

5     other.  Sometimes beforehand and sometimes up on appeal.  As I

6     noted in Saccoccio, there were like five or six objectors,

7     there's two remaining right now.  So that case may also get

8     settled.

9          THE COURT:  Well here we have seven, right? 16 class

10    members.

11         MR. PRIETO:  And only two appeared.  And only two

12    appeared.  And sometimes they object in the District Court, Your

13    Honor grants the final approval and very few, maybe one or two,

14    take an appeal.

15         THE COURT:  How about the fact that 209 individuals

16    opted out?  Isn't that a large number?  Not if you consider that

17    it's a million people.  I know.  209.  Why would someone opt out

18    of getting money?

19         MR. PRIETO:  Because they can pursue their own claims.

20    They're not opting out of getting money.

21         THE COURT:  Who is going to pursue their own claims

22    individually?

23         MR. PRIETO:  Sometimes they do, Your Honor.  Some of

24    these pay out are extremely significant.

25         THE COURT:  20, $30,000.

1          MR. PRIETO:  Mr. Moskowitz, I think, very ably told you

2     one of the payouts was 30 or $40,000.

3          THE COURT:  So they're better off not being part of the

4     class.

5          MR. PRIETO:  They specifically are better off being

6     part of the class because they've chosen to do that.  But this

7     is a very good, fair settlement that's being offered and, you

8     know, when we go back to Saccoccio and the Eleventh Circuit, I

9     think Mr. Moskowitz hit it right on the head.  He said that

10    Waters, which is binding precedent, the focus is, and you said

11    it before, it's almost like the rationale is when you make the

12    benefit available to the class, it's the class's decision by

13    filing a claim to accept that benefit or not.  And this is what

14    the Eleventh Circuit case said in Waters, which is binding

15    precedent.  And the Waters case as well, which is a case from

16    Judge Ungaro, Judge Ungaro noted I understand that the claims

17    here may be low.  But there's a benefit being made available by

18    class counsel and they should be rewarded based on that benefit

19    being made available.  Here's the quote that the Waters case

20    said.  Quote, their right to share the harvest of the lawsuit

21    upon proof of their identity, whether or not they exercise it,

22    is a benefit in the fund created by the efforts of the class

23    representatives and their counsel, end of quote.

24          So the policy behind permitting a settlement to be fair

25    by simply looking at the benefit being made available is

1    essentially what you noted before, it's a question of free will.

2    You make this benefit available to the class and it's their

3    decision whether they choose to accept the benefit or simply not

4    file a claim form and reject the benefit.  And that's what the

5    Eleventh Circuit said in Waters.  I mean, it's a case that's

6    exactly on point because the case says -- and this is on the

7    issue of fees.  This is another quote.  The defendant's primary

8    argument seems to be that the attorneys fee award was based on

9    the percentage of the total fund rather than the actual payments

10   made to class members. The District Court, however, considered

11   the possibility that the actual payout would be less than the

12   total fund generated for the settlement and noted that after

13   seven years the number of class members actually asserting

14   claims will be significantly lower than the class membership.  I

15   can also anticipate that the number of class members who end up

16   having approved claims who will actually demand payment on their

17   notes after five years similarly will decrease, so that the

18   actual dollars paid out will be substantially less than the $4

19   million fund.  End of quote.

20         So Waters, the arguments that they made here are

21   exactly the arguments that the District Court, Judge Ungaro,

22   considered in Waters and that the Eleventh Circuit considered

23   and said we understand that claims are going to be low, but this

24   is a benefit that's been made available to the class and that's

25   what we're going to assess whether, number one, the settlement

1    is fair and number two, whether the fees are fair.

2            I'll make one final point which I think gets lost here.

3    We're not taking money from the class and giving it to the

4    attorneys.  There's two ways that this settlement was made,

5    which is the way it usually is.  First, Mr. Moskowitz and the

6    other firms negotiated the settlement itself.  After they did

7    that, they then went to the attorneys fees.  And this -- the

8    fees are not being taken out from the benefit being made

9    available.

10           THE COURT:  It's an additional amount based on the

11   percentage.

12           MR. PRIETO:  It's an additional amount which represents

13   a seven percent in this case of the total benefit being provided

14   to the class.

15           THE COURT:  And Fladell it was 6.8 percent.

16           MR. PRIETO:  Correct.

17           THE COURT:  Why?

18           MR. PRIETO:  Your Honor, each case is different.  The

19   facts are different, sometimes the merits are different.

20   Obviously the defendants are different in some cases, and it's a

21   question -- these are not cookie cutter cases.  They really are

22   not.  And Mr. Moskowitz in past hearings has said Your Honor,

23   these cases are all different.  Each of these cases are all

24   different.

25           So I think it's important to note that this is not --

1    you know, we're negotiating the fees at the same time that we're

2    negotiating the settlements.  We negotiated what we believe is a

3    fair and reasonable settlement in light of the very bad case law

4    around the country and in this circuit and then after we got

5    that settled, we went and we said -- we negotiated the fees with

6    counsel.  And we believe that in this case fees representing

7    seven percent of the benefit being available to the class is

8    fair, given the case law in this circuit and Waters

9    specifically.

10              THE COURT:  All right.  Thank you.

11              Any of the Defendants want to add anything?  Go ahead.

12   State your name for the record again.

13              MR. ENGLANDER:  I'm John Englander representing the

14   Bank of America defendants.  David Permut is with me, and he may

15   stand up as well.  But I am going to try to be brief because I

16   know the court has thought about this quite a bit.

17              I want to address a few things the court asked.  First

18   is the stay for Saccoccio.  I completely agree with what

19   Mr. Prieto just said, that all you're going to do is introduce

20   additional delay because there's likely to be an appeal at the

21   end of the road anyway.  So we're just delaying the time that

22   the appeal occurs.  But there's another point --

23              THE COURT:  And do you care?

24              MR. ENGLANDER:  Well, Your Honor we care --

25              THE COURT:  I thought defendants love delays.

1          MR. ENGLANDER:  But at this point, we've agreed to the

2     settlement, Your Honor, and we have an interest in having the

3     settlement approved and finalized.

4          What I was going to say though is in Saccoccio, there

5     is an issue that has been raised that is not in this case, and

6     the court might well address that issue and not anything else

7     and you might get no benefit from it.  And that is in Saccoccio

8     there -- the objections to the attorneys fees or the objections

9     were -- the deadline for that preceded the date for the motion

10    for attorneys fees, and that's the issue or one of the issues

11    that's raised.  We don't have that issue here.  So you have --

12    you may wait for Saccoccio and get nothing for this case.  I

13    want to make that point.

14         The second thing is you asked the question, what do you

15    think the Seventh Circuit would do.  And I understand that

16    question well.  And I think, Your Honor, the Seventh Circuit

17    would approve this settlement. Why?  Because this is a

18    reasonable compromise of the Plaintiffs' claims based on the

19    strength of these Plaintiffs' claims.  Your Honor is familiar,

20    very much familiar with the substantive merits of the

21    Plaintiffs' claims and the issues they face.  You have flat-out

22    dismissal of these claims, you have no nationwide class

23    certification of any of the LPI cases over the last several

24    years and several denying it.  So strong headwinds, as Your

25    Honor has put it, and that is not the situation at all that

1    Judge Posner was facing.

2            Here, they have received for this class, and no one is

3    challenging the significance of the award for those Plaintiffs

4    who make a claim.  The 11 percent, six and a half percent or

5    five percent.  No one is standing up and saying they didn't get

6    enough.  They're really challenging the claims-made portion of

7    the settlement and Your Honor has addressed that.  There is

8    nothing inherently wrong with claims-made settlements. In this

9    case, the claims-made process made a great deal of sense because

10   Bank of America is not able to determine whether an individual

11   plaintiff, an individual member of the class actually paid or

12   still owes lender placed insurance premiums.  And that's a

13   question that's asked on the claim form.

14           So this is a immensely defensible settlement from both

15   sides as a reasonable compromise of claims negotiated at arms

16   length.  And Your Honor we ask that for that reason, it be

17   approved.

18           THE COURT:  I take it you have no objection to the

19   motion to intervene.

20           MR. ENGLANDER:  Oh yes, we do, Your Honor.

21           THE COURT:  You do?

22           MR. ENGLANDER:  It's just going to introduce more delay

23   and --

24           THE COURT:  Why does it introduce delay?  Motion to

25   intervene, the same arguments that have been made as objectors

1    come in as interveners.  A rose by any other name is still a

2    rose, and that way it's not an issue.  What's wrong with doing

3    that?  Shouldn't we be liberal when it comes to intervention if

4    it doesn't have any impact?  Just creates an issue perhaps on a

5    future appeal?  What's the difference?

6              MR. ENGLANDER:  Well, that's the thing.  Your Honor --

7              THE COURT:  If I say granted and they go to court of

8    appeals as objectors, as interveners?

9              MR. ENGLANDER:  Here's a very frank answer.  That was

10   filed two days ago.  Your Honor had already rejected a similar

11   motion for, I thought, good reason based on what the law was

12   which requires a timely request for intervention first and

13   foremost, which clearly did not happen here because this has

14   been going on for months.

15             THE COURT:  Well, he's saying the reason is all of a

16   sudden it becomes an issue on the appeal, I learned from the

17   arguments from others before, so now I'm crossing every T and

18   dotting every I.  It's like filing a motion for attorneys fees

19   ahead of time, that kind of thing.  You know, people, lawyers

20   cover themselves, shouldn't they?  And they adapt to make sure

21   they don't get --

22             MR. ENGLANDER:  What we don't know, because we haven't

23   had the opportunity to really think it through because it's

24   untimely, is what does the intervention mean for purposes of who

25   is party in this case, what they have in terms of appellate

1    rights, how those might be different than they otherwise are

2    currently and how they otherwise should be because they didn't

3    follow the rules the way they were supposed to.  And, Your

4    Honor, frankly in the 48 hours we've had since that was filed, I

5    haven't had the chance to think that through as far as I should,

6    and that's not our fault.

7         THE COURT:  All right.  The Plaintiffs, what say you on

8    the motion to intervene?  You don't want any help or additional

9    troops, right?  You've got enough?

10        MR. MOSKOWITZ:  Yes, Your Honor.

11        THE COURT:  Yes, what I've said.

12        MR. MOSKOWITZ:  We don't need the help.  It's the same

13   consistent ruling as Your Honor did in our previous cases.  You

14   denied the intervention.  We don't see any different benefit

15   from it.  Again, it was just filed two days ago so we haven't

16   had time to respond but we would oppose it.

17        THE COURT:  I should rule on the motion to intervene

18   before I approve the settlement.

19        MR. MOSKOWITZ:  Yes.

20        THE COURT:  Okay.  So you need time to respond and they

21   need time to reply and then I can consider whether I approve the

22   settlement or not.

23        MR. MOSKOWITZ:  No, Your Honor.  I've heard from my

24   team we don't need to you wait for that.  You can grant final

25   approval.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1            THE COURT:  And then what happens to the motion to

 2     intervene?

 3            MR. MOSKOWITZ:  If Your Honor is inclined to grant it,

 4     you can grant it.

 5            THE COURT:  It doesn't really make that such

 6     difference.

 7            MR. MOSKOWITZ:  It really doesn't matter to us.  If

 8     it's not for the purpose of serving discovery, that's been

 9     abused in prior cases where you intervene and then you serve

10     discovery and you take depositions.  But if it's solely to

11     intervene for the purpose of being an objector --

12            THE COURT:  Yeah, that's how I understood it. Is that

13     the purpose of it?

14            MR. PRIETO:  That is the purpose, Your Honor.

15            MR. MOSKOWITZ:  So we don't have an objection.

16            THE COURT:  Then it doesn't matter.  Does it matter for

17     the defense if that's the purpose?

18            MR. PERMUT:  Well, I just wanted to point out we did

19     submit a written opposition, a very brief two-page opposition.

20            THE COURT:  When did you do that?

21            MR. PERMUT:  About noon today.

22            THE COURT:  Oh, I missed it.  It would look bad to read

23     it while people are speaking no problem.  No problem.  Okay.

24     Should I read it?  Do you think it's good enough to read?

25            MR. PERMUT:  I think it's excellent.
```

1          THE COURT:  Okay.  It's certainly brief.  I like that.

2     Okay.

3          Anything else?  You want to say something else again?

4          MR. FEARON:  I would, Your Honor, if I could just

5     briefly respond to the points.  Two minutes?

6          THE COURT:  Two minutes.  Okay.

7          MR. FEARON:  Thank you.

8          THE COURT:  I don't have my hour glasses here.  Okay.

9          MR. FEARON:  Your Honor, I think the fact that nobody

10    from counsel's table for either of the parties stood up and told

11    Your Honor how much the Defendants are actually going to pay out

12    or how many claims --

13         THE COURT:  How much do the Defendants think you're

14    actually going to pay out?  Do you know?  Or Plaintiffs?  Do you

15    know?

16         MR. MOSKOWITZ:  Absolutely do not know.

17         THE COURT:  It depends on what?

18         MR. MOSKOWITZ:  Depends on how many claims are filed.

19         MR. FEARON:  As of today.

20         MR. MOSKOWITZ:  There's three more months left in the

21    claims period.  I can tell you right now, Judge, and we're not

22    shy, there's 45,748 claim forms received as of today.

23         THE COURT:  That's a lot.

24         MR. MOSKOWITZ:  45,000.  And we have over 600,000 hits

25    to the website.  We've spoken, us and the claims administrator

1    took over 40,000 calls to the claims administrator.

2              THE COURT:  Isn't that a lot?

3              MR. FEARON:  Not really.  You talk about more than a

4    million customer.

5              THE COURT:  I guess I think everything is a lot.  65

6    million is a lot of money, even the opt-outs is a lot.  But it's

7    like a duty.

8              MR. ENGLANDER:  Your Honor, could I add something to

9    what Mr. Moskowitz said?

10             THE COURT:  Sure.

11             MR. ENGLANDER:  45,000 claims made now and you've got

12   90 days left to make claims, we're literally getting every week

13   thousands of additional claims.

14             THE COURT:  From the past do you get more later or --

15             MR. ENGLANDER:  They spike at the end, Your Honor.

16             THE COURT:  Pardon?

17             MR. MOSKOWITZ:  Every case we've gotten a spike after

18   final approval is granted, yes.

19             MR. ENGLANDER:  And they spike at the end.  They spike

20   close to the end.

21             THE COURT:  To the deadline.  People wait -- they're

22   like lawyers.  They wait until the time that it's filed and then

23   they file a motion for extension of time that is five pages.

24   That is longer than the response should have been.  Okay.  I got

25   it.

1      MR. FEARON:  So Your Honor, this, to me, is amazing

2   actually because what they were claiming is that the settlement,

3   the cash value of it was 200 plus million dollars.

4      THE COURT:  228, I think.  Did I get that right?

5      MR. FEARON:  228 million, right.  And so we're talking

6   about 45,000 claims with over a million class members and that

7   means that about nine out of ten class members get nothing.  The

8   other thing it means --

9      THE COURT:  The last time we were together, I figure

10  we're talking about a 15, 14 percent.  Kind of like the same

11  number of -- percentage of people who voted in the primary.

12     MR. FEARON:  So here you're talking about -- it seems

13  like you're talking about a much lower percentage, at least

14  through today.  And that raises a question to me of, okay, we've

15  got the 45,000, give or take claims, how much does that

16  translate to in terms of what they're paying out?  There's no

17  evidence about that in the record.

18     The reason I say it is because it's an important fact

19  and it goes to both the fairness of the settlement and to the

20  claim for attorneys fees.

21     THE COURT:  I got it.

22     MR. FEARON:  Okay.  The other thing is there was a lot

23  of talk about the Waters case.  And what's important to realize

24  about the Waters case is that in the Waters case there was

25  actually a settlement fund that was created that was, you know,

1    after seven years of litigating and I think a long trial.

2         THE COURT:  Is that a good thing?

3         MR. FEARON:  Well --

4         THE COURT:  Seven years of litigating and a long trial?

5    Who does that help?

6         MR. FEARON:  No, but what it does mean is the

7    defendants actually put up the money.  And the other thing --

8         THE COURT:  But everybody waited seven years.

9         MR. FEARON:  Right.  And so each case is different, but

10   in that case, it was an actual common fund, an actual common

11   fund.  And there --

12        THE COURT:  No, there's a distinction.  There's no

13   question about it.

14        MR. FEARON:  Here, there's not.  Here, there's not.

15        THE COURT:  They concede that it's not that type of

16   case.

17        MR. FEARON:  The other --

18        THE COURT:  But they say it's okay.

19        MR. FEARON:  Okay.  And I say it's not.

20        THE COURT:  And they say the court of appeals says it's

21   okay, I guess we'll have to hear it from them.

22        MR. FEARON:  Here's --

23        THE COURT:  I mean, I hate to be so --

24        MR. FEARON:  Here's the distinction though.  The court

25   of appeals --

1          THE COURT:  -- simple.

2          MR. FEARON:  The court of appeals in Waters doesn't say

3     that.  The court of appeals in Waters says there is a common

4     fund, and then it also says --

5          THE COURT:  So this is unique.  This case is unique.

6          MR. FEARON:  This case is much -- this case is unique

7     from cases where there is a common fund created.

8          THE COURT:  Okay.  I think the Plaintiffs would agree

9     with you and probably the Defendants too.

10          MR. FEARON:  Here's the other thing --

11          THE COURT:  But that doesn't mean it's unfair, does it?

12          MR. FEARON:  Okay.  But here's the other thing that the

13     Eleventh Circuit in Waters says.  It says that nothing in this

14     opinion precludes a District Court Judge in a different case

15     from basing the attorney's fee award on actual class recovery.

16     So it's not --

17          THE COURT:  So we go back to what I suggested last

18     month.  What I should do is approve the settlement, hold off on

19     the attorneys fees.

20          MR. FEARON:  It's a possibility

21          THE COURT:  And how does that help your client?

22          MR. FEARON:  Well, you know --

23          THE COURT:  It doesn't really, because it doesn't come

24     from the common fund.  It helps the Defendants.

25          MR. FEARON:  Here's why it might help.

1       THE COURT:  Right?  Because then instead of kicking

2   money for the attorneys, they keep that money for themselves.

3   What good is that?  If especially since the Defendants say we're

4   okay for whatever strategic reasons including costs, time,

5   whatever reason people settle, it's not worth it for us to do

6   that.  Don't get involved in that as long as it's fair.

7       MR. FEARON:  One of the reasons that might help our

8   clients is because the way I understand the settlement agreement

9   is drafted so the -- the two are independent.  That there's the

10  settlement and then there's the attorneys fee award.

11      THE COURT:  And right now they're not.

12      MR. FEARON:  Well, in most cases the way it's presented

13  is there's a final judgment that deals with both.

14      THE COURT:  Because there's a common fund.  They want

15  to know how to divide it up.

16      MR. FEARON:  Right.  And so --

17      THE COURT:  Here we don't know how much it is.  You say

18  it's illusory, they say this is really what it's worth but we

19  understand that it depends on the voluntary claims.  But the

20  work of the lawyers was the same no matter what the response

21  rate is, right?  Unless they go out and knock on doors.

22      MR. FEARON:  But then the question that you asked how

23  does it benefit my client.

24      THE COURT:  Yes.

25      MR. FEARON:  If you approve the settlement but defer on

1    the fees, I suppose the way that it helps my clients is it

2    allows us to take an appeal immediately from the judgment

3    approval --

4              THE COURT:  Well, you can take an appeal immediately no

5    matter what I do.  I mean, if I approve it.  Attorneys fees or

6    not, right?

7              MR. FEARON:  Correct.  But what I'm saying is if you

8    stayed the case --

9              THE COURT:  No, you're for staying the case.

10             MR. FEARON:  You know, I think --

11             THE COURT:  You've changed your mind.

12             MR. FEARON:  I heard somebody from Plaintiffs' counsel

13   say that if the case was stayed, then there are all these other

14   cases against Bank of America that would be able to go forward.

15   I'm happy to hear that because I have another case that I would

16   love to go forward with.

17             THE COURT:  Well, maybe you should talk with them.

18             MR. FEARON:  I think so.  And I also think, you know,

19   if that's the approach that Your Honor takes here, then I think

20   I probably would be back here asking for some relief from the

21   preliminary approval order which is staying me right now.

22             And then finally -- two things.  One is Judge Posner,

23   Seventh Circuit, or any other judge in the Seventh Circuit, I

24   believe at a minimum, would say whether they approve the

25   settlement or not, they would at least get information about the

1    number of claims, the amount of claims that are being paid out

2    under the settlement.

3         THE COURT:  But we don't know that.  We'll never know

4    that until it's done.

5         MR. FEARON:  I think the other thing that the Seventh

6    Circuit would do is say you should wait.  There's not a rush.

7    You should wait until you see what comes in before you approve

8    the settlement or not and before you grant the attorneys fees.

9         And then finally, counsel for Defendant said nobody is

10   standing up here and challenging the amount of the settlement.

11   I want to make it clear that I am.  I'm challenging the amount

12   of the settlement.  I think it's unfair.  I don't think it's

13   anywhere near the 200 plus million dollars that the parties here

14   represented, and for those reasons I'd ask that Your Honor not

15   approve the settlement.

16        THE COURT:  Thank you.  Is there a way to sever the

17   attorneys fees from the settlement and delay on the attorneys

18   fees?

19        MR. MOSKOWITZ:  There is, if Your Honor chooses.  If

20   Your Honor says --

21        THE COURT:  But if I said that, does that impact --

22   remember my role is limited.  Right?  I can't modify the

23   complicated settlement.  Right?  So if I said how about if we do

24   this, what does that do to the settlement.  From the Defendant's

25   perspective, it doesn't have any impact, right?  They don't

1    care.

2            MR. ENGLANDER:  That's correct, Your Honor.  I think

3    you could enter a Rule 54 B final judgment as to the settlement

4    part, and hold the fees.

5            THE COURT:  Okay.  So you're fine with that.  Objector

6    is fine with that, and the Plaintiffs' attorneys, of course, are

7    probably not fine with that.  But if it's done soon thereafter

8    depending on what occurs, there's no real harm.

9            MR. MOSKOWITZ:  It's absolutely within your discretion,

10   Your Honor, to do that.  We would respectfully ask that you not

11   do that.

12           THE COURT:  Whenever a lawyer says "respectfully", we

13   really don't like where you're going.  We really don't like it.

14   It means a lot.

15           MR. MOSKOWITZ:  Your Honor, we've heard from over a

16   million 200 class members.  Mr. Fearon represents two.  Two

17   individuals.  No classes.  And nobody else has raised the

18   concerns that Mr. Fearon, who is seeking fees in four other

19   cases against us and who is objecting in Nation Star and Citi

20   and all these other cases, that's why he's here.  He wants fees.

21   So we would definitely --

22           THE COURT:  I would infer a little bit of that because

23   there's nothing wrong with dual motivation though, is there?

24           MR. MOSKOWITZ:  If I can finish, that's the sole

25   motivation.

1          MR. FEARON:  No, it's not.

2          MR. MOSKOWITZ:  And after four cases, it's the same

3    objections in each case.  Mr. Fearon has a case, Live Nation

4    which is total claims made -- you can ask him.  His firm, this

5    year.  It's in federal court.  It's against Live Nation.  It's a

6    total claims-made settlement, they're not doing direct payments,

7    they know who those people are, they're going to wait four years

8    to get the claims, and his firm is getting over a million

9    dollars in fees.  So his firm does these claims-made settlements

10   all the time.  This is about fees.  This is four cases he's

11   going to lose and he's coming to us and I can't disclose

12   mediation discussions with each other, but hopefully we can

13   resolve our differences with him.  But there's no reason that we

14   should wait a year on work that we've done for three years which

15   is seven percent of the fund because it won't matter. Say the

16   take rate is ten percent.  What would that matter?  And you're

17   going to preclude 1.2 million people in this country from

18   getting checks because Mr. Fearon is --

19         THE COURT:  That's if I stay.  But if I approve it, it

20   won't prevent them from getting checks.

21         MR. MOSKOWITZ:  If you approve both, the final fairness

22   and the fees.

23         THE COURT:  But why does the fees have an impact on

24   people receiving money?  Except you?

25         MR. MOSKOWITZ:  You're right. 100 percent you're right,

 1    Your Honor.  I'm sorry.  I just -- we would respectfully ask --

 2            THE COURT:  Is it a question about fees?  Come on,

 3    folks.  Unless one has been appointed and gets a case within one

 4    day of confirmation, of course fees have a lot to do with it.

 5    And it's nothing wrong with that, it's what drives the machine.

 6    Sometimes it's not right, most of the time it is right because

 7    it accomplishes something, and I mentioned it before.  I have

 8    nothing -- I see nothing wrong with that and you see nothing

 9    wrong with that because you make a living doing that and you all

10    should be proud of it in the right case for the right amount of

11    time.

12            Now, if a judge thinks the fees are too much, the issue

13    also is if it's a case that I've actually tried, I actually go

14    and deduct and strike things.  If it's a case that has been

15    settled, you know, there's so many things I don't know that we

16    use the percentage.  And the percentages within the perimeters,

17    it's at the low end of the perimeters.  Isn't that enough?  If

18    you were in the case it would be enough, wouldn't it?

19            MR. FEARON:  Your Honor, I think -- you know, I don't

20    want to respond to --

21            THE COURT:  Well, things get personal when it comes to

22    money.  I understand.

23            MR. FEARON:  It does.  It gets personal.  He gets

24    heated.  I try to avoid the personal attacks.  I don't, for a

25    living, object to cases.

1          THE COURT:  No, I didn't mean you objected for a
2     living.  I meant that you are -- you represent people for a
3     living.
4          MR. FEARON:  Right.  And my cases were pending
5     throughout the country in this case and other cases when we got
6     news of this proposed settlement.  So what do I do?
7          THE COURT:  One thing I don't know, of course, in many
8     of these cases in 24 years here, is what happens behind closed
9     doors?  I would love to know or maybe I don't want to know.  I
10    mean, that's why I'm on a need to know basis because what
11    happens, it's like sausage.  Put mustard, eat it, don't find out
12    how it's made.
13         But things like that should be -- I mean, I've never
14    wanted to be a judge who says work it out.  No.  If we could
15    work it out, we wouldn't be here.  But they've worked it out.
16    So in a way, it's a question of if you have an issue here, I
17    cannot believe that you cannot resolve it.  But I don't know.  I
18    don't know why and I think I probably shouldn't know.
19         MR. FEARON:  I think the best way for me to respond is
20    I understand the sausage analogy, and you probably don't want to
21    know how that sausage is made.
22         THE COURT:  I worked in a Greek restaurant in Atlantic
23    City and I know how it was made.  It was before gambling so I
24    can tell you.  It's still not my ideal place.
25         MR. FEARON:  Your Honor, we've made our objections.

1    The objections are what they are, and I'm willing to talk to

2    Defendant's counsel and Plaintiffs' counsel at their

3    availability, whenever they are, and see if we can resolve it.

4              THE COURT:  All right.

5              MR. FEARON:  And I appreciate the time today.

6              THE COURT:  No problem.  That's what I get paid for.

7              MR. FEARON:  Thank you, Your Honor.

8              MR. PRIETO:  Just one point, Your Honor on separating

9    the fees.  What we're going to do is create two appeals instead

10   of one appeal because he is going to appeal.

11             THE COURT:  You know, now it's almost a full court.

12   There are 11 out of 12 judges.  They can handle that.  Plus they

13   invite us.  I'm going to go up there in Atlanta in December.

14             MR. PRIETO:  All I'll say is it would create two

15   appeals versus one appeal.

16             THE COURT:  Because you don't think you can settle the

17   issue?

18             MR. PRIETO:  We would be able to settle that issue --

19             THE COURT:  Irrespective.

20             MR. PRIETO:  -- irrespective of --

21             THE COURT:  See, that's what I don't understand.  But

22   not having been there, I don't understand how those things

23   happen after the fact.

24             MR. PRIETO:  And I'll say this.  I'll say this.  It is

25   probably quicker and easier to settle it with one appeal than

1   with two appeals.  Because if you separate the two, and it's

2   going to be we're going to negotiate on that appeal and then

3   we're going to negotiate on fees.  So if you do both at the same

4   time, we can sit at the table at the same time and get both

5   issues resolved, the merits and the fees.

6            THE COURT:  Okay.  Now, if there's an issue, and I

7   mentioned this before, if there's an issue on attorneys fees,

8   does it come back to me?  Not up on appeal, but let's say

9   someone is persistent.  It's going to come back to me.

10            MR. PRIETO:  Yeah, but it really does.  90 percent --

11            THE COURT:  I'm always so lucky though.  It may come

12   back.

13            MR. PRIETO:  90 percent of the cases, the allocation is

14   private, it's done by counsel and if there's a dispute, then

15   they come to Your Honor.

16            THE COURT:  So I have a 10 percent chance of seeing you

17   all again on this if I approve it, huh?  Okay.  That's kind of

18   higher than the seven percent.  All right.

19            MR. ENGLANDER:  Your Honor, if I might, maybe you know

20   this but --

21            THE COURT:  It's not going to be any food left

22   upstairs.

23            MR. ENGLANDER:  This is just --

24            THE COURT:  That's what I'm thinking.

25            MR. ENGLANDER:  Just to answer a question really

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    quickly, the way they get resolved on appeal is plainly that you

2    can negotiate a settlement at any time.

3              THE COURT:  I know.  I know.  I've seen a lot of them.

4    The mediator is so busy, even after trial they settle cases

5    which upsets me because I kind of want to know -- even at the

6    eve of oral argument they have settled cases.  And I kind of

7    wanted to know what they had to say about it.  But all right.

8              Anything else?  Thank you for waiting patiently.  Have

9    a good Wednesday.

10             (PROCEEDINGS CONCLUDED)
                      *  *  *  *  *

11                       C E R T I F I C A T E

12   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

13

14   _____        /s/ Dawn M. Whitmarsh
     Date                    DAWN M. WHITMARSH, RPR

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**